℧ JS 44  (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a)  PLAINTIFFS

Kaiser Foundation Health Plan Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc. (continued on attachment)

## DEFENDANTS

MedQuist Inc. and MedQuist Transcriptions, Ltd.

**(b)**  County of Residence of First Listed Plaintiff  Alameda
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

See Attachment

Attorneys (If Known)

See Attachment

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question (U.S. Government Not a Party)
- [X] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | PERSONAL INJURY | PERSONAL INJURY | | | |
| [ ] 110 Insurance | [ ] 310 Airplane | [ ] 362 Personal Injury— Med. Malpractice | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury — Product Liability | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | | | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 810 Selective Service |
| [X] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 892 Economic Stabilization Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | **Habeas Corpus:** | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 894 Energy Allocation Act |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | | [ ] 895 Freedom of Information Act |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities— Employment | [ ] 540 Mandamus & Other | **IMMIGRATION** | | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities— Other | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus — Alien Detainee | | |
| | | | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [ ] 1  Original Proceeding
- [X] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from another district (specify)
- [ ] 6  Multidistrict Litigation
- [ ] 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. section 1332, 28 U.S.C. section 1441

Brief description of cause
Plaintiff alleges breach of contract and fraud.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 7,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

[X] SAN FRANCISCO/OAKLAND     [ ] SAN JOSE

DATE
July 2, 2008

SIGNATURE OF ATTORNEY OF RECORD
Neal Marder / KBG

## ATTACHMENT TO
## CIVIL COVER SHEET

### I. (a) PLAINTIFFS

(continued from form) Southern California Permanente Medical Group, Kaiser Foundation
Health Plan of the Mid-Atlantic States, Inc, and Kaiser Foundation Health Plan of Colorado

### I. (c) ATTORNEYS

### FOR PLAINTIFFS

Mark L. Hogge
Eve Triffo
Ronald W. Kleinman
C. Allen Foster
**Greenberg Traurig LLP**
2101 L Street, N.W. Suite 1000
Washington, DC 20036
Phone: (202) 331-3100
Fax: (202) 331-3101

David Perez
**Greenberg Traurig LLP**
1900 University Avenue, 5th Floor
East Palo Alto, CA 94303
Phone: (650) 328-8500
Fax: (650) 328-8508

### FOR DEFENDANTS

Neal R. Marder
Stephen R. Smerek
Kyle R. Gehrmann
Christian Dodd
**Winston & Strawn LLP**
333 South Grand Ave. 38th Floor
Los Angeles, CA 90071
Phone: (213) 615-1700
Fax: (213) 615-1750

COPY

VIA FAX

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1  Neal R. Marder (SBN: 126879)
   nmarder@winston.com
2  Kyle R. Gehrmann (SBN: 212032)
   kgehrmann@winston.com
3  WINSTON & STRAWN LLP
   333 South Grand Avenue
4  Los Angeles, CA 90071-1543
   Telephone:    213-615-1700
5  Facsimile:    213-615-1750        E-filing

6  Attorneys for Defendants
   MEDQUIST INC. and
7  MEDQUIST TRANSCRIPTIONS, LTD.

**ORIGINAL
FILED**

JUL - 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                 OAKLAND DIVISION

11

12                                    C08-03245  JCS

13  KAISER FOUNDATION HEALTH PLAN,    )  CASE NO.
    INC., KAISER FOUNDATION HOSPITALS, )
    THE PERMANENTE MEDICAL GROUP,     )  **DEFENDANTS' NOTICE OF REMOVAL
14  INC., SOUTHERN CALIFORNIA          )  OF ACTION UNDER 28 U.S.C. § 1441(b)
    PERMANENTE MEDICAL GROUP, KAISER  )  (DIVERSITY)**
15  FOUNDATION HEALTH PLAN OF THE      )
    MID-ATLANTIC STATES, INC., and    )
16  KAISER FOUNDATION HEALTH PLAN OF  )
    COLORADO                          )
17                                    )
                                      )
18            Plaintiffs,             )
                                      )
19        v.                          )
                                      )
20  MEDQUIST INC. and MEDQUIST        )
    TRANSCRIPTIONS, LTD.              )
21                                    )
              Defendants.            )
22                                    )

23  TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT AND

24  COUNSEL OF RECORD FOR ALL PARTIES:

25          PLEASE TAKE NOTICE that defendants MedQuist Inc. and MedQuist

26  Transcriptions, Ltd (collectively, "Defendants") hereby remove this action from the California

27  Superior Court for the County of Alameda to the United States District Court for the Northern

28  District of California, Oakland Division, pursuant to 28 U.S.C. §§1441(b) and 1446. The

                                       1

Defendants' removal of this matter is based on the grounds set forth below, and this Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

## I.

## PROCEDURAL HISTORY AND BACKGROUND

### A.    The State Court Action

1.    On or about June 6, 2008, an action was commenced in the Superior Court of the State of California in and for the County of Alameda by plaintiffs Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc., Southern California Permanente Medical Group, Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., and Kaiser Foundation Health Plan of Colorado (collectively, "Plaintiffs"), entitled <u>Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc., Southern California Permanente Medical Group, Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., and Kaiser Foundation Health Plan of Colorado, Plaintiffs vs. MedQuist, Inc. and MedQuist Transcriptions, Ltd., Defendants</u>, as Case Number. 08391487 (the "Kaiser Litigation). A true and correct copy of the Complaint is attached as Exhibit A.

2.    Plaintiffs' Complaint purports to raise claims for common law fraud, violation of California Business & Professions Code, Section 17200 et seq., breach of contract, demand for accounting, and unjust enrichment. <u>See</u> Complaint ¶¶ 26-48. Its allegations primarily relate to Defendants' billing practices for medical transcription services provided to Plaintiffs. <u>See</u> Complaint ¶¶ 11-12. Plaintiffs are seeking, *inter alia*, damages for their alleged losses as a result of purportedly fraudulent billing practices.

### B.    The Parties

3.    Plaintiff Kaiser Foundation Health Plan, Inc. is a California corporation created under the laws of California and thus a California citizen both now and at the time the Complaint was filed. <u>See</u> Complaint ¶ 1. This corporation is and was also a citizen of California because its primary place of business is located in California. <u>Id.</u>

4.    Plaintiff Kaiser Foundation Hospitals is a California corporation created under the laws of California and thus a California citizen both now and at the time the complaint was filed.

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1 | <u>See</u> Complaint ¶ 2. This corporation is and was also a citizen of California because its primary place

2 | of business is located in California. <u>Id.</u>

3 |     5.    Plaintiff The Permanente Medical Group, Inc. is a California corporation

4 | created under the laws of California and thus a California citizen both now and at the time the

5 | complaint was filed. <u>See</u> Complaint ¶ 3. This corporation is and was also a citizen of California

6 | because its primary place of business is located in California. <u>Id.</u>

7 |     6.    Plaintiff Southern California Permanente Medical Group is a California

8 | partnership created under the laws of California and thus a California citizen both now and at the

9 | time the complaint was filed. <u>See</u> Complaint ¶ 4. This partnership is and was also a citizen of

10 | California because its primary place of business is located in California. <u>Id.</u>

11 |     7.    Plaintiff Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. is a

12 | Maryland corporation created under the laws of Maryland and thus a Maryland citizen both now and

13 | at the time the Complaint was filed. <u>See</u> Complaint ¶ 5. This corporation is and was also a citizen of

14 | Maryland because its primary place of business is located in Maryland. <u>Id.</u>

15 |     8.    Plaintiff Kaiser Foundation Health Plan of Colorado is a Colorado corporation

16 | created under the laws of Colorado and thus a Colorado citizen both now and at the time the

17 | Complaint was filed. <u>See</u> Complaint ¶ 6. This corporation is and was also a citizen of California

18 | because its primary place of business is located in California. <u>Id.</u>

19 |     9.    Defendants MedQuist, Inc. and MedQuist Transcriptions, Ltd., both presently

20 | and at the time of the filing of the Complaint, have been and are citizens of New Jersey. Defendants

21 | are both corporations created under the laws of New Jersey. <u>See</u> Complaint ¶¶ 8-9. Defendants are

22 | also citizens of New Jersey because their primary places of business are located in New Jersey.

23 | Defendants are not citizens of California.

24 |     10.    Thus, Plaintiffs, at all times relevant herein, have been citizens of California,

25 | Maryland, and Colorado. Defendants, at all times relevant herein, have been citizens of New Jersey.

26 | Hence, complete diversity of citizenship exists in accordance with 28 U.S.C. § 1332(a).

27 | **C.**    **Amount in Controversy**

28 |     11.    Plaintiffs' Complaint alleges in its third cause of action that it has suffered an

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

amount it believes to exceed seven million dollars ($7,000,000). See Complaint ¶ 40. Accordingly, Plaintiffs' Complaint alleges an amount in controversy, exclusive of interest and costs, in excess of $75,000 and, therefore, exceeds the jurisdictional amount of $75,000 required under 28 U.S.C. § 1332(a).

## II.

## BASIS FOR JURISDICTION

12.    This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332. The action is one which may be removed to this Court pursuant to the provisions of 28 U.S.C. § 1441(a), in that it is a civil action between citizens of different states, and the amount in controversy exceeds the sum of seven million dollars ($7,000,000), exclusive of interest and costs.

13.    Removal to this judicial district is proper under 28 U.S.C. § 1441(a) because the Litigation currently is pending in the county embracing this division, although Defendants reserve the right to contest venue and/or jurisdiction at a later time.

14.    Removal to this judicial division is proper under 28 U.S.C. § 1441(a) because the Kaiser Litigation currently is pending in the county embracing this division, although Defendants reserve the right to contest venue and/or jurisdiction at a later time.

15.    Defendants acknowledged acceptance of service a copy of the Complaint and a summons from the said state court on July 1, 2008. A true and correct copy of the executed notice of acknowledgment and receipt is attached hereto as Exhibit B. This Notice is therefore timely filed with this Court within 30 days after such service, in accordance with 28 U.S.C. § 1446.

16.    Each of the defendants consent to and join in this removal.

17.    As required by 26 U.S.C. § 1446(d), Defendants will provide written notice of the filing of this Notice of Removal to Plaintiffs' attorneys of record, and will promptly file a copy of this Notice of Removal with the Clerk of the Superior Court of the State of California in and for the County of Alameda.

## III.

## STATE COURT PROCESS, PLEADINGS, AND ORDERS

18.    Pursuant to 28 U.S.C. § 1446(a), Defendants attach hereto as Exhibit C true

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

1   and correct copies of the Summons, the state court Civil Case Cover Sheet, Notice of Related Case,

2   Notice of Judicial Assignment for All Purposes, Alternate Dispute Resolution Information Package,

3   Notice of Case Management Conference and Order, and Notice of Acknowledgment of Receipt.

4   Attached as Exhibit D are true and correct copies of papers relating to plaintiffs' counsels' *pro hac*

5   *vice* applications. These are the only pleadings, process, or orders in the State Court's file that have

6   been served on Defendants up to the date of filing this Notice of Removal.

7

8                                                   Respectfully submitted,

9   Dated: July 3, 2008                             WINSTON & STRAWN LLP

10

11

12                                                  _____
                                                    Neal R. Marder
13                                                  Kyle R. Gehrmann
                                                    Attorneys for Defendants
14                                                  MEDQUIST INC. and
                                                    MEDQUIST TRANSCRIPTIONS, LTD.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

DEFENDANTS' NOTICE OF REMOVAL

# EXHIBIT A

1  MARK L. HOGGE (To Be Admitted *Pro Hac Vice*)
   EVE TRIFFO *(SBN 061819)*
2  RONALD W. KLEINMAN (To Be Admitted *Pro Hac Vice*)
3  C. ALLEN FOSTER (To Be Admitted *Pro Hac Vice*)
4  GREENBERG TRAURIG, LLP
   2101 L Street, N.W., Ste. 1000
5  Washington, DC 20036
   Telephone: (202) 331-3100
6  Facsimile: (202) 331-3101

7  DAVID PEREZ  *(SBN 238136)*
   GREENBERG TRAURIG, LLP
8  1900 University Avenue, 5th Floor
   East Palo Alto, CA 94303
9  Telephone: (650) 328-8500
   Facsimile: (650) 328-8508
10

11  Attorneys for Plaintiffs

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                    FOR THE COUNTY OF ALAMEDA

15  KAISER FOUNDATION HEALTH PLAN,        Case No.
    INC., KAISER FOUNDATION
16  HOSPITALS, THE PERMANENTE            **COMPLAINT FOR**
    MEDICAL GROUP, INC., SOUTHERN
17  CALIFORNIA PERMANENTE MEDICAL        1. **COMMON LAW FRAUD**
    GROUP, KAISER FOUNDATION            2. **VIOLATION OF BPC 17200**
18  HEALTH PLAN OF THE MID-ATLANTIC     3. **BREACH OF CONTRACT**
    STATES, INC., and KAISER           4. **DEMAND FOR ACCOUNTING**
19  FOUNDATION HEALTH PLAN OF           5. **UNJUST ENRICHMENT**
    COLORADO
20                                      **DEMAND FOR JURY TRIAL**
21                Plaintiffs,
22  v.
23  MEDQUIST, INC. AND MEDQUIST
24  TRANSCRIPTIONS, LTD.
25
                  Defendants.
26
27
28                                    1
                              COMPLAINT

ENDORSED
FILED
ALAMEDA COUNTY

JUN - 6 2008

CLERK OF THE SUPERIOR COURT
By    S. Halcrombe
                        Deputy

1    Plaintiffs allege as follows:

2                                    **PLAINTIFFS**

3        1.    Plaintiff Kaiser Foundation Health Plan, Inc. is a California nonprofit corporation

4    organized and existing under the laws of the State of California, with its principal place of business

5    located at One Kaiser Plaza, 19th Floor, Oakland, California 94612.  It shares contracts with Kaiser

6    Foundation Hospitals.

7        2.    Plaintiff Kaiser Foundation Hospitals is a California nonprofit corporation organized

8    and existing under the laws of the State of California, with its principal place of business located at

9    One Kaiser Plaza, 19th Floor, Oakland, California 94612.  Its contracts are attached hereto as

10   Exhibits A-R.

11       3.    Plaintiff The Permanente Medical Group, Inc. is a California corporation organized

12   and existing under the laws of the State of California, with its principal place of business located at

13   1950 Franklin Street, Oakland, CA 94612.  Its contracts are attached hereto as Exhibits S and T.

14       4.    Plaintiff Southern California Permanente Medical Group is a California partnership

15   organized and existing under the laws of the State of California, with its principal place of business

16   located at 393 E. Walnut Street, Pasadena, CA 91188.  Its contracts are attached hereto as Exhibits U

17   and V.

18       5.    Plaintiff Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. is a Maryland

19   nonprofit corporation organized and existing under the laws of the State of Maryland, with its

20   principal place of business located at 2101 East Jefferson Street, Rockville, Maryland 20852.  Its

21   contract is attached hereto as Exhibit W.

22       6.    Plaintiff Kaiser Foundation Health Plan of Colorado is a Colorado nonprofit

23   corporation organized and existing under the laws of the State of Colorado, with its principal place of

24   business located at One Kaiser Plaza, 19th Floor, Oakland, CA 94612.  Its contract is attached hereto

25   as Exhibit X.

26       7.    All of the Plaintiffs are collectively referred to herein as "Kaiser."

27

28

**DEFENDANTS**

8.      Defendant MedQuist, Inc., is a corporation, formed under the laws of New Jersey, with offices located at 1000 Bishops Gate Boulevard, Suite 300, Mount Laurel, New Jersey 08054. Defendant MedQuist, Inc. is a publicly traded company. Defendant MedQuist, Inc. determined the policies and practices of its subsidiaries with respect to billing and overbilling their customers.

9.      Defendant MedQuist Transcriptions, Ltd., is a wholly owned subsidiary of MedQuist, Inc., formed under the laws of New Jersey, with offices located at 41555 Cook Street, Suite 140, Palm Desert, California 92211; 6060 Sunrise Vista Drive, Suite 3450, Citrus Heights, California 95610; 1510 Old Oakland Road, Suite 130, San Jose, California 95112; and 111 Anza Boulevard, Suite 300, Burlingame, California 94010.

10.     Both Defendants are collectively referred to herein as "MedQuist."

**FACTS COMMON TO ALL COUNTS**

11.     MedQuist provides, among other services, medical transcription services to hospitals and other healthcare facilities in the United States and in other countries. According to its own literature, MedQuist contends: "By adhering to the same standards of quality, service and value for over 30 years, MedQuist has established itself as the largest medical transcription company and pre-eminent provider of health information solutions in the United States, offering a level of talent, service and technological expertise unparalleled in the industry."

12.     MedQuist has provided transcription services to Kaiser during the relevant time period commencing in or before 1998 and continuing to the present.

13.     The MedQuist transcription process involves several steps. Doctors at Kaiser's hospitals and other health care facilities dictate their reports free form into a voice recorder that connects with MedQuist via telephone connections. That dictation is forwarded to a transcriptionist retained by MedQuist. The transcriptionist calls up a template for the particular type of report being prepared (*e.g.*, discharge summary) and types the formal report. The report is then "uploaded" directly into the MedQuist computer system (with regard to client billing and employee payroll) and onto its corporate computer server.

14.    MedQuist's billing system utilizes a computer program ("Program") to "count" characters in each line of the report.  The Program, used exclusively for billing purposes, creates an invoice which is mailed to Kaiser.

15.    The contracts entered into between Kaiser facilities and MedQuist contained specific terms addressing the manner in which Kaiser was to be billed for transcription services rendered. MedQuist's charges were represented as being calculated on a basis of cost per line within each transcript and certain other variables including turnaround time for the transcripts.

16.    The charges also varied based upon the type of report produced.  For example, the contractual cost per line of an operative report differed from the cost per line of a discharge summary. The definition of a "line" for purposes of determining cost was usually specifically set forth in a contract as an "AAMT line."   AAMT stands for the American Association of Medical Transcriptionists.

17.    MedQuist defined an AAMT line as any line having 65 'characters.'  A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any characters contained within the macro, header, or footer.  A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines.

18.    MedQuist has admitted that with respect to its contracts that called for billing based on the "AAMT line," the company used ratios and formulas to determine the number of "AAMT" transcription lines for which clients were billed rather than counting the number of relevant characters to determine a billable line as provided for in the contracts.  With respect to Kaiser's contracts, MedQuist's use of ratios and formulas as a surrogate for counting was not disclosed to Kaiser.

19.    MedQuist has further admitted that the ratios and formulas for certain client accounts were changed by MedQuist, generally without disclosure to clients, in order to increase the amount actually billed to a client in order to increase profit margins.

20.    Under the terms of the contracts entered into between MedQuist and Kaiser, Kaiser was to be billed by the number of lines in each transcribed report.  Instead of billing Kaiser for the actual number of lines transcribed, MedQuist repeatedly and systematically used bogus line counts. MedQuist never did actual AAMT counting of Kaiser's reports.

21.    MedQuist, by way of its officers (who need not be named herein) were aware that this method of artificially inflating the line count increased MedQuist's profits.  MedQuist's invoices were not transparent but were calculated to conceal the inflated billing.  MedQuist intended that Plaintiffs would be unable to discern the inflated nature of MedQuist's bills because the manner of invoicing did not delineate the specific work performed but contained only gross amounts. MedQuist, through its officers, was complicit in the inflated billing scheme.

22.    Defendants uniformly employed a system to prevent Kaiser from discovering the inflated billing practices utilized.  MedQuist invoiced Kaiser twice a month without any breakdown for the costs charged.  During the relevant period, MedQuist refused to release information to Kaiser about the manner in which its invoices were calculated.  The only way for a hospital to find out if it had been overcharged was for it to count the total number of lines in all the reports prepared by MedQuist for the corresponding time frame on the invoice and compare that to the total invoice price. No Kaiser facility had a system which was capable of recalling all of the reports prepared by its participating physicians during a particular time frame.  Accordingly, Kaiser lacked the necessary system and information to audit the MedQuist reports or any method to authenticate the validity of the amounts charged.

23.    Pursuant to the fraud described herein, when contracting with Kaiser, representatives of MedQuist made material omissions concerning MedQuist's obligation to count and bill for the lines transcribed, and MedQuist's intention in the arbitration clause.  Had those associated with MedQuist been honest and forthright with Kaiser, Kaiser would never have agreed to contract,  For example, MedQuist had a duty to warn Kaiser that it would be "upcharged".  Kaiser reasonably and justifiably relied upon MedQuist's false representations in negotiating the contracts and in paying fraudulent invoices to its detriment.

1  24.  Kaiser has suffered substantial damages through MedQuist's fraudulent conduct,
2  spanning more than seven years.

3  25.  The specific internal corporate mechanisms and operations by which MedQuist carried
4  out the fraud described herein, and the specific activities engaged in by specific personnel in
5  furtherance of the fraud, are within the exclusive knowledge and understanding of those within
6  MedQuist.  To date, given the far-reaching, complex, and clandestine nature of MedQuist, Kaiser has
7  only been able to gather limited information regarding some aspects of the fraud. MedQuist has
8  undertaken many mechanisms by which it has kept specific knowledge and control over the fraud
9  alleged herein from public scrutiny.  Specifically, MedQuist has maintained its control over the
10  secrecy of the fraud through confidentiality and non-disclosure agreements with employees,
11  unjustified and unreasonable false assertions of trade secret protections, and in at least one instance
12  extensive retaliatory litigation against a witness that caused the witness to refuse further disclosure.

13  ## FIRST CAUSE OF ACTION

14  ### (Common Law Fraud)

15  26.  Kaiser realleges and incorporates herein by reference each of the allegations contained
16  in the preceding paragraphs of this Complaint as if more fully set forth herein.

17  27.  MedQuist carried out its fraud against Kaiser by, inter alia, either simply turning off
18  the counting and multiplying a payroll line count by a multiplier to obtain a fraudulent line count to
19  insert on invoices, or by inserting hard returns or bogus characters into reports to obtain a
20  fraudulently inflated line count to insert on invoices.  MedQuist then explicitly or implicitly
21  communicated, falsely, to its clients including Kaiser that MedQuist had properly counted the lines in
22  accordance with the contractual provisions.

23  28.  MedQuist knowingly and intentionally committed these fraudulent acts for the
24  purpose of inducing Kaiser to pay more money than that to which MedQuist was entitled under the
25  MedQuist-Kaiser contracts and to engorge itself with improper profits at the expense of Kaiser.

26  29.  Kaiser was unaware of MedQuist's scheme to artificially inflate invoices for
27  transcription services.  Indeed, MedQuist took affirmative steps to assure that the fraudulent nature of

28

1  the artificially inflated invoices was not apparent on the face of the invoices themselves, and

2  MedQuist acted to disguise the fraudulent nature of its bills to Kaiser as stated supra.

3      30.    Kaiser justifiably relied on the accuracy of MedQuist's false representations on the

4  face of the invoices for transcription services and had no way of detecting MedQuist's fraud.

5      31.    Kaiser unwittingly paid the artificially inflated invoices submitted by MedQuist to its

6  detriment, thereby engorging MedQuist with improper profits at the expense of Kaiser.

7      32.    Kaiser was damaged by MedQuist's fraudulent billing practices in an amount to be

8  proven at trial.

9      33.    The conduct of MedQuist was fraudulent, outrageous, willful, wanton, and malicious,

10  warranting an award of punitive damages.

11                    **SECOND CAUSE OF ACTION**

12       **(Violation Of California Business & Professions Code, Section 17200 et seq.)**

13      34.    Kaiser realleges and incorporates herein by reference each of the allegations contained

14  in the preceding paragraphs of this Complaint as if more fully set forth herein.

15      35.    The unlawful, unfair or fraudulent business acts or practices of MedQuist are

16  described in detail above and contravene the prohibitions of California Business & Professionals

17  Code, Section 17200.

18      36.    The unlawful, unfair or fraudulent business acts or practices of MedQuist include,

19  inter alia: (1) negotiating and inducing Kaiser to enter into contracts for counting lines of medical

20  transcription and invoicing Kaiser on an agreed upon price per AAMT line while knowing full well

21  that the AAMT counting was not going to occur, although representing to Kaiser that it would; (2)

22  adding bogus numbers of lines on MedQuist's invoices to Kaiser in order to obtain more money per

23  invoice than that to which MedQuist was contractually entitled; and (3) promising to produce backup

24  counting data to resolve billing disputes, while knowing full well there would never be such backup

25  data because it did not exist or if it did, because it would not support MedQuist's inflated billing of

26  Kaiser.

27      37.    In accordance with Section 17200, Kaiser is thus entitled to relief including restitution,

28  injunctive relief and orders of disgorgement.

### THIRD CAUSE OF ACTION

### (Breach Of Contract)

38.    Kaiser realleges and incorporates herein by reference each of the allegations contained in the paragraphs 1 through 22 of this Complaint as though more fully set forth herein.

39.    MedQuist has breached its contracts with Kaiser calling for AAMT counting and billing based upon that AAMT counting. MedQuist has breached those contracts by: (1) not performing the agreed upon line counting as contractually required; (2) not preserving back-up data justifying its line counts for invoice disputes as contractually required; (3) by submitting invoices with inflated line count data and therefore false dollar amounts owed MedQuist by Kaiser; and (4) by insisting that Kaiser pay those inflated invoices.

40.    By reason of MedQuist's breaches of contract, Kaiser has suffered consequential damages due and owing in amounts to be determined at trial but believed to exceed $7 million.

### FOURTH CAUSE OF ACTION

### (Demand For Accounting)

41.    Kaiser realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if more fully set forth herein.

42.    MedQuist knew or should have known of the existence of corporate records that indicate the amounts unlawfully obtained, pursuant to the fraud, from Kaiser. Kaiser has demanded that MedQuist reveal its complete corporate records regarding same and that a just and fair accounting be made for profits derived from the upcharging.

43.    MedQuist has failed to provide said records and have failed to comply with Kaiser's demand.

### FIFTH CAUSE OF ACTION

### (Unjust Enrichment)

44.    Kaiser realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if more fully set forth herein.

45.    Pursuant to the fraud, MedQuist was improperly and unjustly enriched by payments received from Kaiser based on wrongful and fraudulent invoices for transcription services rendered as set forth herein.

46.    MedQuist has failed to account for and return to Kaiser the value of the benefits MedQuist derived therefrom and MedQuist has concealed the nature and scope of its participation in the upcharging.

47.    As a result of MedQuist's wrongful acts and omissions as described above, MedQuist has been unjustly enriched at the expense of Kaiser.

48.    Kaiser therefore demands restitution and judgment against MedQuist in an amount to be determined at trial, together with interest, exemplary or punitive damages, attorneys' fees and the costs of this action.

Wherefore, Kaiser prays for relief as set forth below.

## DEMAND FOR JURY TRIAL

Kaiser demands a trial by jury of all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Kaiser prays for judgment against MedQuist as follows:

1.  For damages according to proof at trial;

2.  For pre-judgment interest at the legal rate;

3.  For costs of suit, including attorneys' fees; and

4.  For such other and further relief as this Court deems just and proper.

Dated: June 6, 2008

GREENBERG TRAURIG, LLP

By: _____
     David Perez

Attorneys for Plaintiffs

WDC 371,630,754v4

# EXHIBIT A

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of _Maye 20_ _____, 1999, by and between KAISER FOUNDATION HOSPITAL, LOS ANGELES MEDICAL CENTER, a California corporation, ("Client"), and MEDQUIST TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

### BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

### ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

Paragraph 1.1     Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

Paragraph 1.2     Dictation Equipment: For the purpose of providing the services, Vendor shall maintain at Vendor's offices, at no cost to Client, a direct dial digital dictation system (the "Dictation System").

Paragraph 1.3     Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Vendor shall supply to Client one personal computer system with Vendor's proprietary software installed, a monitor and a modem for purposes of receiving electronically transmitted reports at Client location and one laser printer (the "Client System") at a cost of $300 per month per Client System; provided, however, Vendor shall waive such charge for each month in which the monthly charge to Client for services rendered hereunder exceeds $3,000 per Client System (so long as Client pays each invoice within thirty (30) days). Client shall, at its own cost and expense, supply additional laser printers as needed configured to operate with the Client System and all paper products and printer supplies necessary for printing reports or Vendor will supply additional laser printers to Client for a one time charge of $1,300 plus applicable taxes, delivery costs and set-up charges, if any.

-1-



**EXHIBIT**

*A*

Paragraph 1.4      Delivery of Dictation to Vendor: Client physicians may dictate into the Dictation System at any time, twenty-four hours per day, seven days per week.

Paragraph 1.5      Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transmitted electronically to the Client.

Paragraph 1.6      Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

ARTICLE II

TERM AND TERMINATION

Paragraph 2.1      Term: The term of this Agreement shall be for three (3) years commencing on ___August___ __1__, 1999 and ending on ___July___ __31__, 2002. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

Paragraph 2.2      Termination for Default of Vendor: Either party may terminate this Agreement upon the happening of any of the following:

2.2.1      Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

2.2.2      Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

-2-

Paragraph 2.3    Notice of Default: If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, ten (10) working days' notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

## PAYMENTS AND CHARGES

Paragraph 3.1    Payment to Vendor: Client shall pay to Vendor a payment of $0.15 for each unit (as set forth below) transcribed for Client for the first year of the contract. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement.

The unit of pricing applicable to this Agreement is as designated below:

AAMT Line. An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines.

In addition, Client shall pay to Vendor a monthly payment as follows:

$1500.00    Vendor Interface to Client mainframe, set up and maintenance fee.

$300.00    MTS transcription system installation and maintenance for three workstations at Client site.

$300.00    Three transcription digital dictation system access ports for transcriptionists employed by Client.

$1500.00    MTS Fax Attendant at Client site, set up and maintenance

fee.

3.1.2   Additional Format Changes: Upon execution of this agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.3   Other Unanticipated Changes or Additional Services: In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

Paragraph 3.2      Billing: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

Paragraph 3.3      Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies.

Paragraph 3.4      Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

Paragraph 3.5      Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed

-4-

amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and to pay to Vendor any portion of such disputed amount which Client, in its sole discretion, has determined to be substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations the dispute shall be settled by arbitration, in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall be conducted in the county of Los Angeles, California. The decision reached through arbitration shall be final and binding on both parties. Vendor shall continue to provide services under the terms of this Agreement during the arbitration, at the fees then in effect. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

## CONFIDENTIAL INFORMATION

Paragraph 4.1    Confidential Information: Vendor agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence and with the understanding that it constitutes valuable business information developed by Client at great expenditure of time, effort and money. Vendor agrees that it shall not, without express prior written consent of Client, use the confidential information for any purpose other than the performance of this Agreement. Vendor further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client. Notwithstanding the foregoing, Vendor shall be entitled to disclose all the information contained in all dictated statements to any person or company without Client's consent, so long as all patient identifiable information has been deleted from and not included in such reports.

Paragraph 4.2    Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property

-5-

of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3  Remedies: The parties acknowledge and agree that since a remedy at law for any breach or attempted breach of the provisions of the Article IV shall be inadequate, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist by law. The non-breaching party also waives any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

## ARTICLE V

## MAINTENANCE OF EQUIPMENT

Paragraph 5.1  Maintenance of Equipment: Vendor shall maintain the Dictation System, the Transcription Equipment and the Client System. Client shall notify Vendor promptly of any problems with the Client System. In the event that any of the Client System is not in good working order or any equipment of Vendor is damaged as a result of Client's or its agents' negligence or intentional act, Client shall repair or replace said equipment promptly.

## ARTICLE VI

## MISCELLANEOUS

Paragraph 6.1  Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly or indirectly as a result of services provided in the Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 6.2  Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

Paragraph 6.3  Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the

subject matter hereof.

**Paragraph 6.4**     Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns. This agreement may not be assigned without prior written approval of both parties.

**Paragraph 6.5**     Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

**Paragraph 6.6**     Liability: Notwithstanding anything in this Agreement to the contrary (i) in no event shall the cumulative liability of Vendor, pursuant to this Agreement exceed the amount of fees paid by Client to Vendor during the twelve (12) month period immediately prior to the occurrence resulting in such liability, and (ii) in no event shall Vendor be responsible for consequential or incidental damages or for any lost profits, whether asserted by Client or against Client by any other individual or entity.

**Paragraph 6.7**     Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the party to whom it is to be given as follows:

If to Client:          Christine Hafeman, MBA, RRA
                       Director Hospital Medical Records
                       Kaiser Foundation Hospital
                       4733 Sunset Blvd.
                       Los Angeles, CA  90027
                       Fax #: _____

If to Vendor:          MedQuist Transcriptions, Ltd.
                       Five Greentree Centre, Suite 311
                       Marlton, New Jersey  08053
                       Fax #:  609-797-5949
                       **Attn:** Chief Operating Officer

With a copy to:        MedQuist Transcriptions, Ltd.
                       Five Greentree Centre, Suite 311
                       Marlton, New Jersey  08053
                       Fax #:  609-797-5949
                       **Attn:** General Counsel

-7-

Paragraph 6.8        Agency: Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other.

Paragraph 6.9        Exclusive Agreement: During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other transcription service to perform client's medical dictation/transcription work other than work that Vendor can not or will not perform.

Paragraph 6.10       Force Majeure: Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

Paragraph 6.11       Medicare Clause: The Vendor agrees to allow the Secretary of the Department of Health and Human Services and the Comptroller General, or their duly authorized representatives, access upon request to this Agreement and to the books, documents and records of the Vendor that are necessary to verify the nature and extent of costs of services furnished under this Agreement. The Vendor also agrees that if the Vendor carries out any duties of the Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, the subcontract must contain a clause to the effect that the related organization must make available, upon written request, to the Secretary, or upon request to the Comptroller General, or their duly authorized representatives, the subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs. Such access shall be until the expiration of four (4) years after the services are furnished under this Agreement.

Paragraph 6.12       Effective Date: If Client does not execute this Agreement within thirty (30) days after Vendor sends it to Client, then this Agreement shall be null and void, absent Vendor's express written consent to the contrary.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

MEDQUIST TRANSCRIPTIONS, LTD.

By: _____        By: _____ (5/25/99)

Name: Chris HAFEMAN

Title: Director Hosp. Med Records        John A. Donohoe, Jr.
Title: President and Chief Operating Officer

Revised as of 4/1/99

EXHIBIT A

Turnaround Times

| | |
|---|---|
| Transfer Summaries | 2 hours |
| History & Physical Examination | 24 hours |
| Inpatient Procedures/Diagnostics | 12 hours |
| Inpatient Consultations/Code Blue | 24 hours |
| Operative Reports | 24 hours |
| Correspondence | 48 hours |
| Discharge Summaries | 48 hours |
| Outpatient Procedures/Diagnostics | 48 hours |
| Outpatient Consultations | 48 hours |
| Interim Summaries (inpatient) | 24 hours |

05/11/2004 TUE 14:09 FAX 602 288 7820 MedQuist Western Office →→→ Legal                    🖂002/011

04/18/2002  13:31   3237891213          RADIOLOGY MGR OFFICE                    PAGE  01/01
                                                                                P.2
Apr 17 02 03:27p    Wes rn Group Office       602-212 '115



John Quaintance
1222 E. Missouri Ave. Ste 202
Phoenix, AZ 85014
602.212.0944
FAX 602.212.1115

4/17/02

Kaiser Foundation Hospital, Los Angeles Medical Center
Rick M. Kanamoto

DEAR Mr. Kanamoto:

Thank you for your inquiry regarding transcription services. As we discussed, please accept this letter as
acknowledgement of our mutual agreement for the facility listed below to participate under the terms and conditions
of the existing Transcription Services Agreement dated August 1, 1999 (the "Agreement") between Kaiser
Foundation Hospital, Los Angeles Medical Center and MedQuist Transcriptions, Ltd. ("MedQuist"):

| | |
|---|---|
| **Facility Name:** | Kaiser Foundation Hospital, Los Angeles Medical Center |
| **Department:** | Diagnostic Imagining (Radiology) |
| **Physical Address:** | 1505 N Edgemont |
| | Los Angeles, CA 90027 |
| **Billing Address (If different than above):** | |

As agreed, MedQuist will offer the same competitive pricing of $0.1654 as in, and subject to change in accordance
with, the Agreement.

Thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your
organization.

Sincerely,
MEDQUIST TRANSCRIPTIONS, LTD.

John Quaintance
Senior Vice President

                                                        4-18-02

AGREED & ACCEPTED:

Kaiser Foundation Hospital, Los Angeles Medical Center

By:
    Name: Rick M. Kanamoto              John J Mueller
    Title:                              Assistant Medical Group Admin
    Date:                               SCPMG
                                        4-18-02

*Revision Date 11/01*



John Quaintance
President, Transcription Division
1222 E. Missouri Ave, Ste 202
Phoenix, AZ 85014
602.212.0944
fax 602.212.1115

January 29, 2003

Tom Baxley, HIM Director
Kaiser LAMC – Department of Occupational Health Services
4733 Sunset Blvd., 1st. Floor
Los Angeles, Ca. 90027

Dear Tom:

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser LAMC – Department of Occupational Health Services ("Client") as a provider of transcription services. It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 180 days from the date of acceptance by Client. Following the initial term, this agreement shall be automatically renewed for additional 30-day periods. Either party may cancel this agreement with 30 days written notice. In the event Client enters into a three (3) year exclusive agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – MedQuist will furnish an 800 number for access to the dictation system provided by MedQuist.

- Document Transmission and Storage – For the purpose of transmitting reports via modem, MedQuist will provide a computer and will upload reports to that computer, which will be located at Client's offices. Client will provide and maintain, at its cost, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing.

- Measurement of Work and Price – The price will be $.16 per defined line plus any other charges set forth herein. A defined line is any line having 65 "characters". A character is defined as any letter, number, symbol, data or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer. A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to arrive at the number of defined lines. The price may be increased at any time upon thirty (30) days' notice to Client.

- Billing and Payment – An invoice will be generated each month, payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month, or the maximum allowable under applicable law, from the date of invoice. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- Privacy Law - To the extent required by the provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C., 1171 et seq. and regulations promulgated thereunder, MedQuist agrees to maintain the confidentiality of any Protected Health Information ("PHI") obtained from Client as a Business Associate pursuant to this Agreement. To the extent required by the provisions of HIPAA and the regulations promulgated thereunder, specifically, MedQuist agrees not to use or further disclose any PHI other than as permitted by this Agreement or as legally required to prevent such disclosure and to use appropriate safeguards to prevent use or disclosure other than as provided for by this Agreement. To the extent required by the provisions of HIPAA and the regulations promulgated thereunder, MedQuist agrees to report to Client any disclosure of which it becomes aware which was not provided for in this Agreement, to obligate its subcontractors contractually to abide by the provisions of this Agreement, to make PHI available where legally permitted, to make its records regarding the use and disclosure of PHI available to the U.S. Secretary of Health and Human Services, to incorporate any corrections requested by Client to PHI when notified in accordance with applicable law, to make available the information legally required to provide an accounting of disclosures and to return or destroy all PHI to Client at the termination of this Agreement. Client understands and agrees that MedQuist transmits unsigned, transcribed reports to Client. The parties understand that Client may, at its discretion, modify the finalized transcribed reports from time to time without MedQuist's knowledge. Client understands and agrees that MedQuist provides medical transcription services and is not in the business of maintaining original records by or for Client and that data maintained by MedQuist is a copy only.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Page 3 of 3

At such time [Client] is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

Sincerely,

John Quaintance
President Transcription Division

---

Kaiser LAMC – Department of Occupational Health Services

Agreed to by: _Thomas L Bradley_

Name: 
Title: _DIRECTOR HOSP RECORDS_

Date: _1/29/2003_

_Revision Date: 08/08/02_

# EXHIBIT B

T-092   P.002/015   F-696

23-2006  01:07pm  From-

MedQuist Legal Dept. ONLY:
Contract No. _____

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of March 1, 2003, by and between KAISER FOUNDATION HOSPITALS, CALIFORNIA NORTHEAST BAY ("Client"), and MEDQUIST TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

### BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

### ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

Paragraph 1.1

Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

Paragraph 1.2

Dictation Equipment: For the purpose of providing the services, Client shall maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System").

Paragraph 1.3

Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports.

Vendor will provide to Client a personal computer system including a monitor and modem at no cost.

Vendor will provide to Client a laser printer at no cost. The Client is responsible for associated maintenance fees, paper and toner.

Paragraph 1.4

Delivery of Dictation to Vendor: Client shall assign to Vendor 300 minutes of dictation per weekday. At no charge to Client, Vendor shall provide VoiceLink software to access dictation assigned by Client.

EXHIBIT

B

tabbies®

6-23-2006  01:07pm   From-

**Paragraph 1.5**

Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transmitted.

1.5.1   Grace Period: Vendor shall adhere to the turnaround times set forth on Exhibit A at all times throughout the term of this Agreement following an initial grace period of ninety (90) calendar days commencing on the first day on which services are provided hereunder. The grace period is intended to allow Vendor a reasonable period of time in which to set up the account, systems, telephone configurations and appropriate staffing.

**Paragraph 1.6**

Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

## ARTICLE II

## TERM AND TERMINATION

**Paragraph 2.1**

Term: The term of this Agreement shall be for one (1) year with automatic one (1) year renewals commencing on March 1, 2003 and ending on February 28, 2004. Client may terminate this Agreement after one hundred and twenty (120) days' notice following the procedures outlined in Paragraph 2.3.

**Paragraph 2.2**

Termination for Default: Either party may terminate this Agreement upon the happening of any of the following:

2.2.1   Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

2.2.2   Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which

breach or default shall not have been cured as provided in Paragraph 2.3.

**Paragraph 2.3**

<u>Notice of Default:</u> If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, written notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

## PAYMENTS AND CHARGES

**Paragraph 3.1**

<u>Payment to Vendor:</u> Client shall pay to Vendor a payment for each unit (as set forth below) transcribed for Client for the first year of the contract. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement. Failure to implement a price increase shall not constitute a waiver of the right to such increase and Vendor may bill at any time for previously unbilled amounts.

The unit of pricing applicable to this Agreement is as designated below:

A. _____    <u>AAMT Line at $0.15 per line.</u> An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines. Client acknowledges that the charges set forth in this Agreement are based upon the fact that character counts shall be determined using Vendor's software system and shall not be derived from any third party software or interface systems.

B. ___ ✓      **Black Character at $0.0049 per black character:** A black character includes visible characters within the formatted document. Black characters are represented by ASCII codes 33-126 only as identified in Exhibit D.

3.1.1   **Additional Format Changes:** Upon execution of this Agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change. New work types and formats that are a result of Client's addition of work will be provided by Vendor at no charge.

3.1.2   **Interface Requirements:** The interface requirements of this Agreement are as designated below:

Interface requirements are set forth in Exhibit B.

3.1.3   **Other Unanticipated Changes or Additional Services:** In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

Paragraph 3.2    **Billing:** Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

Paragraph 3.3    **Payment:** Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

| | |
|---|---|
| Paragraph 3.4 | **Charges:** The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises. |

Paragraph 3.5       **Dispute Resolution:** In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and shall pay to Vendor any portion of such disputed amount which has been substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations, the dispute shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Arbitration shall be conducted in the jurisdiction of the principal headquarters of the party not raising the dispute. The decision reached through arbitration shall be final and binding on both parties. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

## CONFIDENTIAL INFORMATION

Paragraph 4.1       **Confidential Information:** Vendor agrees and acknowledges that confidential patient information shall be disclosed to it in confidence. Vendor agrees to keep strictly confidential and hold in trust all confidential patient information in compliance with applicable laws and the HIPAA Regulations (as defined in Article VII).

Paragraph 4.2       **Proprietary Information:** Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal such Information to or with any third party without the express prior written consent of Vendor or to de-compile, reverse engineer or otherwise use such Information. Client acknowledges

cnanges to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

**Paragraph 4.3**

**Remedies:** The parties acknowledge and agree that a remedy at law for any breach or attempted breach of the provisions of this Article IV shall be inadequate and that the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist at law.

**Paragraph 4.4**

**Certain Exceptions:** The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis and in compliance with applicable laws or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

**Paragraph 4.5**

**Non-Solicitation of Transcriptionists and Employees:** During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, Client shall not solicit, hire or engage any person who during the term is or has been an employee or transcriptionist of Vendor.

## ARTICLE V

## MAINTENANCE OF EQUIPMENT

**Paragraph 5.1**

**Maintenance of Equipment:** The party providing the Dictation System pursuant to Section 1.2 hereof shall be responsible for the repair and maintenance of the Dictation System. Vendor shall be responsible for the repair and maintenance of the Transcription Equipment. Client shall be responsible for the repair and maintenance of any other equipment located at Client's offices.

## ARTICLE VI

## MISCELLANEOUS

**Paragraph 6.1**

**Indemnity - Vendor:** Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action,

and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly by a breach of the terms of this Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

**Paragraph 6.2**    **Counterparts:** This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

**Paragraph 6.3**    **Entire Agreement:** This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof. All Exhibits attached hereto are incorporated herein, and made a part hereof.

**Paragraph 6.4**    **Successors and Assigns:** This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

**Paragraph 6.5**    **Severability:** If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

**Paragraph 6.6**    **Liability:** Notwithstanding anything in this Agreement to the contrary, in no event shall Vendor be responsible for special, exemplary, punitive, consequential or incidental damages or for any damages other than, or in addition to, actual damages.

**Paragraph 6.7**    **Notice:** Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the party to whom it is to be given as follows:

If to Client:    Kaiser Foundation Hospitals, California Northeast Bay

Fax #: _____

Attn.: John T. Rowe, Director Transcription Services

If to Vendor:    MedQuist Transcriptions, Ltd.

Attn:  Chief Operating Officer

With a copy to:    MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
Attn:  General Counsel

| | |
|---|---|
| Paragraph 6.8 | **Agency:** Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other. |
| Paragraph 6.9 | **Exclusive Agreement:** During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other new transcription service vendor to perform Client's medical dictation/transcription work other than work that Vendor cannot or will not perform. |
| Paragraph 6.10 | **Force Majeure:** Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party. |
| Paragraph 6.11 | **Medicare Clause:** The Vendor agrees to allow the Secretary of the Department of Health and Human Services and the Comptroller General, or their duly authorized representatives, access upon request to this Agreement and to the books, documents and records of the Vendor that are necessary to verify the nature and extent of costs of services furnished under this Agreement. The Vendor also agrees that if the Vendor carries out any duties of the Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, the subcontract must contain a clause to the effect that the related organization must make available, upon written request, to the Secretary, or upon request to the Comptroller General, or their duly authorized representatives, the subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs. Such access shall be until the expiration of four (4) years after the services are furnished under this Agreement. |

Paragraph 6.12        <u>Effective Date:</u>  If Client does not execute this Agreement within thirty (30) days after Vendor sends it to Client, then this Agreement shall be null and void, absent Vendor's express written consent to the contrary.

## ARTICLE VII

## HIPAA

Paragraph 7.1        <u>Confidential Patient Health Information:</u>   In connection with the performance of services hereunder, Client discloses to Vendor certain information that will be subject to protection under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191.  Vendor, as a recipient of protected information from Client, is a "Business Associate" as that term is defined in HIPAA and regulations promulgated by the U.S. Department of Health and Human Services to implement certain provisions of HIPAA (herein "HIPAA Regulations").  Pursuant to said HIPAA Regulations, all Business Associates of entities such as Client must agree in writing to certain mandatory provisions regarding the use and disclosure of individually identifiable health information (within the meaning of 45 CFR, §164.501 of HIPAA, hereafter "Protected Health Information" or "PHI").   In order to satisfy the requirements of the HIPAA Regulations effective upon the applicable compliance dates set forth in 45 CFR, §164.534 (the "Effective Time"), Client and Vendor agree as follows effective as of the Effective Time:

7.1.1    Unless otherwise provided in this Agreement, capitalized terms in this Paragraph 7.1 shall have the meanings given to them in the HIPAA Regulations.

7.1.2    Vendor will:

   a.  not use or further disclose the PHI other than as permitted or required by this Agreement or as required by law;

   b.  use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement;

   c.  report to Client any use or disclosure of the PHI not provided for by this Agreement of which Vendor becomes aware;

   d.  ensure that any agents, including a subcontractor, to whom it provides PHI received from, or created or received by Vendor on behalf of, the Client agrees to the same restrictions and conditions that apply to the Vendor with respect to such PHI;

e.  make available to Client, such information as Client may require to fulfill Client's obligations to provide access to, provide a copy of, and account for disclosures with respect to PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR, §164.524 and §164.528. Vendor may charge a reasonable fee for providing the above services. Notwithstanding the foregoing, Client understands and agrees that Vendor provides medical transcription services and is not in the business of maintaining records by or for Client and that data maintained by Vendor shall not be considered to be a Designated Record Set.

f.  make Client's PHI available to Client, as Client may require to fulfill Client's obligations to amend PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR, §164.526 and Vendor shall, as directed by Client, incorporate any amendments to Client's PHI into copies of such PHI maintained by Client. Vendor may charge a reasonable fee for providing the above services. Notwithstanding the foregoing, Client understands and agrees that Vendor provides medical transcription services and is not in the business of maintaining records by or for Client and that data maintained by Vendor shall not be considered to be a Designated Record Set.

g.  make available the information required to provide an accounting of disclosures in accordance with 45 CFR, §164.528.

h.  make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Vendor on behalf of, the Client available to the Secretary of the U.S. Department of Health and Human Services for purposes of determining the Client's compliance with HIPAA; and

i.  at termination of this Agreement, if feasible, return or destroy all PHI received from, or created or received by Vendor on behalf of, the Client that the Vendor still maintains in any form and retain no copies of such information or, if such return is not feasible, extend the protections of this Agreement to the information and limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible.

7.1.3  Vendor, in its capacity as Business Associate to Client, shall be

the requirements of the HIPAA Regulations as follows:

  i.    for the proper management and administration of Vendor;
  ii.   to carry out the legal responsibilities of Vendor; and to fulfill
        Vendor's duties and responsibilities under this Agreement
        including in part disclosure to its employees and
        subcontractors; and
  iii.  to provide data aggregation services relating to the health
        care operations of Client.

7.1.4   Client is authorized to terminate this Agreement if Client determines
        that Vendor has violated a material term of this Paragraph 7.1 in
        accordance with the terms of this Agreement.

7.1.5   This Paragraph 7.1 shall survive the expiration or termination of
        this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date
first written above.

[CLIENT]                           MEDQUIST TRANSCRIPTIONS, LTD.

By: _John Rowe_____                By: _Brian Kearns_____
Name: _John Rowe_____              Name: _BRIAN J. KEARNS_
Title: _North East Bay Transcription   Title: _EV P + CFO_
       Manager, Kaiser Permanente

Revised as of 02/01/02
MEDQTLTRANSERVAGT

May-23-2006  01:12pm    From-                                     T-092   P.013/015   F-636

## EXHIBIT A

## TURNAROUND TIMES

All reports assigned by Client will be returned within Twenty-four (24) hours from the time received by Vendor.

## EXHIBIT B

### INTERFACE

At no charge to the Client, Vendor shall implement and maintain a document upload to the Kaiser CIPS system for any and all work compatible for such upload.

May-23-2006 01:12pm From-

T-092   P.015/015   F-636

# EXHIBIT C

The standard ASCII character set consists of 128 decimal numbers ranging from zero to 127 assigned to letters, both upper and lower case, numbers, punctuation marks and the most common special characters used in the medical transcription industry.

A black character includes visible characters within the formatted document. Black characters are represented by ASCII codes 33-126 only.

**THE ASCII CHARACTER CHART**

| Dec | Hx | Oct | Char | Dec | Hx | Oct | Html | Chr | Dec | Hx | Oct | Html | Chr | Dec | Hx | Oct | Html | Chr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 000 | NUL (null) | 32 | 20 | 040 | &#32; | Space | 64 | 40 | 100 | &#64; | @ | 96 | 60 | 140 | &#96; | ` |
| 1 | 1 | 001 | SOH (start of heading) | 33 | 21 | 041 | &#33; | ! | 65 | 41 | 101 | &#65; | A | 97 | 61 | 141 | &#97; | a |
| 2 | 2 | 002 | STX (start of text) | 34 | 22 | 042 | &#34; | " | 66 | 42 | 102 | &#66; | B | 98 | 62 | 142 | &#98; | b |
| 3 | 3 | 003 | ETX (end of text) | 35 | 23 | 043 | &#35; | # | 67 | 43 | 103 | &#67; | C | 99 | 63 | 143 | &#99; | c |
| 4 | 4 | 004 | EOT (end of transmission) | 36 | 24 | 044 | &#36; | $ | 68 | 44 | 104 | &#68; | D | 100 | 64 | 144 | &#100; | d |
| 5 | 5 | 005 | ENQ (enquiry) | 37 | 25 | 045 | &#37; | % | 69 | 45 | 105 | &#69; | E | 101 | 65 | 145 | &#101; | e |
| 6 | 6 | 006 | ACK (acknowledge) | 38 | 26 | 046 | &#38; | & | 70 | 46 | 106 | &#70; | F | 102 | 66 | 146 | &#102; | f |
| 7 | 7 | 007 | BEL (bell) | 39 | 27 | 047 | &#39; | ' | 71 | 47 | 107 | &#71; | G | 103 | 67 | 147 | &#103; | g |
| 8 | 8 | 010 | BS (backspace) | 40 | 28 | 050 | &#40; | ( | 72 | 48 | 110 | &#72; | H | 104 | 68 | 150 | &#104; | h |
| 9 | 9 | 011 | TAB (horizontal tab) | 41 | 29 | 051 | &#41; | ) | 73 | 49 | 111 | &#73; | I | 105 | 69 | 151 | &#105; | i |
| 10 | A | 012 | LF (NL line feed, new line) | 42 | 2A | 052 | &#42; | * | 74 | 4A | 112 | &#74; | J | 106 | 6A | 152 | &#106; | j |
| 11 | B | 013 | VT (vertical tab) | 43 | 2B | 053 | &#43; | + | 75 | 4B | 113 | &#75; | K | 107 | 6B | 153 | &#107; | k |
| 12 | C | 014 | FF (NP form feed, new page) | 44 | 2C | 054 | &#44; | , | 76 | 4C | 114 | &#76; | L | 108 | 6C | 154 | &#108; | l |
| 13 | D | 015 | CR (carriage return) | 45 | 2D | 055 | &#45; | - | 77 | 4D | 115 | &#77; | M | 109 | 6D | 155 | &#109; | m |
| 14 | E | 016 | SO (shift out) | 46 | 2E | 056 | &#46; | . | 78 | 4E | 116 | &#78; | N | 110 | 6E | 156 | &#110; | n |
| 15 | F | 017 | SI (shift in) | 47 | 2F | 057 | &#47; | / | 79 | 4F | 117 | &#79; | O | 111 | 6F | 157 | &#111; | o |
| 16 | 10 | 020 | DLE (data link escape) | 48 | 30 | 060 | &#48; | 0 | 80 | 50 | 120 | &#80; | P | 112 | 70 | 160 | &#112; | p |
| 17 | 11 | 021 | DC1 (device control 1) | 49 | 31 | 061 | &#49; | 1 | 81 | 51 | 121 | &#81; | Q | 113 | 71 | 161 | &#113; | q |
| 18 | 12 | 022 | DC2 (device control 2) | 50 | 32 | 062 | &#50; | 2 | 82 | 52 | 122 | &#82; | R | 114 | 72 | 162 | &#114; | r |
| 19 | 13 | 023 | DC3 (device control 3) | 51 | 33 | 063 | &#51; | 3 | 83 | 53 | 123 | &#83; | S | 115 | 73 | 163 | &#115; | s |
| 20 | 14 | 024 | DC4 (device control 4) | 52 | 34 | 064 | &#52; | 4 | 84 | 54 | 124 | &#84; | T | 116 | 74 | 164 | &#116; | t |
| 21 | 15 | 025 | NAK (negative acknowledge) | 53 | 35 | 065 | &#53; | 5 | 85 | 55 | 125 | &#85; | U | 117 | 75 | 165 | &#117; | u |
| 22 | 16 | 026 | SYN (synchronous idle) | 54 | 36 | 066 | &#54; | 6 | 86 | 56 | 126 | &#86; | V | 118 | 76 | 166 | &#118; | v |
| 23 | 17 | 027 | ETB (end of trans. block) | 55 | 37 | 067 | &#55; | 7 | 87 | 57 | 127 | &#87; | W | 119 | 77 | 167 | &#119; | w |
| 24 | 18 | 030 | CAN (cancel) | 56 | 38 | 070 | &#56; | 8 | 88 | 58 | 130 | &#88; | X | 120 | 78 | 170 | &#120; | x |
| 25 | 19 | 031 | EM (end of medium) | 57 | 39 | 071 | &#57; | 9 | 89 | 59 | 131 | &#89; | Y | 121 | 79 | 171 | &#121; | y |
| 26 | 1A | 032 | SUB (substitute) | 58 | 3A | 072 | &#58; | : | 90 | 5A | 132 | &#90; | Z | 122 | 7A | 172 | &#122; | z |
| 27 | 1B | 033 | ESC (escape) | 59 | 3B | 073 | &#59; | ; | 91 | 5B | 133 | &#91; | [ | 123 | 7B | 173 | &#123; | { |
| 28 | 1C | 034 | FS (file separator) | 60 | 3C | 074 | &#60; | < | 92 | 5C | 134 | &#92; | \ | 124 | 7C | 174 | &#124; | | |
| 29 | 1D | 035 | GS (group separator) | 61 | 3D | 075 | &#61; | = | 93 | 5D | 135 | &#93; | ] | 125 | 7D | 175 | &#125; | } |
| 30 | 1E | 036 | RS (record separator) | 62 | 3E | 076 | &#62; | > | 94 | 5E | 136 | &#94; | ^ | 126 | 7E | 176 | &#126; | ~ |
| 31 | 1F | 037 | US (unit separator) | 63 | 3F | 077 | &#63; | ? | 95 | 5F | 137 | &#95; | _ | 127 | 7F | 177 | &#127; | DEL |

**Amendment No. 1**
**To**
**Transcription Services Agreement**

This Amendment No. 1 ("Amendment") by and between Kaiser Foundation Hospitals, California Northeast Bay ("Client") and MedQuist Transcriptions, Ltd., ("Vendor") is entered into and effective as of this 20th day of May 2004.

## BACKGROUND

WHEREAS, Client and Vendor entered into a Transcription Services Agreement dated March 1, 2003 (the "Agreement"); and

WHEREAS, the parties desire to amend the terms of the Agreement as set forth in this Amendment.

NOW THEREFORE, in consideration of the mutual agreements and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, it is mutually agreed and covenanted by and between the parties to this Second Amendment, as follows:

1. Capitalized terms not otherwise defined in this Amendment shall have the meanings given to them in the Agreement.

2. Paragraph 1.4 of the Agreement shall be modified to read as follows:

   "Paragraph 1.4    Delivery of Dictation to Vendor:  The parties agree that the volume of work that Client shall assign to Vendor shall be no less than an average of three hundred (300) minutes of dictation per weekday.  At no charge to Client, Vendor shall provide/has provided VoiceLink software to access dictation assigned by Client."

3. Paragraph 2.1 of the Agreement shall be deleted in its entirety and replaced with the following:

   "Paragraph 2.1    Term: The term of this Agreement (the "Term") shall be for one (1) year commencing on June 1, 2004. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.  At the end of the Term, this Agreement shall automatically renew for successive one (1) year terms ("Renewal Term") unless either party shall notify the other of termination at least sixty (60) days prior to such Renewal Term."

4. Paragraph 4.5 of the Agreement shall deleted in its entirety and replaced with the following:

"Paragraph 4.5    "Non-Solicitation of Transcriptionists and Employees:  During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, neither party shall solicit, hire or engage any person who, at the time of their solicitation, hiring or engagement is, or in the preceding twelve months was, an employee or transcriptionist of the other party without the prior written consent of the other party; provided that neither party shall be in breach of this Paragraph 4.5 if one of the other party's employees responds to and is hired following a response to a general solicitation of employment via a newspaper, web site or other job posting."

5. The following paragraph shall be added to Article VI of the Agreement as Paragraph 6.13:

"Paragraph 6.13    No Offshore Subcontracting:  Vendor will not use offshore labor in performing services under this Agreement without the prior written consent of Client. In addition, Vendor agrees that absolutely no portion or function of the completion of Client's transcription, dictation or quality control will be transported, either electronically or physically, outside the geographic United States."

6. Except as modified by this Amendment, the Agreement shall remain in full force and effect unmodified.  To the extent the terms of the Agreement are inconsistent with the terms of this Amendment, the terms of this Amendment shall control.

IN WITNESS WHEREOF, Client and Vendor have executed this Amendment as of the day and year first written above by their duly authorized representatives.


KAISER FOUNDATION HOSPITALS,
CALIFORNIA NORTHEAST BAY

By:    _AH Small_

Name:  Sandra H. Small
Title:   Senior Vice President, Service Area
         Director, Kaiser Foundation Hospitals,
         California Diablo and Napa/Solano
         Service Areas


MEDQUIST TRANSCRIPTIONS, LTD.

By:    _Brian Kearns_

Name:  Brian J. Kearns
Title:   Executive Vice President & CFO
         6-15-04

## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("BA Agreement") is entered into as of and is in effect as of April 14, 2004 ("Effective Date") by and between Kaiser Foundation Health Plan, Inc. ("KP"), on behalf of KP OHCA, and MedQuist Transcriptions, Ltd. ("Business Associate").

## RECITALS

A.    KP provides certain Protected Information (as defined below) to Business Associate in the course of the parties' business relationship.

B.    In order to protect the privacy of the Protected Information and to comply with HIPAA and the HIPAA Regulations (as defined below), KP and Business Associate desire to enter into this BA Agreement setting forth the terms and conditions of disclosure of Protected Information.

In consideration of the mutual promises set forth below, the parties agree as follows:

## ARTICLE I:  DEFINITIONS

1.1    **General Rule.**  Capitalized terms not otherwise defined in this BA Agreement shall have the same meaning as those terms in the Privacy Rule and the Security Rule.

1.2    **HIPAA** means the Health Insurance Portability & Accountability Act of 1996, P.L. 104-191.

1.3    **HIPAA Regulations** means the regulations promulgated under HIPAA by the U.S. Department of Health and Human Services, including but not limited to, the Privacy Rule.

1.4    **KP OHCA** means the Organized Health Care Arrangement formed by the Covered Entities comprising Kaiser Permanente's integrated health care organization, including, as of the date of execution of this BA Agreement:
Northern California OCHA – Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc.;
Southern California OHCA - Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, the Southern California Permanente Medical Group;
Hawaii OHCA - Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, the Hawaii Permanente Medical Group;
Northwest OHCA – Kaiser Foundation Health Plan of the Northwest, Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, Northwest Permanente Physician and Surgeons, P.C., the Permanente Dental Associates;

Colorado OHCA - Kaiser Foundation Health Plan of Colorado, Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, the Colorado Permanente Medical Group;

Ohio OHCA - Kaiser Foundation Health Plan of Ohio, Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, the Ohio Permanente Medical Group;
Mid-Atlantic OHCA - Kaiser Foundation Health Plan of the Mid-Atlantic States, Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, the Capitol Area Permanente Medical Group;

Georgia OHCA - Kaiser Foundation Health Plan of Georgia, Inc., Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, the Southeast Permanente Medical Group.

1.5 **Privacy Rule** means the Standards for Privacy of Individually Identifiable Health Information, codified at 45 CFR parts 160 and 164, Subparts A and E, as currently in effect.

1.6 **Protected Information** means Protected Health Information ("PHI") provided by KP to Business Associate, or created or received by Business Associate on KP's behalf.

1.7 **Protected Health Information (PHI)** shall have the meaning given to the term under the Privacy Rule, including by not limited to, 45 CFR Section 164.501.

1.8 **Security Rule** means the Standards for Security for the Protection of Electronic Protected Health Information, codified at 45 CFR parts 160 and 164, Subpart C, as will be in effect April 21, 2005.

## ARTICLE II: OBLIGATIONS OF BUSINESS ASSOCIATE

2.1 **General Requirements.** Except as otherwise limited in this BA Agreement, Business Associate may use or disclose Protected Information to perform functions, activities, or services for, or on behalf of, KP as described in Exhibit A, attached hereto and incorporated herein, provided that such Use or Disclosure would not violate the Privacy Rule if done by KP. Business Associate and its agents and subcontractors shall only request, use, and disclose the minimum amount of Protected Information necessary to accomplish the purpose of the permitted Use or Disclosure. Business Associate agrees to comply with all applicable HIPAA Regulations.

2.2 **Uses Permitted By Law.** As permitted by the Privacy Rule, Business Associate may use or disclose Protected Information: (a) as is necessary for the proper management and administration of Business Associate's organization, or (b) to carry out the legal responsibilities of Business Associate; provided, however, that any permitted Disclosure to a third party must be either Required By Law or subject to reasonable assurances obtained by Business Associate from the third party that the Protected Information will be held confidentially, and securely, and used

or disclosed only as Required By Law or for the purposes for which it was disclosed to such third party, and that any breaches of confidentiality of the Protected Information which become known to such third party will be immediately reported to Business Associate. Business Associate shall notify KP in a timely manner prior to making any Disclosure of Protected Information Required By Law, to afford KP the opportunity to respond to the request for such a Disclosure.

2.3 **Data Aggregation.** Business Associate may provide Data Aggregation services relating to the Health Care Operations of KP.

2.4 **Disclosures to Agents and Subcontractors.** Business Associate shall ensure that any agent or subcontractor to whom it provides Protected Information agrees in writing to substantially the same terms as set forth herein regarding the Use and Disclosure and security of Protected Information, including, but not limited to, implementation of administration, physical and technical safeguards in accordance with the statutorily prescribed timelines, notice of prohibited Use or Disclosure, mitigation of harmful effects, responses to requests for access and amendment, and a term permitting immediate termination of the agent's or subcontractor's agreement with Business Associate for improper Use or Disclosure of Protected Information.

2.5 **Safeguards.** Business Associate shall implement and use appropriate safeguards as necessary to prevent the Use or Disclosure of Protected Information in any manner that is not permitted by this BA Agreement, including but not limited to, safeguards designed to limit incidental Uses or Disclosures made pursuant to an otherwise permitted or required Use or Disclosure.

2.6 **Notice of Prohibited Uses or Disclosures.** Business Associate shall provide written notice to KP of any Use or Disclosure of Protected Information that is in violation of this BA Agreement, the Privacy Rule, or other applicable federal or state law within five (5) business days of becoming aware of such Use or Disclosure. Business Associate shall also notify KP in writing within five (5) business days of receipt of any complaint that Business Associate receives concerning the handling of Protected Information or compliance with this BA Agreement.

2.7 **Mitigation.** Business Associate shall mitigate promptly, to the extent practicable, any harmful effect that is known to Business Associate of a Use or Disclosure of Protected Information by Business Associate in violation of this BA Agreement, the Privacy Rule, or other applicable federal or state law.

2.8 **Access and Amendment.** To enable KP to fulfill its obligations under the Privacy Rule, Business Associate shall make Protected Information in Designated Record Sets that are maintained by Business Associate or its agents or subcontractors available to KP for inspection, copying or amendment within ten (10) days of a request by KP. If an Individual

requests inspection, copying or amendment of Protected Information directly from Business Associate or its agents or subcontractors, Business Associate shall notify KP in writing within five (5) business days of receipt of the request, and shall defer to, and comply with, KP's direction in a timely manner regarding the response to the Individual regarding the request for inspection, copying or amendment.

2.9     **Accounting**. Business Associate shall implement a process for recording certain Disclosures of Protected Information by Business Associate ("Accounting Information") in order to enable KP to comply timely with its obligations under the Privacy Rule including, but not limited to, 45 CFR Section 164.528.  At a minimum, this Accounting Information shall include for each such Disclosure recordation of (a) the name and date of birth of the Individual whose Protected Information was the subject of the Disclosure; (b) the date of Disclosure; (c) the name and address of the recipient of the Protected Information; (d) a brief description of the Protected Information disclosed; and (e) a brief statement of the purpose for the Disclosure that reasonably informs the Individual of the basis for the Disclosure.  Within ten (10) days of notice from KP of a request for an accounting of Disclosures of Protected Information, Business Associate shall make available to KP this Accounting Information.  If an Individual requests an accounting directly from Business Associate or its agents or subcontractors, Business Associate must notify KP in writing within five (5) business days of the request, and shall defer to, and comply in a timely manner with, KP's direction regarding the response to the Individual regarding the request for an accounting.

2.10    **Government Officials**.  Business Associate shall make its internal practices, books and records relating to the Use and Disclosure of Protected Information available to the Secretary of the U.S. Department of Health and Human Services ("Secretary") for purposes of determining KP's compliance with the Privacy Rule.  Business Associate shall notify KP regarding any Protected Information that Business Associate provides to the Secretary concurrently with providing such Protected Information to the Secretary, and upon KP's request, shall provide KP with a duplicate copy of such Protected Information.

2.11    **Insurance**.  Business Associate shall maintain or cause to be maintained sufficient insurance coverage as shall be necessary to insure Business Associate and its agents or subcontractors against any claim or claims for damages arising under this BA Agreement.  Such insurance coverage shall apply to all site(s) of Business Associate and to all services provided by Business Associate or its agents or subcontractors under this BA Agreement.

2.12    **Disclosure.**  To the extent that Business Associate creates, receives, maintains, or transmits electronic PHI, Business Associate shall also,

effective April 21, 2005, implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic Protected Information that may be transmitted in conformity with the requirements of the Security Rule.

2.13 **Reporting of Security Incidents**. Effective April 21, 2005, if the Business Associate creates, receives, maintains, or transmits electronic PHI, Business Associate shall appropriately report any security incident, as defined by the Security Rule.

2.14 **Mitigation**. Effective April 21,2005, or such other date on which compliance with the Security Rule is required ("Security Rule Effective Date") Business Associate shall mitigate promptly, to the extent practicable, any harmful effect of a security incident for which Business Associate is responsible, or of which Business Associate is aware, that involves electronic Protected Information and is in violation of this BA Agreement, the Security Rule, or other applicable federal or state law.

## ARTICLE III: OBLIGATIONS OF KP

3.1 **Notice of Privacy Practices**. KP shall notify Business Associate of limitation(s) in its notice of privacy practices in accordance with 45 CFR Section 164.520, to the extent such limitation affects Business Associate's permitted Uses or Disclosures.

3.2 **Individual Permission**. KP shall notify Business Associate of changes in, or revocation of, permission by an Individual to use or disclose Protected Information, to the extent such changes affect Business Associate's permitted Uses or Disclosures.

3.3 **Restrictions**. KP shall notify Business Associate of restriction(s) in the Use or Disclosure of Protected Information that KP has agreed to in accordance with 45 CFR Section 164.522, to the extent such restriction affects Business Associate's permitted Uses or Disclosures.

3.4 **Prohibited Requests**. KP shall not request Business Associate to use or disclose Protected Information in any manner that would not be permissible under the Privacy Rule if done by KP.

3.5 **OHCA**. The provisions of this BA Agreement regarding the obligations and rights of KP, and the obligations owed by Business Associate to KP, shall be deemed to extend to every entity in the KP OHCA as if each such entity was a party to this BA Agreement.

## ARTICLE IV: TERM AND TERMINATION

4.1 **Term**. This BA Agreement shall commence as of the Effective Date and shall continue in effect unless and until terminated by KP under this Section 4.1 or

destruction has occurred.  If Business Associate determines that return or destruction is not feasible, Business Associate shall explain to KP in writing why conditions make the return or destruction of such Protected Information not feasible.  If KP agrees that the return or destruction of Protected Information is not feasible, Business Associate shall retain the Protected Information, subject to all of the protections of this BA Agreement, and shall make no further Use or Disclosure of the Protected Information, except as for those purposes that make the return or destruction of the Protected Information not feasible.  In any event, upon termination of the business relationship between the parties and/or the BA Agreement, Business Associate shall retain for no less than six (6) years the Accounting Information compiled by Business Associate pursuant to section 2.9 of this BA Agreement, and shall make such Accounting Information available to KP within five (5) business days of a request.

4.4   **Survival.**  The obligations of Business Associate under section 4.3 shall survive the termination of the business relationship between the parties and/or the BA Agreement.

## ARTICLE V:  MISCELLANEOUS

5.1 **Assistance.** In the event of an administrative or judicial action commenced against KP where Business Associate may be at fault, in whole or in part, as the result of its performance under this BA Agreement, Business Associate agrees to defend or to reasonably cooperate with KP in the defense against such action.

5.2 **Subcontracts and Assignment.** Business Associate shall not subcontract its obligations, assign its rights, or delegate its duties under this BA Agreement without the express written consent of KP.

5.3 **Amendment.** If any modification to this BA Agreement is required for conformity with federal or state law or if KP reasonably concludes that an amendment to this BA Agreement is required because of a change in federal or state law, or by reason of KP's status as a business associate of another covered entity, KP shall notify Business Associate of such proposed modification(s) ("Required Modifications"). The parties shall enter into good faith negotiations to amend this BA Agreement as necessary. If the parties are unable to agree upon terms of an amendment, either party may terminate the business relationship upon thirty (30) days written notice, or such longer period as may be required by law. Other modifications to this BA Agreement may be made on mutual agreement of the parties.

5.4 **Business Relationship.** Except as specifically required to implement the purposes of this BA Agreement, and except to the extent inconsistent with this BA Agreement, all terms of the business relationship between the parties shall remain in full force and effect. In the event of a conflict between the terms of the business relationship between the parties and this BA Agreement, this BA Agreement shall control with respect to the subject matter of this BA Agreement.

5.5 **Ambiguity.** Any ambiguity in this BA Agreement relating to the Use and Disclosure of Protected Information shall be resolved in favor of a meaning that furthers the obligations to protect the privacy and security of the Protected Information, whether electronic or other medium, in accordance with the Privacy Rule.

5.6 **State Law.** In addition to HIPAA and all applicable HIPAA Regulations, Business Associate shall comply with all applicable state and federal security and privacy laws.

5.7 **Third Party Beneficiaries.** Except as expressly provided for in this BA Agreement or the Privacy Rule, there are no third party beneficiaries to this BA Agreement.

5.8 **Counterparts.** This BA Agreement and any exhibits hereto may be executed in one or more counterparts; each counterpart shall be deemed an original.

5.9 **Notices.** All notices required or permitted to be given under this BA Agreement shall be in writing and shall be sufficient in all respects if delivered

# EXHIBIT C



The **MRC** Group

SecroPhone
Medical Records Corp.
Medilar

October 25, 1996

**Via Facsimile #518/783-8891**

Ginny Charbonneau, ART
Manager, Health Information
Community Health Plan
1 CHP Plaza
Latham, NY  12110

Dear Ms. Charbonneau:

The MRC Group {MRCG} would be pleased to comply with your request for MRCG to
offer committed assistance to your transcription department. So that each of us has a clear
understanding of our mutual expectations, we thought it best to reiterate our discussion.

It is our understanding that you want MRCG to transcribe approximately 250 reports
daily, Monday through Saturday, for the next twelve months. The volume will initially be
100 reports daily, and build up to 250 reports within four weeks. The reports we are to
complete will primarily be Office Visit Notes. We will return the completed report within
36 hours of the time we accessed the report.

Our Vorhees office will transcribe these reports directly from your digital dictation system.
We will transmit them back to CHP, where they will be uploaded directly into the Dolby
Stat Report System. You will be responsible for providing a telephone line for
communication to the PC.

Our initial charge will be $.13 per line. Any reports delivered unacceptable due to our
error will be retyped at no charge.

We will need a Purchase Order to commence work. We appreciate this opportunity and
look forward to working with you and your staff.

If you agree, please sign in the area below.

Sincerely,                              Accepted:

THE MRC GROUP                           COMMUNITY HEALTH PLAN

John M Beats                            By: _Ginny Charbonneau_
Regional Sales Manager
                                        Date: _11-22-96_

3627 Green Road   Cleveland, Ohio  44122   1.800.DICTATE or 1.800.347.8283   FAX: 216.464.4819
JMB/kdc

**EXHIBIT**
tabbies®
**C**





Community Health Plan
Kaiser Foundation Health Plan of New York
Kaiser Health Plan of Connecticut, Inc.
1 CHP Plaza
Latham, NY 12110

*Re: Clinic Transcription Service Agreement*

The MRC Group ("MRC") agrees to provide to Community Health Plan, Kaiser Foundation Health Plan of New York, Kaiser Health Plan of Connecticut, Inc. ("Client"), the medical transcription services described herein and Client, by its acceptance of this agreement, agrees to accept all such services upon the terms and conditions contained herein.

1.  **TERM**

    The term of this agreement shall be two years commencing on 2/2/98 and terminating on 1/31/2000.

    The Client has the right to not extend this contract by providing written notice at least 90 days prior to the end of the initial term.

2.  **SERVICES PROVIDED BY THE MRC GROUP**

    (a)  MRC will transcribe reports recorded on a digital system owned and maintained by Client and located in Client facility.

    (b)  MRC will prepare all completed reports according to Dolbey File Formats and transmit to Client via modem.

    (c)  The monthly cost for telephone access of Client's digital dictation system will be borne by MRC.

3.  **TO BE PROVIDED BY THE CLIENT**

    (a)  A list of those members of the Client's staff authorized to utilize MRC's services.

    (b)  Any purchase orders required by the Client relative to the services to be performed by MRC.

    (c)  Any other specific instructions the Client deems appropriate in order that MRC may provide the Client with effective service.

    (d)  Installation and maintenance of sufficient telephone lines within the facility allowing MRC to implement the services requested in this agreement.

4.    **PRICE**
MRC will provide transcription services to the Client at the rate of $.13 per line. Any reports delivered unacceptable due to MRC's error will be reprocessed at no charge.

The price will increase on each anniversary of commencement of service by the Cost of Living Index (CPIU-Medical Professional Services) during the preceding 12 months.

5.    **CONFIDENTIAL INFORMATION**
All information received by MRC from Client shall be deemed and treated as confidential and will not be disclosed to any person or company without Client's specific written authorization. MRC will exercise all reasonable security precautions in order that such information remains confidential.

New employees are required to sign a "confidentiality agreement" as a condition of employment. On an annual basis, the policy and procedures will be reviewed and updated as necessary. A continuing education program will be performed, and employees will be required to sign a "confidentiality acknowledgement" to remind them of their ongoing responsibility to confidentiality.

6.    **TERMINATION**
If at any time MRC's work does not meet the Client's standards, the Client shall notify MRC in writing and allow five days to correct the problem. If the Client is still not satisfied, the Client shall again advise MRC in writing and allow five more days to correct the problem. If at the end of that time the Client is still not satisfied with MRC's work, the Client may cancel this agreement by providing MRC with 30 days prior written notice.

Consistent with KP/CHP internal quality standards, each document shall have no medical content errors and no more than one format or spelling error. If that standard is not met on at least 95% of all documents, the bi-weekly bill will be reduced by 5%.

7.    **ERRORS BY THE MRC GROUP**
MRC's liability, if any, for errors and omissions is limited to the total charge for the specific work done and MRC shall not be liable for any other damages arising in connection with this agreement, except as to any liability that may occur as a result of MRC's obligations under Section 6 above.

8.    **COMPLETION**
Reports will be completed as follows:

All Reports                            Within 36 Hours of Dictation

9.    **GRACE PERIOD**
The initial 60-90 days of an agreement are critical for MRC to track dictation flow in terms of peak volume, appropriate staffing, etc. While MRC's goal is to immediately transmit completed reports in a timely fashion, MRC wants to make certain that its staff has an in-depth knowledge of the Hospital and physicians' distinct requirements.

10.    **TERMS**
Terms of payment under this Agreement are net 30 days. There will be a 1½% per month carrying charge (18% per year) on all balances past due.

11.    **COMPLIANCE**
If MRC fails to meet the turnaround requirements for any invoicing period, the Client shall so advise MRC inwriting within five (5) working days of the end of the respective invoicing period, and MRC will reduce the invoice by 5%, if the 36 hour turnaround is not met for at least 95% of all documents.

12.    **INDEMNIFICATION**

The Client and MRC each agree, to the extent allowed under governing law, to indemnify and hold the other party harmless from any claim, demand, suit, loss, or liability which the indemnified party may sustain as a result of the indemnifying party's breach of its duties or the indemnifying party's errors or omissions and from the reasonable expenses of the indemnified party, including attorney's fees, incurred in connection with such claims and damages (collectively "Damages"). As a condition precedent to asserting a right of indemnity, the party seeking indemnification shall have given the indemnifying party timely written notice of the assertion of the claim as to which the right of indemnification is claimed to exist. The Client hereby acknowledges that MRC is performing an outsourcing service for the Client and that the Client and the appropriate physician(s) and/or the Client staff are solely responsible for the content of each medical report and other types of reports transcribed by MRC. Accordingly, without limiting the generality of the foregoing, the Client shall indemnify and hold harmless MRC from any Damages resulting from the content of any medical report or other report transcribed by MRC for the Client, and any errors contained therein or omissions therefrom.

13.    **SUCCESSORS AND ASSIGNS**
This Agreement shall be binding upon, and shall be enforceable by and inure to the benefit of, the parties named herein and their respective successors and assigns; provided, however, that (a) except as otherwise provided hereunder, this Agreement shall not be assignable in whole or in part by either party without first obtaining the written consent of the other party, which consent shall not be unreasonably withheld, and (b) the Client and MRC may assign this Agreement, including their respective rights and obligations hereunder, to any affiliate or successor entity without obtaining the other's consent.

# EXHIBIT D

## AGREEMENT FOR TRANSCRIPTION SERVICES

### Prepared for Kaiser Permanente - Bakersfield
### September 17, 1996

KAISER PERMANENTE - BAKERSFIELD herein referred to as "CLIENT", and YOUR OFFICE GENIE. herein referred to as "YOG", contractually agree to the following:

### RECITALS

A.  Whereas, Client is Kaiser Permanente - Bakersfield location at P.O. Box 12099, Bakersfield, California 93389-1299.

B.  Whereas, YOG is the owner and operator of a medical transcription service company located at 2620 South California Avenue, Monrovia, California 91016.

C.  Whereas, Client desires YOG to provide said, as needed, overflow medical transcription service and YOG is willing to provide.

Therefore, Client and YOG enter into this Agreement in order to provide a full statement of their respective responsibilities in association with the provision of the service described herein.

### ARTICLE I.

### Agreement

1.1  Client shall utilize YOG for overflow transcription on one clinic of their choice for a 90-day trial period.

### ARTICLE II.

### Equipment

2.1  YOG shall provide Client with the following equipment, where and if necessary, for any Client location:

    1.  One or more IBM compatible computers and Hewlett Packard printers for the Health Information Department or ancillary departments.



EXHIBIT
D

Kaiser Permanente - Bakersfield
Page 2

2.2    YOG will maintain service on above referenced equipment at no additional cost to Client and this equipment shall remain property of YOG.

2.3    Client agrees to provide phone line access for either the YOG computer or direct dial-in to the computer/printer provided to Client. Client agrees to assume the cost of an additional phone line, if one is not available for the sole use of YOG uploads.

2.4    YOG agrees to provide in-service on the YOG software, computers and printers.

2.5    YOG agrees to provide Client with access to YOG's Digital Dictating System on 800 toll-free lines, to include training, and wallet instruction cards.

## ARTICLE III.

### Rights and Duties

3.1    Client shall provide YOG with a copy of the census or visit listing, if available, via fax on a daily basis. YOG shall destroy census data after use within ten (10) days of receipt.

3.2    All reports dictated by physicians must be identified by name, number and other appropriate data.

   3.2.1    Medical Group shall encourage physicians to spell patient name in order to assure proper identity.

3.3    YOG shall assure transcription turnaround as follows:

   All report types no greater than 12-24 hours or as specified by Client.

3.4    Quality Assurance

   YOG shall maintain appropriate in-service professional supervision to oversee the transcription department's activities and to conduct intermittent transcription quality reviews.

3.5    Inquiries

   YOG commits to address and resolve, in a timely manner, inquiries from the Clinic concerning the status of report(s). YOG will respond to telephone and/or written inquiries within a four hour time period or less.

Kaiser Permanente - Bakersfield
Page 3

3.6    Confidentiality

YOG agrees to secure the confidentiality of all patient information from access to
unauthorized parties.

3.6.1 By written agreement between YOG and its employees, all employees of YOG
agree not to misuse or disclose any or all portions of the contents of the medical
reports transcribed to unauthorized parties.

3.6.2    YOG agrees to limit the number of persons who have access to the
confidential documentation on patients seen at the Clinic to those employees who
have need to access in order to perform service for the Clinic.

3.6.3  YOG agrees to be held responsible for any liability arising out of the misuse
or unwarranted disclosure of all or any of the confidential patient information by any
representative or employee of YOG.

## ARTICLE IV.

4.1    YOG agrees to provide all transcription service described herein for the rate of **$0.13**
cents per line, every line is a line.

4.1.1  Margins are defined by Client using a 65 character line, as outlined by AAMT
and MTIA.

4.1.2  Log sheets shall be provided indicating patient name, physician name, date
and time dictated, date and time transcribed, type of report, pages and lines.

4.2    All bills are due and payable within 30 days of receipt by Client.

## ARTICLE V.

5.1    Not withstanding any other provision contained herein, this Agreement may be
terminated as follows:

5.1.1 Either party may terminate this Agreement, with our without cause, upon thirty
(30) days written notice to the other party.

5.1.2  Termination for non-payment upon 24 hour faxed notice.

Kaiser Permanente - Bakersfield
Page 4

5.1.3  Client and YOG are independent contractors and are not responsible for the
acts or admissions of each other. Nothing in this Agreement is intended, nor
shall be construed, to create a partnership, employer-employee or joint venture
relationship between YOG and the Client.

## ARTICLE VI.

### Term of Contract

6.1     This Agreement shall remain in effect for a term of 90 (ninety) days commencing with
valid execution by both parties unless terminated under the provisions provided
herein. Thereafter, this Agreement will be renegotiated as agreed upon by both YOG
and the Client.

## ARTICLE VII.

### General Provisions

7.1     Notice

Written notice required under this Agreement shall be delivered personally or sent
by United States registered or certified mail, postage pre-paid, and return receipt
requested or by fax and addressed or delivered to the parties at the following address
(or such other address as may hereafter be designated by a party with written notice
thereof to the other party):

AND
CAROLE CIRAULO
YOUR OFFICE GENIE
2620 South California Avenue
Monrovia, California  91016
FAX #  (800) 743-6439

If personally delivered or transmitted by fax, such notice shall be effective upon delivery,
and if mailed as provided above, such notice shall be effective two (2) days after it is placed
in the mail.

Kaiser Permanente - Bakersfield
Page 5

7.2    Governing Law

The validity, interpretation and performance of the Agreement shall be governed by, and
construed in accordance with, the laws of the State of California.

EXECUTED BY:

YOUR OFFICE GENIE, INC.

By:

Name:

Title:

Date:

KAISER PERMANENTE  - BAKERSFIELD

By:

Name:

Title:

Date:

0124



YOUR OFFICE GENIE
*Health Information Services*

FEB 2 2001

2620 S. California Ave., Monrovia, CA 91016

Phone 800 743 6433     Fax 800 743 6439

January 30, 2001

Ms. Ann Ryder
Medical Group Administrator
Kaiser Permanente
5055 California Avenue
Bakersfield, CA 93309

Dear Ms. Ryder:

As requested by Ms. Arlene Huber, I am submitting herein a letter indicating the intentions of Your Office Genie to extend our contract at the rate of thirteen cents (.13) per line until March 1, 2003.

We are pleased that we have been able to keep our price stable for so many years.

Kindly sign below and we will consider this a contract etension.

Sincerely,

*Carole Ciraulo*

Carole Ciraulo

Agreed as above

*Ann Ryder*

Ms. Ann Ryder                    Date: 2-5-01

cc:  Arlene Huber

# EXHIBIT E

MedQuist Legal Dept.
ONLY:
Contract No._____

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of August 8, 2002, by and between Kaiser Permanente – Kern County ("Client"), and MEDQUIST TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

### BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

### ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

**Paragraph 1.1**

Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

**Paragraph 1.2**

Dictation Equipment: For the purpose of providing the services Vendor shall maintain at Vendor's offices, at no cost to Client, a direct dial digital dictation system (the "Dictation System").

**Paragraph 1.3**

Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports.

Vendor will install a server at the client site, connecting this server if desired by Client to the Client's backbone. The system will be configured with a minimum of a modem, file server, print/edit workstation and three (3) laser printers, for purposes of receiving electronically transmitted reports and printing the same, if desired, at Client location. Client shall supply additional workstations and printers as desired, required cabling and all paper and printer supplies necessary for printing reports. The Client is responsible for supplying and maintaining necessary software for network connections should Client desire to connect to Vendor's on-site server. Vendor shall supply and maintain network card (s) necessary to connect to Client's network, if desired by Client. Vendor will continue to maintain their Dictation Management System and Document Management System and associated hardware and software at Client's site, providing updates as needed.

**Paragraph 1.4**

Delivery of Dictation to Vendor: Client physicians may dictate into the Dictation System at any time, twenty-four hours per day, seven days per week.

**EXHIBIT**

**E**

**Paragraph 1.5**

Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured as a monthly average from the time at which the dictation of the report is available to Vendor to the time at which the report is transcribed. Reports that do not meet turnaround time standards because the dictator has miscoded them and/or due to required quality assurance verification shall not be included in turnaround time average calculations.

**Paragraph 1.6**

Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and reasonable standards established by Client that conform with system capabilities.

**Paragraph 1.7**

Storage of Documents: Vendor shall maintain voice files active on Vendor's dictation system for ten (10) days following transcription and maintain archived files voice files for six (6) months following transcription. Text files shall be active for a minimum of one (1) year on Vendor's on-site server. Vendor will maintain text files as transmitted to Client for one (1) year following transcription. Client is responsible for back-up and archive of on-site files as desired.

**Paragraph 1.8**

Quality Assurance: Client shall have the ability to edit reports that have been electronically transferred to Client location. Client shall have the option of returning reports to Vendor for editing. Any report returned to Vendor for modification due to Vendor error shall be corrected without charge. Any report returned by Client to Vendor for modification due to no fault of the Vendor shall be modified and subject to charges outlines in Paragraph 3.1.

1.8.1   Deficiency Notification: Client shall be notified by Vendor of deficiencies in content and context though an electronic deficiency/omission form. Vendor shall furnish electronic deficiency/omission form, which averages three (3) lines per page, noting deficiencies in reports.

1.8.2   Blanks: Vendor will route reports with two (2) or more identified deficiencies or those reports where the transcriptionist has requested assistance to Vendor's Quality Assurance Staff prior to transmission to the Client. It is understood that identified deficiencies in reports are often the result of poor dictation habits and/or imprecise/inaccurate information provided by the dictator. Vendor will use commercially reasonable efforts to resolve issue(s) resulting in deficiencies prior to transmitting reports to Clients. Client will be notified of unresolved issues resulting in deficiencies as outlined in Paragraph 1.8.1.

## ARTICLE II

### TERM AND TERMINATION

Paragraph 2.1

**Term:** The term of this Agreement shall be for five (5) years commencing on September 1, 2002 and ending on August 31, 2007. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

Paragraph 2.2

**Termination for Default:** Either party may terminate this Agreement upon the happening of any of the following:

2.2.1   **Insolvency:** If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

2.2.2   **Default:** If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

Paragraph 2.3

**Notice of Default:** If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, written notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have thirty (30) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said thirty (30) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

### PAYMENTS AND CHARGES

Paragraph 3.1

**Payment to Vendor:** Client shall pay to Vendor a payment of twelve and one-quarter cents ($.1225) for each unit (as set forth below) transcribed for Client for the first year of the contract. This payment shall be increased to twelve and one half cents ($.1250) for each unit (as set forth below) transcribed for Client for the subsequent contract years. Failure to implement a price increase shall not constitute a waiver of the right to such increase and Vendor may bill at any time for previously unbilled amounts.

The unit of pricing applicable to this Agreement is as designated below:

Gross Line. A gross line is defined as any line with typing or data and includes, without limitation, information necessary to derive the final appearance and content of the document and to format the electronic data process. Header lines shall be excluded from this line count and three lines per page will be added to the gross line count in lieu of counting the individual header lines.

3.1.1  Additional Format Changes: Upon execution of this Agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.2  Interface Requirements: The interface requirements of this Agreement are as are set forth in Exhibit B.

Paragraph 3.2    Billing: Vendor will invoice the Client two (2) times monthly for services rendered pursuant to the terms and conditions listed herewith.

Paragraph 3.3    Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor. If Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

Paragraph 3.4    Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises. Vendor will provide toll free dictation access and and toll free back-up dictation access for Client's dictators to access Vendor's dictation systems.

Paragraph 3.5    Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and shall pay to Vendor any portion of such disputed amount which has been substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations, the dispute shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Arbitration shall be conducted in the jurisdiction of the principal headquarters of the party not raising the dispute. The decision reached through arbitration shall be final and binding on both parties. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

## CONFIDENTIAL INFORMATION

Paragraph 4.1

Confidential Information: Vendor agrees and acknowledges that confidential patient information shall be disclosed to it in confidence. Vendor agrees to keep strictly confidential and hold in trust all confidential patient information in compliance with applicable laws and the HIPAA Regulations (as defined in Article VII).

4.1.1    Confidentiality Statements: Vendor will maintain signed Confidentiality Statements for Vendor's employees as defined in Vendor's operational procedures.

Paragraph 4.2

Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor or to de-compile, reverse engineer or otherwise use such Information. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3

Remedies: The parties acknowledge and agree that a remedy at law for any breach or attempted breach of the provisions of this Article IV shall be inadequate and that the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist at law.

Paragraph 4.4

Certain Exceptions: The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis and in compliance with applicable laws or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

Paragraph 4.5

Non-Solicitation of Transcriptionists and Employees: During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, Client shall not solicit, hire or engage any person who during the term is or has been an employee or transcriptionist of Vendor.

### ARTICLE V

### MAINTENANCE OF EQUIPMENT

**Paragraph 5.1**

Maintenance of Equipment: The party providing the Dictation System pursuant to Section 1.2 hereof shall be responsible for the repair and maintenance of the Dictation System. Vendor shall be responsible for the repair and maintenance of the Transcription Equipment, including the Dictation Management System and Document Management System. Client shall be responsible for the repair and maintenance of any other equipment located at Client's offices.

### ARTICLE VI

### MISCELLANEOUS

**Paragraph 6.1**

Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly by a breach of the terms of this Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

**Paragraph 6.2**

Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

**Paragraph 6.3**

Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof. All Exhibits attached hereto are incorporated herein, and made a part hereof.

**Paragraph 6.4**

Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

**Paragraph 6.5**

Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

**Paragraph 6.6**

Liability: Notwithstanding anything in this Agreement to the contrary, in no event shall Vendor be responsible for special, exemplary, punitive, consequential or incidental damages or for any damages other than, or in addition to, actual damages.

**Paragraph 6.7**

Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the party to whom it is to be given as follows:

If to Client:              Kaiser Permanente – Kern County

PO Box 12099
Bakersfield, California 93389-1299
Fax Number: 661 633-5986
Attention: Director, Support Services

If to Vendor:   MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
Attention: Chief Operating Officer

With a copy to:   MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
Attention: General Counsel

Paragraph 6.8   **Agency:** Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other.

Paragraph 6.10   **Force Majeure:** Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

Paragraph 6.11   **Medicare Clause:** The Vendor agrees to allow the Secretary of the Department of Health and Human Services and the Comptroller General, or their duly authorized representatives, access upon request to this Agreement and to the books, documents and records of the Vendor that are necessary to verify the nature and extent of costs of services furnished under this Agreement.  The Vendor also agrees that if the Vendor carries out any duties of the Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, the subcontract must contain a clause to the effect that the related organization must make available, upon written request, to the Secretary, or upon request to the Comptroller General, or their duly authorized representatives, the subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs. Such access shall be until the expiration of four (4) years after the services are furnished under this Agreement.

Paragraph 6.12   **Effective Date:** If Client does not execute this Agreement within thirty (30) days after Vendor sends it to Client, then this Agreement shall be null and void, absent Vendor's express written consent to the contrary.

Paragraph 6.13   Subordination Clause:  Should Client's parent organization (Kaiser Foundation Health Plan, Inc. or its affiliates) enter into a new Master Transcription Services Agreement with Vendor during the term of this Agreement, Client may elect to:

a.   participate in either the Master Agreement with the corresponding scope of services and costs as defined for said Master Agreement and terminate this Agreement without penalty upon thirty (30) days notification as outlined in Paragraph 6.7. or,

b.   continue services under the terms and conditions of this Agreement as outlined herein.

## ARTICLE VII

### HIPAA

Paragraph 7.1

**Confidential Patient Health Information:**   In connection with the performance of services hereunder, Client discloses to Vendor certain information that will be subject to protection under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191.   Vendor, as a recipient of protected information from Client, is a "Business Associate" as that term is defined in HIPAA and regulations promulgated by the U.S. Department of Health and Human Services to implement certain provisions of HIPAA (herein "HIPAA Regulations"). Pursuant to said HIPAA Regulations, all Business Associates of entities such as Client must agree in writing to certain mandatory provisions regarding the use and disclosure of individually identifiable health information (within the meaning of 45 CFR, §164.501 of HIPAA, hereafter "Protected Health Information" or "PHI").   In order to satisfy the requirements of the HIPAA Regulations effective upon the applicable compliance dates set forth in 45 CFR, §164.534 (the "Effective Time"), Client and Vendor agree as follows effective as of the Effective Time:

7.1.1   Unless otherwise provided in this Agreement, capitalized terms in this Paragraph 7.1 shall have the meanings given to them in the HIPAA Regulations.

7.1.2   Vendor transmits copies of unsigned, transcribed reports to Client (hereafter "Copy" or "Copies").   The parties understand that Client may, at its discretion, modify the finalized transcribed reports from time to time without Vendor's knowledge.   Client understands and agrees that Vendor provides medical transcription services and is not in the business of maintaining original records by or for Client and that data maintained by Vendor is a Copy only.

7.1.3   Vendor will:

a.   not use or further disclose the PHI other than as permitted or required by this Agreement or as required by law;

b.   use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement;

c.   report to Client any use or disclosure of the PHI not provided for by this Agreement of which Vendor becomes aware;

d.   ensure that any agents, including a subcontractor, to whom it provides PHI received from, or created or received by Vendor on behalf of, the Client agrees to the same restrictions and conditions that apply to the Vendor with respect to such PHI;

e.  make available to Client, such information as Client may require to fulfill Client's obligations to provide access to, provide a copy of, and account for disclosures with respect to PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR, §164.524 and §164.528.  Vendor may charge a reasonable fee for providing the above services.

f.  make Client's PHI available to Client, as Client may require to fulfill Client's obligations to amend PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR, §164.526 and Vendor shall, as directed by Client, incorporate any amendments to Client's PHI into copies of such PHI maintained by Client.  Vendor may charge a reasonable fee for providing the above services.

g.  make available the information required to provide an accounting of disclosures in accordance with 45 CFR, §164.528.

h.  make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Vendor on behalf of, the Client available to the Secretary of the U.S. Department of Health and Human Services for purposes of determining the Client's compliance with HIPAA; and

i.  at termination of this Agreement, if feasible, return or destroy all PHI received from, or created or received by Vendor on behalf of, the Client that the Vendor still maintains in any form and retain no Copies of such information or, if such return is not feasible, extend the protections of this Agreement to the information and limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible.

7.1.4  Vendor, in its capacity as Business Associate to Client, shall be permitted to use and disclose PHI in a manner that would not violate the requirements of the HIPAA Regulations as follows:

i.  for the proper management and administration of Vendor;
ii.  to carry out the legal responsibilities of Vendor; and to fulfill Vendor's duties and responsibilities under this Agreement including in part disclosure to its employees and subcontractors; and
iii.  to provide data aggregation services relating to the Health care operations of Client.

7.1.5  Client is authorized to terminate this Agreement if Client determines that Vendor has violated a material term of this Paragraph 7.1 in accordance with the terms of this Agreement.

7.1.6  This Paragraph 7.1 shall survive the expiration or termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

KAISER PERMANENTE – KERN COUNTY

By: _~Ann Ryder~_   9-30-02

Name:  Ann Ryder
Title:   Medical Group Administrator

MEDQUIST TRANSCRIPTIONS, LTD.

By: _~Brian Kearns~_

Name:  BRIAN J. KEARNS
Title:  SVP + CFO

Revised as of 02/01/02
MEDQTLTRANSERVAGT

## EXHIBIT A

### TURNAROUND TIMES

Vendor shall electronically deliver to Client each report transcribed by Vendor before or within the time period applicable to such reports as set forth below. The time period for the delivery of such reports shall be measured as a monthly average from the time at which the dictation of the report is available to Vendor to the time at which Vendor transcribes the report. Reports that do not meet turnaround time standards because the dictator has miscoded them and/or due to required quality assurance verification shall not be included in turnaround time average calculations.

**Turnaround Time**

**Report Type**                                   **Turnaround Time**

All Report Types                                   24 hours

**Environmental Factors:** Vendor will strive to meet optimum turnaround times as defined above. These times are predicated upon optimal conditions for both the dictation and transcription environment. Turnaround times may not always be obtainable due to dictation or transcription station equipment failure; telephone communication line(s) failure; poor dictation quality, incorrect coding of required information by dictator;; computer equipment failure. Turnaround time may vary slightly on weekends and holidays but should not exceed forty-eight (48) hours after the turnaround times defined above.

**STAT Services:** STAT transcription services are available with a one to four (1-4) hour turnaround time. STAT reports are reports containing urgent information needed for immediate patient care and have been called in by Client to advise Vendor of the status. STAT services are provided at no additional charge if the total volume of STAT reports is less than twenty (20) percent of total volume. Should STAT volume exceed twenty (20) percent of total volume, STAT reports will be charged at a rate of 1.50 times the normal line rate

**Penalty Clause:** As liquidated damages for Vendor's failure to meet required turnaround times, and so long as Client is not in default of this Agreement, Vendor shall pay a per report penalty to Client as follows:

All work returned 72 hours after the              Reduced 2.0 percent (2.0%)
contracted turnaround time

NOV-17-2000 04:37  FROM:ARLENE 16616335986              TO:915102716634        P:15/15

## EXHIBIT B

### INTERFACE

Work performed for this contract will require the following existing interfaces:

**ADT Patient Demographic or Orders Download**

<u>XX</u>     HL7 Interactive (real-time) download

**Report Upload**

<u>XX</u>     HL7 Interactive (real-time) interface

# EXHIBIT F

## OVERFLOW TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of August 1, 1997, by and between KAISER PERMANENTE FONTANA, DEPARTMENT OF RADIOLOGY ("Client"), and TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

### BACKGROUND

Client desires to engage Vendor to perform medical transcription and document management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

### ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

Paragraph 1.1    Service Description: Vendor shall provide overflow medical transcription and document management services to Client pursuant to the terms of this Agreement. Vendor shall print at Vendor's location a copy of each Client report transcribed by Vendor and deliver same to Client within 36 hours after printing.

Paragraph 1.2    Dictation Equipment: Unless otherwise agreed, for the purpose of providing the services, Client shall obtain, locate and maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System"). Vendor shall re-record dictation from such system to Vendor's systems.

Paragraph 1.3    Transcription Equipment: Vendor shall obtain and maintain sufficient transcription processing equipment in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Vendor shall obtain and maintain one personal computer system, configured with a modem and a laser printer for purposes of receiving electronically transmitted reports and printing same reports at Client location (the "Client System"). Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports.



EXHIBIT

F

Paragraph 1.5        **Delivery of Transcribed Documents to Client:** Vendor shall deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is successfully re-recorded by Vendor to the time at which the report is transmitted electronically to the Client.

Paragraph 1.6        **Format:** All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

## ARTICLE II

## TERM AND TERMINATION

Paragraph 2.1        **Term:** The term of this Agreement shall be for three (3) years commencing on August 1, 1997 and ending on July 31, 2000. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

Paragraph 2.2        **Termination for Default of Vendor:** Either party may terminate this Agreement upon the happening of any of the following:

    2.2.1    **Insolvency:** If Vendor or Client is unable to pay its debts as they become due and becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

    2.2.2    **Default:** If Vendor or Client materially breaches or defaults in the performance of any covenants, terms or conditions of this Agreement which breach or default shall not have been cured as provided in Paragraph 2.3.

Paragraph 2.3            Notice of Default: If the Vendor defaults in the performance of any of the
                        covenants, terms or conditions of this Agreement, the Client shall deliver to
                        Vendor by registered mail, return receipt requested, ten (10) working days'
                        notice of default, which notice shall enumerate those acts which constitute a
                        breach or default hereunder. Vendor shall then have ninety (90) working
                        days' from receipt of said notice in which to cure said default. If Vendor shall
                        fail to cure such default within said ninety (90) working day period, Client
                        shall have the absolute right to terminate this Agreement, as per Paragraph
                        2.1.

                                            ARTICLE III

                                        PAYMENTS AND CHARGES

Paragraph 3.1           Payment to Vendor: Client shall pay to Vendor a payment of $.1400 for each
                        unit (as set forth below) transcribed for Client for the first year of the contract.
                        This payment shall be increased three and one-half percent (3.5%) annually
                        for each of the subsequent contract years. If Vendor shall cease to print Client
                        reports as per Paragraph 1.1 hereof, the price per unit shall be decreased to
                        $.13 plus any increases pursuant to the previous sentence.

                        The unit of pricing applicable to this Agreement is as designated below:

                        AAMT Line. An AAMT line is defined as any line having 65 "characters".
                                        A character is defined as any letter, number, symbol or
                                        function key necessary for the final appearance and content of
                                        a document including, without limitation, the space bar,
                                        carriage return, underscore, bold, and any character contained
                                        within the macro, header, or footer. A defined line is
                                        calculated by counting all characters contained within a
                                        document and simply dividing the total number of characters
                                        by 65 to arrive at the number of defined lines.

                        3.1.1   Other Unanticipated Changes or Additional Services: In the event that
                                Client changes the manner in which it conducts business or requires
                                services above and beyond that anticipated at the time of execution of
                                this Agreement, Vendor may charge a reasonable fee for such changes
                                and for additional services.

Paragraph 3.2           Billing: Vendor will invoice the Client monthly for services rendered pursuant
                        to the terms and conditions listed herewith.

Paragraph 3.3

Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. After sixty (60) days of the date of the invoice, any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. In addition, Client shall be responsible for all reasonable costs of collection, including reasonable attorney fees, incurred by Vendor in its efforts to collect any overdue amount.

Paragraph 3.4

Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

Paragraph 3.5

Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and to pay to Vendor any portion of such disputed amount which Client, in its sole discretion, has determined to be substantiated. Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations the dispute shall be settled by arbitration, in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall be conducted in the Philadelphia, Pennsylvania metropolitan area. The decision reached through arbitration shall be final and binding on both parties. Vendor shall continue to provide services under the terms of this Agreement during the arbitration, at the fees then in effect. This Paragraph 3.5 shall also apply to any other dispute between the parties under this Agreement.

-4-

## ARTICLE IV

## CONFIDENTIAL INFORMATION

Paragraph 4.1
Confidential Information: Vendor agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence and with the understanding that it constitutes valuable business information developed by Client at great expenditure of time, effort and money. Vendor agrees that it shall not, without express prior written consent of Client, use the confidential information for any purpose other than the performance of this Agreement. Vendor further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client.

Paragraph 4.2
Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3
Remedies: The parties acknowledge and agree that since a remedy at law for any breach or attempted breach of the provisions of the Article IV shall be inadequate, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist by law. The non-breaching party also waives any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

## ARTICLE V

## MISCELLANEOUS

Paragraph 5.1

Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith (including) reasonable attorney's fees (collectively, "Damages") caused directly or indirectly as a result of services provided in the Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 5.2

Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

Paragraph 5.3

Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties to the subject matter hereof.

Paragraph 5.4

Assignment: Client may assign all of its rights hereunder at any time without the prior consent of Vendor. Vendor may not assign any of its rights hereunder without the prior written consent of Client, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Vendor may assign all of its rights hereunder to its lenders as collateral security.

Paragraph 5.5

Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto, their respective successors and assigns, if any.

Paragraph 5.6

Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

**Paragraph 5.7**      Liability: Notwithstanding anything in this Agreement to the contrary (i) in no event shall the cumulative liability of Vendor, pursuant to this Agreement exceed the amount of fees paid by Client to Vendor during the twelve (12) month period immediately prior to the occurrence resulting in such liability, and (ii) in no event shall Vendor be responsible for consequential or incidental damages or for any lost profits or any claim or demand of any nature or kind, whether asserted by Client or against Client by any other individual or entity.

**Paragraph 5.8**      Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, addressed to the party to whom it is to be given as follows:

If to Client:     Tony Garcia, RT
                  Director or Radiology
                  Kaiser Permanente Fontana Hospital
                  9961 Sierra Avenue
                  Fontana, California  92335

If to Vendor:     Transcriptions, Ltd.
                  Five Greentree Centre, Suite 311
                  Marlton, New Jersey  08053
                  Attn:  Chief Operating Officer

With a copy to: Transcriptions, Ltd.
                  Five Greentree Centre, Suite 311
                  Marlton, New Jersey  08053
                  Attn:  General Counsel

**Paragraph 5.9**      Agency: Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other.

| Paragraph 5.10 | Exclusive Agreement: During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other transcription service to perform client's medical dictation/transcription work other than work that Vendor can not or will not perform. |
|---|---|
| Paragraph 5.11 | Force Majeure: Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party. |

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

KAISER PERMANENTE FONTANA                    TRANSCRIPTIONS, LTD.

By: _Tony C. Garcia_                          By: _____
Title: _Assist. Dept. Adm___                  Title: Executive Vice President and
                                                      Chief Operating Officer

Rev: March 5, 1997

-8-

## EXHIBIT "A"

All work must be transcribed and uploaded within 24 hours.
All transcribed reports must be returned to Client within 36 hours.

# EXHIBIT G

Transcriptions, Ltd.

(909) 824-9890
(800) 524-2918
FAX:  (909) 824-0548

AGREEMENT FOR TRANSCRIPTION

DATE: December 12, 1995

TO:    Tony Garcia
       Administrator, Radiology Department
       Kaiser Fontana Hospital
       9961 Sierra Avenue
       Fontana, CA.  92335


The following agreement is for transcription services for the
period - indefinitely.

Transcriptions, Ltd. (Vendor) will perform for Kaiser Fontana
(Hospital) the following services.

1.    Transcription of all types of Radiological Reports.

2.    Delivery of reports on the following schedule:  Pick-up of
      requisitions by 9:00 a.m. Monday through Friday.  Reports will
      be copied to a floppy disk and delivered each morning with the
      pick-up of the requisitions.

3.    Turnaround time as follows:   24-48 hour turnaround time,
      depending on volume and individual circumstances.

4.    Reports of accurate context and quality as deemed satisfactory
      by your quality assurance mechanisms and standards.

5.    A transcribed log of all reports indicating:   Dictator,
      patient, date of dictation, date of transcription, patient
      file number, transcriptionist.

COSTS:

1.    Costs will be $.1300 per 65 character defined line for an
      indefinite period, of time with rate increases of three (3)
      percent a year.

2.    Billing is provided monthly and includes date of bill,
      identity of vendor, purchase order number and total lines
      transcribed.

CONFIDENTIALITY:

1.    The Vendor is responsible for maintaining confidentiality of
      the information contained in the dictated records and
      transcribed reports while in the Vendor's possession.

EXHIBIT

G

**Transcriptions, Ltd.**

(909) 824-9890
(800) 524-2918
FAX: (909) 824-0548

TRANSCRIPTIONS, LTD.
AGREEMENT FOR TRANSCRIPTION
PAGE TWO

CANCELLATION:

1.  This agreement can be canceled with thirty days (30) written
    notice by either party.

_Karen Westenberger_
TRANSCRIPTIONS, LTD.

_1-10-95_
DATE

_Tony C. Garcia_
KAISER FONTANA HOSPITAL

_12/20/95_
DATE



**Transcriptions, Ltd.** _____

(909) 824-9890
(800) 524-2918
FAX: (909) 824-0548

This authorizes Transcriptions, Ltd. (Vendor) to provide
transcription of medical reports for Kaiser Fontana Hospital at a
rate of $.1300 per 65 character defined line until such time that
a purchase order number can be obtained and received by the Vendor.


_____          _____
KAISER FONTANA HOSPITAL                 DATE  12/20/95

_____          _____
TRANSCRIPTIONS, LTD.                    DATE  1-10-95

# EXHIBIT H

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of October 15, 1999, by and between KAISER PERMANENT, HARBOR CITY, a California Corporation ("Client"), and MEDQUIST MRC, INC., a New Jersey Corporation ("Vendor").

## BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

## ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

Paragraph 1.1        Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

Paragraph 1.2        Dictation Equipment: For the purpose of providing the services, Client shall maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System").

Paragraph 1.3        Transcription Equipment:  Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement. (the "Transcription Equipment"). Client shall, at its own cost and expense, supply a laser printer(s) configured to operate with the Client System and all paper products and printer supplies necessary for printing reports.

Paragraph 1.4        Delivery of Dictation to Vendor: Client will provide Vendor with access to Client dictation system, twenty-four hours per day, seven days per week. Client will provide adequate transcription ports in order for Vendor to fulfill its obligations and duties under this Agreement.

Paragraph 1.5        Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transmitted electronically to the Client.

Paragraph 1.6        Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

**EXHIBIT**

**H**

## ARTICLE II

## TERM AND TERMINATION

Paragraph 2.1    Term: The term of this Agreement shall be for three (3) years commencing on October 15, 1999 and ending on October 14, 2002. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

Paragraph 2.2    Termination for Default of Vendor: Either party may terminate this Agreement upon the happening of any of the following:

2.2.1    Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

2.2.2    Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

Paragraph 2.3    Notice of Default: If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, ten (10) working days' notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

## PAYMENTS AND CHARGES

Paragraph 3.1    Payment to Vendor: Client shall pay to Vendor a payment of $0.15 for each unit (as set forth below) transcribed for Client for the first year of the contract. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement.

The unit of pricing applicable to this Agreement is as designated below:

AAMT Line.    An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a

document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines.

In addition, Client shall pay to Vendor a monthly payment as follows:

$500.00    Vendor interface to Client mainframe, set up and maintenance fee.

\* $100 each    MTS transcription system installation and maintenance for transcriptionist workstations at Client site.

\*_NOTE:_ to be further discussed as needs for future. Not in initial setup & transation.

3.1.2    Additional Format Changes: Upon execution of this agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.3    Interface Requirements: The interface requirements of this Agreement are as designated below:

Interface requirements are set forth in Exhibit B.

3.1.4    Other Unanticipated Changes or Additional Services: In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

Paragraph 3.2    Billing: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

Paragraph 3.3    Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in

order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

**Paragraph 3.4**    Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

**Paragraph 3.5**    Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and to pay to Vendor any portion of such disputed amount which Client, in its sole discretion, has determined to be substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations the dispute shall be settled by arbitration, in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall be conducted in the Philadelphia, Pennsylvania metropolitan area. The decision reached through arbitration shall be final and binding on both parties. Vendor shall continue to provide services under the terms of this Agreement during the arbitration, at the fees then in effect. This Paragraph 3.5 shall also apply to any other dispute between the parties.

### ARTICLE IV

### CONFIDENTIAL INFORMATION

**Paragraph 4.1**    Confidential Information: Vendor agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. Vendor agrees that it shall not, without express prior written consent of Client, use the confidential information for any purpose other than the performance of this Agreement. Vendor further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client. Notwithstanding the foregoing, Vendor shall be entitled to disclose all the information contained in all dictated statements to any person or company without Client's consent, so long as all patient identifiable information has been deleted from and not included in such reports.

**Paragraph 4.2**    Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary

information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3    Remedies: The parties acknowledge and agree that since a remedy at law for any breach or attempted breach of the provisions of the Article IV shall be inadequate, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist by law. The non-breaching party also waives any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

Paragraph 4.4    Certain Exceptions: The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

Paragraph 4.5    Non-Solicitation of Transcriptionists and Employees: During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, Client shall not solicit, hire or engage any person who then is or within the prior twelve (12) months has been an employee or transcriptionist of Vendor.

## ARTICLE V

## MAINTENANCE OF EQUIPMENT

Paragraph 5.1    Maintenance of Equipment: Vendor shall maintain the Dictation System, the Transcription Equipment and the Client System. Client shall notify Vendor promptly of any problems with the Client System. In the event that any of the Client System is not in good working order or any equipment of Vendor is damaged as a result of Client's or its agents' negligence or intentional act, Client shall repair or replace said equipment promptly.

# ARTICLE VI

## MISCELLANEOUS

Paragraph 6.1 — Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly or indirectly as a result of services provided in the Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 6.2 — Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

Paragraph 6.3 — Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof.

Paragraph 6.4 — Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

Paragraph 6.5 — Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

Paragraph 6.6 — Liability: Notwithstanding anything in this Agreement to the contrary (i) in no event shall the cumulative liability of Vendor, pursuant to this Agreement exceed the amount of fees paid by Client to Vendor during the twelve (12) month period immediately prior to the occurrence resulting in such liability, and (ii) in no event shall Vendor be responsible for consequential or incidental damages or for any lost profits, whether asserted by Client or against Client by any other individual or entity.

Paragraph 6.7 — Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the party to whom it is to be given as follows:

If to Client:    Kaiser Permanente
                 25825 S. Vermont Ave.
                 Harbor City, CA 90710
                 Fax #: (310) 517-4333
                 Attn.: Marion C. Ott, Health Information Systems Manager

If to Vendor:  MedQuist MRC, Inc.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #:  609-797-5949
**Attn:**  Chief Operating Officer

With a copy to: MedQuist MRC, Inc.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #:  609-797-5949
**Attn:**  General Counsel

Paragraph 6.8    Agency: Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other.

Paragraph 6.9    Exclusive Agreement: During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other transcription service to perform client's medical dictation/transcription work other than work that Vendor can not or will not perform.

Paragraph 6.10    Force Majeure: Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

Paragraph 6.11    Medicare Clause: The Vendor agrees to allow the Secretary of the Department of Health and Human Services and the Comptroller General, or their duly authorized representatives, access upon request to this Agreement and to the books, documents and records of the Vendor that are necessary to verify the nature and extent of costs of services furnished under this Agreement. The Vendor also agrees that if the Vendor carries out any duties of the Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, the subcontract must contain a clause to the effect that the related organization must make available, upon written request, to the Secretary, or upon request to the Comptroller General, or their duly authorized representatives, the subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs. Such access shall be until the expiration of four (4) years after the services are furnished under this Agreement.

**Paragraph 6.12**     **Effective Date:**  If Client does not execute this Agreement within thirty (30) days after Vendor sends it to Client, then this Agreement shall be null and void, absent Vendor's express written consent to the contrary.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By: _Marion C. Ott_

Name: MARION C. OTT

Title: _Health Information Systems Manager_

Revised as of 5/27/99

MEDQUIST MRC, INC.

By: _____

John A. Donohoe, Jr.

Title:  President and Chief Operating Officer

**Exhibit A**

Turnaround Time

| | |
|---|---|
| STAT reports | 2-4 hours |
| History & Physical Exam | 18 hours |
| Consultation | 18 hours |
| Operative/Procedure Reports | 24 hours |
| Discharge Summaries | 48 hours |
| Inpatient Cardiology | 24 hours |
| Outpatient Cardiology | 48 hours |
| Correspondence | 72 hours |

**Exhibit B**

Interface Requirements

Vendor will provide an interface for document upload to the Kaiser KPDS mainframe system.

# EXHIBIT I

MedQuist Legal Dept. ONLY:
Contract No._____

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of October 1, 2002, by and between KAISER PERMANENTE, HARBOR CITY ("Client"), and MEDQUIST TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

### BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

### ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

Paragraph 1.1    Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

Paragraph 1.2    Dictation Equipment: For the purpose of providing the services

Client shall maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System").

Paragraph 1.3    Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports.

Vendor shall, at its own cost and expense, supply a personal computer system, monitor, modem and laser printer configured to operate with the Vendor's System

Vendor will provide to Client a laser printer at no cost to the Client. The Client is responsible for associated maintenance fees, paper


EXHIBIT
tabbies'
I

and ink cartridges.

Paragraph 1.4    Delivery of Dictation to Vendor: Client physicians may dictate into the Dictation System at any time, twenty-four hours per day, seven days per week.

Paragraph 1.5    Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transcribed.

    1.5.1   Grace Period: Vendor shall adhere to the turnaround times set forth on Exhibit A at all times throughout the term of this Agreement following an initial grace period of ninety (90) calendar days commencing on the first day on which services are provided hereunder. The grace period is intended to allow Vendor a reasonable period of time in which to set up the account, systems, telephone configurations and appropriate staffing.

Paragraph 1.6    Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

## ARTICLE II

### TERM AND TERMINATION

Paragraph 2.1    Term: The term of this Agreement shall be for three (3) years commencing on October 1, 2002 and ending on September 30, 2005. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

Paragraph 2.2    Termination for Default: Either party may terminate this Agreement upon the happening of any of the following:

2.2.1    Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

2.2.2    Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

Paragraph 2.3    Notice of Default: If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, written notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) calendar days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) calendar day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

## PAYMENTS AND CHARGES

Paragraph 3.1    Payment to Vendor: Client shall pay to Vendor a payment of $0.14 for each unit (as set forth below) transcribed for Client for the first year of the contract and any other amounts set forth on Exhibit C attached hereto. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement. Failure to implement a price increase shall not constitute a waiver of the right to such increase and Vendor may bill at any time for previously unbilled amounts.

The unit of pricing applicable to this Agreement is as designated below:

AAMT Line. An AAMT line is defined as any line having 65 "characters".
A character is defined as any letter, number, symbol or

function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines. Client acknowledges that the charges set forth in this Agreement are based upon the fact that character counts shall be determined using Vendor's software system and shall not be derived from any third party software or interface systems.

3.1.1    Additional Format Changes: Upon execution of this Agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.2    Interface Requirements: The interface requirements of this Agreement are as designated below:

Interface requirements are set forth in Exhibit B.

3.1.3    Other Unanticipated Changes or Additional Services: In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

Paragraph 3.2    Billing: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

Paragraph 3.3    Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month, or the maximum allowable under applicable law, until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to

make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

Paragraph 3.4    Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

Paragraph 3.5    Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and shall pay to Vendor any portion of such disputed amount which has been substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations, the dispute shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Arbitration shall be conducted in the jurisdiction of the principal headquarters of the party not raising the dispute. The decision reached through arbitration shall be final and binding on both parties. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

## CONFIDENTIAL INFORMATION

Paragraph 4.1    Confidential Information: Vendor agrees and acknowledges that confidential patient information shall be disclosed to it in confidence. Vendor agrees to keep strictly confidential and hold in trust all confidential patient information in compliance with applicable laws and the HIPAA Regulations (as defined in Article VII).

-5-

Paragraph 4.2      Proprietary Information:. Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor or to de-compile, reverse engineer or otherwise use such Information. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3      Remedies: The parties acknowledge and agree that a remedy at law for any breach or attempted breach of the provisions of this Article IV shall be inadequate and that the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist at law.

Paragraph 4.4      Certain Exceptions:  The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis and in compliance with applicable laws or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

Paragraph 4.5      Non-Solicitation of Transcriptionists and Employees:  During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, Client shall not solicit, hire or engage any person who during the term is or has been an employee or transcriptionist of Vendor.

## ARTICLE V

### MAINTENANCE OF EQUIPMENT

Paragraph 5.1      Maintenance of Equipment: The party providing the Dictation System pursuant to Section 1.2 hereof shall be responsible for the repair and maintenance of the Dictation System. Vendor shall be responsible for the repair and maintenance of the Transcription Equipment. Client shall be responsible for the repair and maintenance of any other equipment located at Client's offices.

## ARTICLE VI

### MISCELLANEOUS

Paragraph 6.1     Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly by a breach of the terms of this Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 6.2     Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

Paragraph 6.3     Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof. All Exhibits attached hereto are incorporated herein, and made a part hereof.

Paragraph 6.4     Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

Paragraph 6.5     Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

Paragraph 6.6     Liability: Notwithstanding anything in this Agreement to the contrary, in no event shall Vendor be responsible for special, exemplary, punitive, consequential or incidental damages or for any damages other than, or in addition to, actual damages.

Paragraph 6.7     Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the

party to whom it is to be given as follows:

If to Client:    Kaiser Permanente, Harbor City
25825 s. Vermont Ave.
Harbor City, CA. 90710
Fax #:
Attn.: Marion C. Ott, Health Information Systems Manager


If to Vendor:    MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
**Attn:** Chief Operating Officer

With a copy to:    MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
**Attn:** General Counsel

Paragraph 6.8    Agency: Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other.

Paragraph 6.9    Exclusive Agreement: During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other transcription service to perform Client's medical dictation/transcription work other than work that Vendor cannot or will not perform.

Paragraph 6.10    Force Majeure: Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

Paragraph 6.11    Medicare Clause: The Vendor agrees to allow the Secretary of the Department of Health and Human Services and the Comptroller General, or their duly authorized representatives, access upon request to this Agreement and to the books, documents and records of the Vendor that are necessary to verify the nature and extent of costs of services furnished under this Agreement. The Vendor also agrees that if the Vendor carries out any duties of the Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, the subcontract must contain a clause to the effect that the related organization must make available, upon written request, to the Secretary, or upon request to the Comptroller General, or their duly authorized representatives, the subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs. Such access shall be until the expiration of four (4) years after the services are furnished under this Agreement.

Paragraph 6.12    Effective Date: If Client does not execute this Agreement within thirty (30) days after Vendor sends it to Client, then this Agreement shall be null and void, absent Vendor's express written consent to the contrary.

## ARTICLE VII

## HIPAA

Paragraph 7.1    Confidential Patient Health Information: In connection with the performance of services hereunder, Client discloses to Vendor certain information that will be subject to protection under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191. Vendor, as a recipient of protected information from Client, is a "Business Associate" as that term is defined in HIPAA and regulations promulgated by the U.S. Department of Health and Human Services to implement certain provisions of HIPAA (herein "HIPAA Regulations"). Pursuant to said HIPAA Regulations, all Business Associates of entities such as Client must agree in writing to certain mandatory provisions regarding the use and disclosure of individually identifiable health information (within the meaning of 45 CFR, §164.501 of HIPAA, hereafter "Protected Health Information" or "PHI"). In order to satisfy the requirements of the HIPAA Regulations effective upon the applicable compliance dates set forth in 45 CFR, §164.534 (the "Effective Time"), Client and Vendor agree as follows effective as of the Effective Time:

7.1.1    Unless otherwise provided in this Agreement, capitalized terms in

-9-

this Paragraph 7.1 shall have the meanings given to them in the HIPAA Regulations.

7.1.2 Vendor transmits unsigned, transcribed reports to Client. The parties understand that Client may, at its discretion, modify the finalized transcribed reports from time to time without Vendor's knowledge. Client understands and agrees that Vendor provides medical transcription services and is not in the business of maintaining original records by or for Client and that data maintained by Vendor is a copy only.

7.1.3 Vendor will:

a. not use or further disclose the PHI other than as permitted or required by this Agreement or as required by law;

b. use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement;

c. report to Client any use or disclosure of the PHI not provided for by this Agreement of which Vendor becomes aware;

d. ensure that any agents, including a subcontractor, to whom it provides PHI received from, or created or received by Vendor on behalf of, the Client agrees to the same restrictions and conditions that apply to the Vendor with respect to such PHI;

e. make available to Client, such information as Client may require to fulfill Client's obligations to provide access to, provide a copy of, and account for disclosures with respect to PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR, §164.524 and §164.528. Vendor may charge a reasonable fee for providing the above services.

f. make Client's PHI available to Client, as Client may require to fulfill Client's obligations to amend PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR, §164.526 and Vendor shall, as directed by Client, incorporate any amendments to Client's PHI into copies of such PHI maintained by Client. Vendor may charge a reasonable fee for providing the above services.

g. make available the information required to provide an accounting of disclosures in accordance with 45 CFR, §164.528.

    h.  make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Vendor on behalf of, the Client available to the Secretary of the U.S. Department of Health and Human Services for purposes of determining the Client's compliance with HIPAA; and

    i.  at termination of this Agreement, if feasible, return or destroy all PHI received from, or created or received by Vendor on behalf of, the Client that the Vendor still maintains in any form and retain no copies of such information or, if such return is not feasible, extend the protections of this Agreement to the information and limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible.

**7.1.4**    Vendor, in its capacity as Business Associate to Client, shall be permitted to use and disclose PHI in a manner that would not violate the requirements of the HIPAA Regulations as follows:

    i.  for the proper management and administration of Vendor;
    ii.  to carry out the legal responsibilities of Vendor; and to fulfill Vendor's duties and responsibilities under this Agreement including in part disclosure to its employees and subcontractors; and
    iii.  to provide data aggregation services relating to the health care operations of Client.

**7.1.5**    Client is authorized to terminate this Agreement if Client determines that Vendor has violated a material term of this Paragraph 7.1 in accordance with the terms of this Agreement.

**7.1.6**    This Paragraph 7.1 shall survive the expiration or termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

KAISER PERNANENTE, HARBOR CITY

By: *Marion C Ott*

Name: MARION C. OTT

Title: *Health Information Manager*

Date: 9/20/02

MEDQUIST TRANSCRIPTIONS, LTD.

By: *Brian J Kearns*

Brian J. Kearns
Senior Vice President & CFO

Date: 9-27-02

By: _____

Name: _____

Title: _____

Date: _____

*Revised as of 08/08/02*

-12-

## EXHIBIT A

### TURNAROUND TIMES

| | |
|---|---|
| STAT Reports | 2-4 Hours |
| History & Physical Exam | 18 Hours |
| Consultation | 18 Hours |
| Operative/Procedure Reports | 24 Hours |
| Discharge Summaries | 48 Hours |
| Inpatient Cardiology | 24 Hours |
| Outpatient Cardiology | 48 Hours |
| Correspondence | 72 Hours |

# EXHIBIT B

## INTERFACE

Vendor will provide an interface for document upload to the Kaiser KPDS mainframe system.

**EXHIBIT C**

**OTHER CHARGES**

No other charges.

## AMENDMENT No. 1
### Dated as of December X, 2004
### TO
### TRANSCRIPTION SERVICES AGREEMENT

This Amendment No. 1 ("Amendment") by and between MedQuist Transcriptions, Ltd. ("Vendor") and Kaiser Permanente South Bay Medical Center ("Client") is dated as of December X, 2004 ("Amendment No. 1 Effective Date").

### BACKGROUND

WHEREAS, Client and Vendor entered into a Transcription Services Agreement effective as of October 1, 2002, ("Agreement"); and

WHEREAS, the parties desire to amend the terms of the Agreement as set forth in this Amendment.

NOW THEREFORE, in consideration of the mutual agreements and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, it is mutually agreed and covenanted by and between the parties to this Amendment, as follows:

1. Capitalized terms not otherwise defined in this Amendment shall have the meanings given to them in the Agreement.

2. As of the Amendment No. 1 Effective Date, the billing rate shall be changed from $0.147 per AAMT Line to the per report pricing set forth below.

| Report Level | Report Description | Pricing per Report |
|---|---|---|
| HCC | Cardiology Consult Outpatient | $12.39 |
| HCH | Holter Monitor | $4.89 |
| HCI | Cardiology Consult Inpatient | $11.88 |
| HCO | Outpatient Consult | $14.91 |
| HCP | Cardiology Procedure | $6.93 |
| HDR | Carson Discharge Summary | $8.65 |
| HDS | Discharge Summary | $12.17 |
| HDT | Death Summary | $9.32 |
| HED | Echo-dopler | $7.19 |
| HHC | History & Physical/Carson CDR | $24.84 |
| HHP | History & Physical | $16.64 |
| HHQ | Pediatric History & Physical | $17.04 |
| HIE | Inpatient Echo | $9.92 |
| HLC | Carson Letter | $4.75 |
| HLG | Gardena Letter | $5.21 |
| HLH | South Bay Letter | $6.41 |
| HLL | Long Beach Letter | $6.80 |
| HLT | Torrance Letter | $2.56 |

| HMH | Memo South Bay | $7.85 |
|-----|----------------|-------|
| HOC | Inpatient Consultation | $18.54 |
| HOE | Outpatient Echo | $9.51 |
| HOP | Operative | $13.01 |
| HPE | Psych Evaluation | $19.86 |
| HPN | Progress Note | $6.30 |
| HPR | Procedure Report | $8.01 |
| HSN | Skilled Nursing Discharge Summary | $9.32 |
| HTE | Transefophagael Echo | $6.83 |
| HTR | Transfer Summary | $15.34 |

Upon Client's migration to Vendor's DocQment™ Enterprise Platform and acceptance by both parties of the Black Character unit of measure and price, Vendor shall send Client a letter setting forth the Black Character rate and the date upon which it will be effective.

3. The following language shall be added as Paragraph 2.4 of the Agreement:

   "Paragraph 2.4    Termination for Convenience:    Either party may terminate this Agreement without cause, after providing one hundred twenty (120) days prior written notice to the other party."

4. Except as modified by this Amendment, the Agreement shall remain in full force and effect unmodified. To the extent the terms of the Agreement are inconsistent with the terms of this Amendment, the terms of this Amendment shall control.

   IN WITNESS WHEREOF, Client and Vendor have executed this Amendment No. 1 as of the day and year first written above by their duly authorized representatives.

KAISER PERMANTENTE
SOUTH BAY MEDICAL CENTER

By: _Leroy Foster_

Name: _LEROY FOSTER_

Title: _HLTH INFO MGR_

MEDQUIST TRANSCRIPTIONS, LTD.

By: _____

Name: JOHN W. QUAINTANCE
EXECUTIVE VICE PRESIDENT
CHIEF OPERATING OFFICER
MEDQUIST, INC.

Title: _____

2

# EXHIBIT J



# TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of December 1, 1999, by and between KAISER PERMANENTE, RIVERSIDE MEDICAL CENTER, a California Corporation ("Client"), and MEDQUIST MRC, INC., a New Jersey Corporation ("Vendor").

## BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

## ARTICLE I

**EXHIBIT**

tables J

## SERVICE DESCRIPTION AND SPECIFICATIONS

Paragraph 1.1     Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

Paragraph 1.2     Dictation Equipment: For the purpose of providing the services, Client shall maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System").

Paragraph 1.3     Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement. (the "Transcription Equipment"). Client shall, at its own cost and expense, supply a laser printer(s) configured to operate with the Client System and all paper products and printer supplies necessary for printing reports.

Paragraph 1.4     Delivery of Dictation to Vendor: Client will provide Vendor with access to Client dictation system, twenty-four hours per day, seven days per week. Client will provide adequate transcription ports in order for Vendor to fulfill its obligations and duties under this Agreement.

Paragraph 1.5     Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transmitted electronically to the Client.

Paragraph 1.6     Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

## ARTICLE II

### TERM AND TERMINATION

**Paragraph 2.1**

<u>Term:</u> The term of this Agreement shall be for three (3) years commencing on December 15, 1999 and ending on December 14, 2002. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

**Paragraph 2.2**

<u>Termination for Default of Vendor:</u> Either party may terminate this Agreement upon the happening of any of the following:

2.2.1    <u>Insolvency:</u> If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

2.2.2    <u>Default:</u> If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

**Paragraph 2.3**

<u>Notice of Default:</u> If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, ten (10) working days' notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

### PAYMENTS AND CHARGES

**Paragraph 3.1**

<u>Payment to Vendor:</u> Client shall pay to Vendor a payment of $0.15 for each unit (as set forth below) transcribed for Client for the first year of the contract. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement.

The unit of pricing applicable to this Agreement is as designated below:

<u>AAMT Line.</u>    An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a

document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines.

In addition, Client shall pay to Vendor a monthly payment as follows:

$500.00     Vendor interface to Client mainframe, set up and maintenance fee. *if average monthly report volume exceeds 1500 reports/mth.*

$100 each     MTS transcription system installation and maintenance for transcriptionist workstations at Client site.

3.1.2    <u>Additional Format Changes:</u> Upon execution of this agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.3    <u>Interface Requirements:</u> The interface requirements of this Agreement are as designated below:

Interface requirements are set forth in <u>Exhibit B.</u>

3.1.4    <u>Other Unanticipated Changes or Additional Services:</u> In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

<u>Paragraph 3.2</u>    <u>Billing:</u> Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

<u>Paragraph 3.3</u>    <u>Payment:</u> Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in

order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

**Paragraph 3.4**    Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

**Paragraph 3.5**    Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and to pay to Vendor any portion of such disputed amount which Client, in its sole discretion, has determined to be substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations the dispute shall be settled by arbitration, in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall be conducted in the Philadelphia, Pennsylvania metropolitan area. The decision reached through arbitration shall be final and binding on both parties. Vendor shall continue to provide services under the terms of this Agreement during the arbitration, at the fees then in effect. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

## CONFIDENTIAL INFORMATION

**Paragraph 4.1**    Confidential Information: Vendor agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. Vendor agrees that it shall not, without express prior written consent of Client, use the confidential information for any purpose other than the performance of this Agreement. Vendor further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client. Notwithstanding the foregoing, Vendor shall be entitled to disclose all the information contained in all dictated statements to any person or company without Client's consent, so long as all patient identifiable information has been deleted from and not included in such reports.

**Paragraph 4.2**    Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary

information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

**Paragraph 4.3**   Remedies: The parties acknowledge and agree that since a remedy at law for any breach or attempted breach of the provisions of the Article IV shall be inadequate, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist by law. The non-breaching party also waives any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

**Paragraph 4.4**   Certain Exceptions: The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

**Paragraph 4.5**   Non-Solicitation of Transcriptionists and Employees: During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, Client shall not solicit, hire or engage any person who then is or within the prior twelve (12) months has been an employee or transcriptionist of Vendor.

## ARTICLE V

## MAINTENANCE OF EQUIPMENT

**Paragraph 5.1**   Maintenance of Equipment: Vendor shall maintain the Dictation System, the Transcription Equipment and the Client System. Client shall notify Vendor promptly of any problems with the Client System. In the event that any of the Client System is not in good working order or any equipment of Vendor is damaged as a result of Client's or its agents' negligence or intentional act, Client shall repair or replace said equipment promptly.

## ARTICLE VI

## MISCELLANEOUS

Paragraph 6.1    Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly or indirectly as a result of services provided in the Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 6.2    Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

Paragraph 6.3    Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof.

Paragraph 6.4    Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

Paragraph 6.5    Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

Paragraph 6.6    Liability: Notwithstanding anything in this Agreement to the contrary (i) in no event shall the cumulative liability of Vendor, pursuant to this Agreement exceed the amount of fees paid by Client to Vendor during the twelve (12) month period immediately prior to the occurrence resulting in such liability, and (ii) in no event shall Vendor be responsible for consequential or incidental damages or for any lost profits, whether asserted by Client or against Client by any other individual or entity.

Paragraph 6.7    Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the party to whom it is to be given as follows:

If to Client:    Kaiser Permanente
Riverside Medical Center
10800 Magnolia Ave.
Riverside, CA 92505
Fax #:

Attn.: Robert Carie, Health Information Systems Manager

If to Vendor:  MedQuist MRC, Inc.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: 609-797-5949
**Attn:** Chief Operating Officer

With a copy to: MedQuist MRC, Inc.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: 609-797-5949
**Attn:** General Counsel

**Paragraph 6.8**

**Agency:** Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other.

**Paragraph 6.9**

*OK for other agent*

**Exclusive Agreement:** During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other transcription service to perform client's medical dictation/transcription work other than work that Vendor can not or will not perform.

**Paragraph 6.10**

**Force Majeure:** Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

**Paragraph 6.11**

**Medicare Clause:** The Vendor agrees to allow the Secretary of the Department of Health and Human Services and the Comptroller General, or their duly authorized representatives, access upon request to this Agreement and to the books, documents and records of the Vendor that are necessary to verify the nature and extent of costs of services furnished under this Agreement. The Vendor also agrees that if the Vendor carries out any duties of the Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, the subcontract must contain a clause to the effect that the related organization must make available, upon written request, to the Secretary, or upon request to the Comptroller General, or their duly authorized representatives, the subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs. Such access shall be until the expiration of four (4) years after the services are furnished under this Agreement.

Paragraph 6.12    **Effective Date:** If Client does not execute this Agreement within thirty (30) days after Vendor sends it to Client, then this Agreement shall be null and void, absent Vendor's express written consent to the contrary.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By: _Robert L. Carie_

Name: Robert L. CARIE

Title: Director, HIM Dept.

MEDQUIST MRC, INC.

By: 

Title:    John A. Donohoe, Jr.

    President and Chief Operating Officer

*Revised as of 3/27/99*

## Exhibit A

### Turnaround Time

| | |
|---|---|
| STAT reports | 2-4 hours |
| History & Physical Exam | 18 hours |
| Consultation | 18 hours |
| Operative/Procedure Reports | 24 hours |
| Discharge Summaries | 48 hours |
| Inpatient Cardiology | 24 hours |
| Outpatient Cardiology | 48 hours |
| Correspondence | 72 hours |

FROM :                          FAX NO. :9513533782              Jul. 15 2007 11:58PM  P10

# Exhibit B

## Interface Requirements

Vendor will provide an interface for document upload to the Kaiser KPDS mainframe system.

**MedQuist Legal Dept. ONLY:**
Contract No. _____

# TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of June 1, 2002, by and between Kaiser Permanente, Riverside ("Client"), and MEDQUIST TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

## BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

## ARTICLE I

## SERVICE DESCRIPTION AND SPECIFICATIONS

**Paragraph 1.1**    Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

**Paragraph 1.2**    Dictation Equipment: For the purpose of providing the services

Client shall maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System").

**Paragraph 1.3**    Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports.

Vendor will provide to Client a personal computer system including a monitor and modem at no cost.

Vendor will provide to Client a laser printer at no cost. The Client is responsible for associated maintenance fees, paper and toner.

**Paragraph 1.4**    Delivery of Dictation to Vendor: Client will provide port availability for vendor transcriptionists to access dictation. 24 hours a day, 7 days per week.

**Paragraph 1.5**    Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transcribed.

    1.5.1    Grace Period: Vendor shall adhere to the turnaround times set forth on Exhibit A at all times throughout the term of this Agreement following an initial grace period of ninety (90) calendar days commencing on the first day on which services are provided hereunder. The grace period is intended to allow Vendor a reasonable period of time in which to set up the account, systems, telephone configurations and appropriate staffing.

**Paragraph 1.6**    Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

### ARTICLE II

### TERM AND TERMINATION

**Paragraph 2.1**    Term: The term of this Agreement shall be for one (1) year with automatic one (1) year renewals commencing on June 1, 2002 and ending on May 31, 2003. Client may terminate this Agreement after one hundred and twenty (120) days' notice following the procedures outlined in Paragraph 2.3.    *May 2007*

**Paragraph 2.2**    Termination for Default: Either party may terminate this Agreement upon the happening of any of the following:

    2.2.1    Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

    2.2.2    Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other

covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

Paragraph 2.3

Notice of Default: If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, written notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

## PAYMENTS AND CHARGES

Paragraph 3.1

Payment to Vendor: Client shall pay to Vendor a payment of $0.145 for each unit (as set forth below) transcribed for Client for the first year of the contract and any other amounts set forth on Exhibit C attached hereto. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement. Failure to implement a price increase shall not constitute a waiver of the right to such increase and Vendor may bill at any time for previously unbilled amounts.

The unit of pricing applicable to this Agreement is as designated below:

AAMT Line. An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines. Client acknowledges that the charges set forth in this Agreement are based upon the fact that character counts shall be determined using Vendor's software system and shall not be derived from any third party software or interface systems.

3.1.1    Additional Format Changes: Upon execution of this Agreement and

before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.2   Interface Requirements: The interface requirements of this Agreement are as designated below:

Interface requirements are set forth in Exhibit B.

3.1.3   Other Unanticipated Changes or Additional Services: In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

**Paragraph 3.2**   Billing: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

**Paragraph 3.3**   Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

**Paragraph 3.4**   Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

**Paragraph 3.5**   Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or

other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and shall pay to Vendor any portion of such disputed amount which has been substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations, the dispute shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Arbitration shall be conducted in the jurisdiction of the principal headquarters of the party not raising the dispute. The decision reached through arbitration shall be final and binding on both parties. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

### CONFIDENTIAL INFORMATION

Paragraph 4.1       Confidential Information: Vendor agrees and acknowledges that confidential patient information shall be disclosed to it in confidence. Vendor agrees to keep strictly confidential and hold in trust all confidential patient information in compliance with applicable laws and the HIPAA Regulations (as defined in Article VII).

Paragraph 4.2       Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor or to de-compile, reverse engineer or otherwise use such Information. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3       Remedies: The parties acknowledge and agree that a remedy at law for any breach or attempted breach of the provisions of this Article IV shall be

inadequate and that the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist at law.

**Paragraph 4.4**

Certain Exceptions:  The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis and in compliance with applicable laws or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

**Paragraph 4.5**

Non-Solicitation of Transcriptionists and Employees:  During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, Client shall not solicit, hire or engage any person who during the term is or has been an employee or transcriptionist of Vendor.

## ARTICLE V

## MAINTENANCE OF EQUIPMENT

**Paragraph 5.1**

Maintenance of Equipment:  The party providing the Dictation System pursuant to Section 1.2 hereof shall be responsible for the repair and maintenance of the Dictation System.  Vendor shall be responsible for the repair and maintenance of the Transcription Equipment.  Client shall be responsible for the repair and maintenance of any other equipment located at Client's offices.

## ARTICLE VI

## MISCELLANEOUS

**Paragraph 6.1**

Indemnity - Vendor:  Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly by a breach of the terms of this Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

**Paragraph 6.2**

Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

# EXHIBIT K



# COPY

MedQuist Legal Dept. ONLY:
Contract No: 80612

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of July 1, 2002, by and between Kaiser Permanente, ("Client"), and MEDQUIST TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

## BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW THEREFORE, in consideration of the premises and the mutual terms and conditions the parties hereby agree as follows:

## ARTICLE I

## SERVICE DESCRIPTION AND SPECIFICATIONS

Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

Dictation Equipment: For the purpose of providing the services

Client shall maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System").

Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports.

Vendor will provide to Client a personal computer system including a monitor and modem at no cost.

Vendor will provide to Client a laser printer at no cost. The Client is responsible for associated maintenance fees, paper and toner.

**EXHIBIT**

K

tabbies

**Paragraph 1.4**   Delivery of Dictation to Vendor: Client will provide port availability for vendor transcriptionists to access dictation. 24 hours a day, 7 days per week.

**Paragraph 1.5**   Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transcribed.

   1.5.1   Grace Period: Vendor shall adhere to the turnaround times set forth on Exhibit A at all times throughout the term of this Agreement following an initial grace period of ninety (90) calendar days commencing on the first day on which services are provided hereunder. The grace period is intended to allow Vendor a reasonable period of time in which to set up the account, systems, telephone configurations and appropriate staffing.

**Paragraph 1.6**   Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

## ARTICLE II

## TERM AND TERMINATION

**Paragraph 2.1**   Term: The term of this Agreement shall be for one (1) year with automatic one (1) year renewals commencing on July 1, 2002 and ending on June30, 2003. Client may terminate this Agreement after one hundred and twenty (120) days' notice following the procedures outlined in Paragraph 2.3.

**Paragraph 2.2**   Termination for Default: Either party may terminate this Agreement upon the happening of any of the following:

   2.2.1   Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

   2.2.2   Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any

other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

Paragraph 2.3       Notice of Default: If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, written notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

# ARTICLE III

## PAYMENTS AND CHARGES

Paragraph 3.1       Payment to Vendor: Client shall pay to Vendor a payment of $0.14 for each unit (as set forth below) transcribed for Client for the first year of the contract and any other amounts set forth on Exhibit C attached hereto. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement. Failure to implement a price increase shall not constitute a waiver of the right to such increase and Vendor may bill at any time for previously unbilled amounts.

The unit of pricing applicable to this Agreement is as designated below:

AAMT Line.  An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines. Client acknowledges that the charges set forth in this Agreement are based upon the fact that character counts shall be determined using Vendor's software system and shall not be derived from any third party software or interface systems.

3.1.1 <u>Additional Format Changes</u>: Upon execution of this Agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.2 <u>Interface Requirements</u>: The interface requirements of this Agreement are as designated below:

Interface requirements are set forth in <u>Exhibit B</u>.

3.1.3 <u>Other Unanticipated Changes or Additional Services</u>: In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

Paragraph 3.2     <u>Billing</u>: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

Paragraph 3.3     <u>Payment</u>: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

Paragraph 3.4     <u>Charges</u>: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

Paragraph 3.5     <u>Dispute Resolution</u>: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor

within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and shall pay to Vendor any portion of such disputed amount which has been substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations, the dispute shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Arbitration shall be conducted in the jurisdiction of the principal headquarters of the party not raising the dispute. The decision reached through arbitration shall be final and binding on both parties. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

## CONFIDENTIAL INFORMATION

Paragraph 4.1

Confidential Information: Vendor agrees and acknowledges that confidential patient information shall be disclosed to it in confidence. Vendor agrees to keep strictly confidential and hold in trust all confidential patient information in compliance with applicable laws and the HIPAA Regulations (as defined in Article VII).

Paragraph 4.2

Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor or to de-compile, reverse engineer or otherwise use such Information. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3

**Remedies:** The parties acknowledge and agree that a remedy at law for any breach or attempted breach of the provisions of this Article IV shall be inadequate and that the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist at law.

Paragraph 4.4

**Certain Exceptions:** The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis and in compliance with applicable laws or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

Paragraph 4.5

**Non-Solicitation of Transcriptionists and Employees:** During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, Client shall not solicit, hire or engage any person who during the term is or has been an employee or transcriptionist of Vendor.

## ARTICLE V

## MAINTENANCE OF EQUIPMENT

Paragraph 5.1

**Maintenance of Equipment:** The party providing the Dictation System pursuant to Section 1.2 hereof shall be responsible for the repair and maintenance of the Dictation System. Vendor shall be responsible for the repair and maintenance of the Transcription Equipment. Client shall be responsible for the repair and maintenance of any other equipment located at Client's offices.

## ARTICLE VI

## MISCELLANEOUS

Paragraph 6.1

**Indemnity - Vendor:** Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly by a breach of the terms of this Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from

and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 6.2    Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

Paragraph 6.3    Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof. All Exhibits attached hereto are incorporated herein, and made a part hereof.

Paragraph 6.4    Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

Paragraph 6.5    Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

Paragraph 6.6    Liability: Notwithstanding anything in this Agreement to the contrary, in no event shall Vendor be responsible for special, exemplary, punitive, consequential or incidental damages or for any damages other than, or in addition to, actual damages.

Paragraph 6.7          Notice: Any notice required or permitted by this Agreement shall be in
                       writing and shall be deemed given at the time it is deposited in the United
                       States Mail, postage prepaid, certified or registered mail, return receipt
                       requested, overnight courier or by facsimile transmission addressed to the
                       party to whom it is to be given as follows:

            If to Client:      Kaiser Permanente, Riverside
                               10800 Magnolia
                               Riverside, Ca. 92505
                               Fax #: 909-3583-3782
                               Attn.: Robert Caric, Director of Health Information Services

            If to Vendor:      MedQuist Transcriptions, Ltd.
                               Five Greentree Centre, Suite 311
                               Marlton, New Jersey 08053
                               Fax #: (856) 797-5949
                               Attn: Chief Operating Officer

            With a copy to:    MedQuist Transcriptions, Ltd.
                               Five Greentree Centre, Suite 311
                               Marlton, New Jersey 08053
                               Fax #: (856) 797-5949
                               Attn: General Counsel

Paragraph 6.8          Agency: Vendor is an independent contractor and this Agreement shall not
                       be construed as constituting either party as an employee, agent, partner, or
                       joint venture of the other.

Paragraph 6.9          Exclusive Agreement: During the term of this Agreement and any renewal
                       thereof, Client agrees that it will not contract with any other transcription
                       service to perform Client's medical dictation/transcription work other than
                       work that Vendor cannot or will not perform.

Paragraph 6.10         Force Majeure: Each party to this Agreement shall not be liable to the others
                       for failure to perform any of its obligations hereunder due to a cause or
                       causes beyond its reasonable control, including, but not limited to, acts of
                       God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots,
                       strikes, blackouts, telephone outage, war or war operations, restraints of
                       government, or other causes which cannot with reasonable diligence be
                       controlled or prevented by such party.

Paragraph 6.11    Medicare Clause: The Vendor agrees to allow the Secretary of the Department of Health and Human Services and the Comptroller General, or their duly authorized representatives, access upon request to this Agreement and to the books, documents and records of the Vendor that are necessary to verify the nature and extent of costs of services furnished under this Agreement. The Vendor also agrees that if the Vendor carries out any duties of the Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, the subcontract must contain a clause to the effect that the related organization must make available, upon written request, to the Secretary, or upon request to the Comptroller General, or their duly authorized representatives, the subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs. Such access shall be until the expiration of four (4) years after the services are furnished under this Agreement.

Paragraph 6.12    Effective Date: If Client does not execute this Agreement within thirty (30) days after Vendor sends it to Client, then this Agreement shall be null and void, absent Vendor's express written consent to the contrary.

## ARTICLE VII

## HIPAA

Paragraph 7.1    Confidential Patient Health Information:    In connection with the performance of services hereunder, Client discloses to Vendor certain information that will be subject to protection under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Public Law 104-191.  Vendor, as a recipient of protected information from Client, is a "Business Associate" as that term is defined in HIPAA and regulations promulgated by the U.S. Department of Health and Human Services to implement certain provisions of HIPAA (herein "HIPAA Regulations"). Pursuant to said HIPAA Regulations, all Business Associates of entities such as Client must agree in writing to certain mandatory provisions regarding the use and disclosure of individually identifiable health information (within the meaning of 45 CFR, §164.501 of HIPAA, hereafter "Protected Health Information" or "PHI").    In order to satisfy the requirements of the HIPAA Regulations effective upon the applicable compliance dates set forth in 45 CFR, §164.534 (the "Effective Time"), Client and Vendor agree as follows effective as of the Effective Time:

7.1.1    Unless otherwise provided in this Agreement, capitalized terms in this Paragraph 7.1 shall have the meanings given to them in the

HIPAA Regulations.

<u>7.1.2</u>    Vendor will:

a.    not use or further disclose the PHI other than as permitted or required by this Agreement or as required by law;

b.    use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement;

c.    report to Client any use or disclosure of the PHI not provided for by this Agreement of which Vendor becomes aware;

d.    ensure that any agents, including a subcontractor, to whom it provides PHI received from, or created or received by Vendor on behalf of, the Client agrees to the same restrictions and conditions that apply to the Vendor with respect to such PHI;

e.    make available to Client, such information as Client may require to fulfill Client's obligations to provide access to, provide a copy of, and account for disclosures with respect to PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR, §164.524 and §164.528. Vendor may charge a reasonable fee for providing the above services. Notwithstanding the foregoing, Client understands and agrees that Vendor provides medical transcription services and is not in the business of maintaining records by or for Client and that data maintained by Vendor shall not be considered to be a Designated Record Set.

f.    make Client's PHI available to Client, as Client may require to fulfill Client's obligations to amend PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR, §164.526 and Vendor shall, as directed by Client, incorporate any amendments to Client's PHI into copies of such PHI maintained by Client. Vendor may charge a reasonable fee for providing the above services. Notwithstanding the foregoing, Client understands and agrees that Vendor provides medical transcription services and is not in the business of maintaining records by or for Client and that data maintained by Vendor shall not be considered to be a Designated Record Set.

g.    make available the information required to provide an accounting of disclosures in accordance with 45 CFR, §164.528.

h. make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Vendor on behalf of, the Client available to the Secretary of the U.S. Department of Health and Human Services for purposes of determining the Client's compliance with HIPAA; and

i. at termination of this Agreement, if feasible, return or destroy all PHI received from, or created or received by Vendor on behalf of, the Client that the Vendor still maintains in any form and retain no copies of such information or, if such return is not feasible, extend the protections of this Agreement to the information and limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible.

7.1.3   Vendor, in its capacity as Business Associate to Client, shall be permitted to use and disclose PHI in a manner that would not violate the requirements of the HIPAA Regulations as follows:

i.   for the proper management and administration of Vendor;

ii.  to carry out the legal responsibilities of Vendor; and to fulfill Vendor's duties and responsibilities under this Agreement including in part disclosure to its employees and subcontractors; and

iii. to provide data aggregation services relating to the health care operations of Client.

7.1.4   Client is authorized to terminate this Agreement if Client determines that Vendor has violated a material term of this Paragraph 7.1 in accordance with the terms of this Agreement.

7.1.5   This Paragraph 7.1 shall survive the expiration or termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

[CLIENT]                           MEDQUIST TRANSCRIPTIONS, LTD.

By: _____              By: _____
Name: _____              Name: Brian J. Kearns
Title: Director, Health            Title: Sv P - CFO
Information Mgmt.
Dept.
Kaiser - Riverside

FROM :                          FAX NO. :9513533782           Jul. 30 2007 01:54AM  P12

Revised as of 02/01/02
MEDQTLTRANSERVAGT

## EXHIBIT A

### TURNAROUND TIMES

Twenty-four (24) hours from the time received by vendor.

## EXHIBIT B

## INTERFACE

**Reports to upload to hospital KPDS system.**

## EXHIBIT C

### OTHER CHARGES

**No other charges.**

# EXHIBIT L



**MedQuist, Inc.**
**515 13ᵗʰ Street**
**Suite 204**
**Modesto, CA 95354**
**Phone: 209-526-5135**
**Fax: 209-526-5283**

November 10, 2000

Marina Baroff
Assistant Administrator
Kaiser Permanente
4647 Zion Ave.
San Diego, CA 92120

Dear Ms. Baroff:

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser
Permanente, San Diego ("Client") as a provider of backlog transcription services. It describes the scope of
service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 90 days from the date of acceptance by Client. Following the initial
term, this agreement shall be automatically renewed for additional 30-day periods. Either party may cancel
this agreement with 30 days written notice. In the event Client enters into a three (3) year exclusive
agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Client's digital dictation system. Client
  will furnish MedQuist a number for access to the dictation system. If MedQuist is supplying
  Client with access to one of MedQuist's digital dictation systems, Client shall pay to
  MedQuist an additional fee of $0.01 per defined line (as defined below) for use of the system
  and phone costs.

- Document Transmission and Storage – For the purpose of transmitting reports via modem,
  MedQuist will provide a computer and will upload reports to that computer, which will be
  located at Client's offices. MedQuist will install the Kaiser IT certified KPDS interface for
  demographic requests and report upload. Client will provide and maintain, at its cost, a
  dedicated laser printer that is HP compatible and a dedicated phone line for use with the
  foregoing.

- Measurement of Work and Price – The price will be $.16 per defined line plus any other
  charges set forth herein. A defined line is any line having 65 "characters". A character is
  defined as any letter, number, symbol, data or function key necessary for the final appearance
  and content of a document including, without limitation, the space bar, carriage return,
  underscore, bold and any character contained within the macro, header or footer. A defined
  line is calculated by counting all characters contained within a document and dividing the
  total number of characters by 65 to arrive at the number of defined lines. The price may be
  increased at any time upon thirty (30) days' notice to Client.



EXHIBIT
tabbies
L

- Measurement of Turnaround Time – All reports transcribed for Client will be returned to Client within 24 hours of the MedQuist transcriptionist having accessed the dictation.

- Measurement of Quality – MedQuist will assess the quality of transcribed documents according to industry standards in conjunction with Client specifications outlined in Attachment A hereto.

- Billing and Payment – An invoice will be generated each month, payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month from the date of invoice. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws. In addition, MedQuist will not retain any transcribed documents beyond 90 days.

- During the term of this Agreement and for a period of twelve (12) months after MedQuist ceases to provide services to Client, both Client and MedQuist shall not actively solicit, hire or engage transcriptionist employees of the other party. Client may request that certain current or previous employees not transcribe Client's work and MedQuist will honor said request. Such communication will be submitted by Client in written form to be maintained on file in the MedQuist office.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time Kaiser Permanente, San Diego is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,

*Kathy Ca—*

Kathy Cameron, RHIT
Regional Vice President
MedQuist Transcriptions, Ltd.

Kaiser Permanent, San Diego

Agreed to by: _____

Title: _____

Date: _____11-15-00_____

*Revised 01/03/00*

**ATTACHMENT A**

**Quality Standards
for
MedQuist Inc.**

**by
Kaiser Permanente, San Diego
Hospital Records Transcription Department
November 9, 2000**

We expect a quality standard of not more than one error per report. Please use the following as indicators of what constitutes an error, as well as "Guidelines to Meet Quality Assurance Standards Word Processing Medical Transcription Department" and "Common Quality Errors" documents provided by Kaiser.

- Wrong patient identifier (name and/or medical record number) the name dictated is the one used. Medical record number dictated is the one used if different than what doctor keyed in.
- Wrong provider/doctor name.
- Wrong "label" of report uploaded to KPDS,
  i.e., Vista ICS uploaded when actually it was Zion ER report
      Cons Ortho uploaded when actually it was Cons Neuro
- More than one blank (unless it's the same untranscribed word/phrase used multiple times in report)
  **Note:**
    - **A blank plus any of the other listed error items would be more than one error per report.**
    - **Unintelligible dictation may be "flagged" on the dictation system for review by Kaiser personnel.**

- Attached "Guidelines to Meet Quality Assurance Standards Word Processing Medical Transcription Department" and "Common Quality Errors" documents with the following exceptions:
    - No italics, underlining, subscript, superscript, or special characters will be expected in documents transcribed by MedQuist
    - Numbers separated from their terms at the beginning or end of a sentence, or title separated from name will be acceptable in documents transcribed by MedQuist.

March 18, 2003

Kathy Cameron, RHIT
Regional Vice President
MedQuist, Inc
515.13th Street, Suite 204
Modesto, CA 95354

RE: 30-Day Notice to Cancel Transcription Services

To Whom It May Concern:

This is to provide you with a 30-day notice to cancel your company's transcription services with Kaiser
Permanente, San Diego, Hospital Records Department.

We expect to be able to continue to have your equipment onsite for an additional 30 days to allow us the
opportunity to identify and print and/or upload to our mainframe transcribed reports not received by April
18, 2003. Please call me to arrange for date to remove your equipment after May 18, 2003.

Sincerely,

Cindy Guanto, RHIT
Hospital Records
(619) 528-5856

cc:    Liza Webb, Kaiser Permanente
       Karen Harness, MedQuist
       Reba Matthews, MedQuist

# EXHIBIT M



The **MRC** Group

January 20, 1998                              *via facsimile: 714-284 6625*

Kaiser Permanente, Orange County Outpatient Clinics
Corinne Soltis, Medical Records Administrator
1011 South East Street
Anaheim, California 92805

Dear Corinne:

The MRC Group is pleased to comply with your request to provide committed assistance to your outpatient transcription department. So that each of us has a clear understanding of our mutual expectations and goals, we thought it best to reiterate our discussion.

The MRC Group will:

1.  During the next 12 months transcribe the following report types with turnaround shown below:

    Report Type                      Turnaround Times

    Consults & Procedures            24 hours from time of receipt to
                                     time of return to you

2.  Utilizing your telephone lines, transcribe reports recorded on a digital dictation system owned and maintained by you and located in your facility.

3.  We will provide and maintain a PC, laser printer and modem for return of reports in ASCII format, which have been counted prior to conversion.

4.  We will provide management reports off our MedRite system.

You will:

1.  Assign The MRC Group approximately 150,000 lines per month, in approximately equal increments every Monday through Friday for the next 12 months.

2.  Use The MRC Group as your sole Outpatient Clinic transcription service so long as we are meeting our committed support.

3.  Provide a dedicated telephone line for communication to the PC.



EXHIBIT
**M**

4.    Provide 7 ports, 24 hours per day, 7 days per week for transcription.

5.    Provide consumable materials used in your location such as paper and printer toner.

6.    Pay us $.13 per line. Any reports delivered unacceptable due to our error will be retyped at no charge. A line is defined, verified and billed by our computerized system using a 65 character margin setting.

7.    Provide us with samples of your reports, as well as a current staff list and timely updates.

Contract Terms:

1.    Either party may terminate this agreement for cause with 30 days notice in writing.

2.    Our price is firm for one year from the date of this letter agreement. It will increase on each anniversary date by the larger of 3% or Cost of Living Index.

3.    Our payment terms are Net 30 Days.

If the above is in keeping with your understanding, please sign in the area below and return a copy for our files. We appreciate the opportunity to work with you and your staff.

Accepted:                                         Accepted:

THE MRC GROUP                          KAISER ORANGE COUNTY
                                                          OUTPATIENT CLINICS

By: _James W Mills_                     By: _Connie Hatta_

Date: _2/6/98_                               Date: _1-29-98_

Sincerely,

THE MRC GROUP

_Adrienne Yazijian /kra_

Adrienne Yazijian
Regional Sales Manager

714 641-2707          P.2

1 06 98 12:17p     John Fuchs
JUN. 29, 1998   4:53PM   OUTPATIENT MEDICAL RECORDS   714 641-2707  NO.669   P.2   P.2
un 29 98 04:04p    John Fuchs



The **MRC** Group
SurroPhone
Medical Records Corp
Modifier

## AMENDMENT TO AGREEMENT

### DATED JUNE 22, 1998
### BY AND BETWEEN

Kaiser Permanente
And
The MRC Group, Inc.

By this amendment the above transcription agreement is modified under the same terms and conditions specified in the basic agreement, as well as the terms set forth below:

Add the following:

MRC will provide weekend coverage to the Client at the following rates:

Health Information Management Reports, Stat*          $.145 per 65 character line

* Stat reports are defined as all reports required and requested as turnaround time within 2 to 4 hours of dictation as keyed in by the physician (work types 11, 22 & 33).

All other provisions of the original agreement remain in full force and effect.

Approved:

Kaiser Permanente                               The MRC Group, Inc.

_Signature_                                     _Signature_

Medical Record Administrator                    Vice Pres
Title                                           Title

Date:  6-29-98                                  Date:  7/7/98

3637 Green Road   Cleveland, Ohio  44122   1 800.DICTATE or 1.800.342.8283   FAX: 216.464.4012

# EXHIBIT N

MAR-19-01 01:35 PM  LYNN BRUENING                5107287390              P.02

# 86958



Lynn Bruening
MedQuist, Inc.
1260 B Street, Suite 325
Hayward, CA 94541
510-247-3000
fax: 510-728-7390

February 23, 2001

Lori Donaldson
Kaiser Foundation Hospital, Fremont Medical Center
39400 Paseo Padre Parkway
Inpatient HIM
Transcription Dept, 2nd Floor
Fremont, CA 94538

Dear Lori:

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser Foundation Hospital, Fremont Medical Center ("Client") as a provider of backlog transcription services. It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 90 days from the date of acceptance by Client. Following the initial term, this agreement may be renewed for additional 30-day periods by agreement of the parties. Either party may cancel this agreement with 30 days written notice. In the event Client enters into a three (3) year exclusive agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Client's digital dictation system. If MedQuist is supplying Client with access to one of MedQuist's digital dictation systems, Client shall pay to MedQuist an additional fee of $0.005 per defined line (as defined below) for use of the system and phone costs.

- Document Transmission and Storage – For the purpose of transmitting reports via modem, MedQuist will provide a computer and will upload reports to that computer, which will be located at Client's offices. Client will provide and maintain, at its cost, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing.

- Measurement of Work and Price – The price will be $.165 per defined line plus any other charges set forth herein. A defined line is any line having 65 "characters". A character is defined as any letter, number, symbol, data or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer. A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to

EXHIBIT
tabbies
N

Page 2

arrive at the number of defined lines. The price may be increased at any time upon thirty (30) days' notice to Client.

- Billing and Payment – An invoice will be generated each month, payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month from the date of invoice. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time Kaiser Foundation Hospital, Fremont Medical Center is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,

Lynn Bruening
Manager – Hayward CSC
MedQuist Transcriptions, Ltd.

Kaiser Permanente Fremont

Agreed to by: _Corrine Martini_

Title: _Director Health Information Management_

Date: _3/9/01_

# EXHIBIT O



®

Kathryn G. Lang
MedQuist, Inc
1222 E. Missouri, #202
Phoenix, AZ 85014
(602) 212-0944 voice
(602) 212-1115 fax
klang@medquist.com

December 27, 2000

Loula Smith
Director, Health Information Management
Kaiser Santa Rosa
401 Bicentennial Way
Santa Rosa, CA  95403
(707) 571-4158 fax

Dear Ms. Smith:

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser Santa Rosa ("Client") as a provider of backlog transcription services.  It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 30 days from the date of acceptance by Client.  Following the initial term, this agreement may be automatically renewed for additional 30-day periods with written notice.  In the event Client enters into a three (3) year exclusive agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Client's digital dictation system.  Client will furnish MedQuist access to the dictation system sufficient to manage the desired workload.  Client with manage work pooling as needed to ensure workflow as agreed to by both parties.

- Document Transmission and Storage – For the purpose of transmitting reports MedQuist will print and ship via FedEx Next Day Service to:

  Christine Peterson
  Health Information Management Department
  Kaiser Santa Rosa, Lower Level Hospital
  401 Bicentennial Way
  Santa Rosa, CA 95403

- Client will provide any letterhead or other necessary printed forms for creation of documents.

- Measurement of Work and Price – The price will be $.165 per defined line plus any other charges set forth herein.  A defined line is any line having 65 "characters".  A character is defined as any letter, number, symbol, data or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer.  A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to arrive at the number of defined lines.



**EXHIBIT**

O

Page 2

- Billing and Payment – An invoice will be generated each month, payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month from the date of invoice.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time Kaiser Santa Rosa is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,


Kathryn G. Lang
Vice President
MedQuist Transcriptions, Ltd.


**Kaiser Santa Rosa**

Agreed to by:  _Lula R. Smith_

Title:  _HIM Manager_

Date:  _12 | 27/00_


*Revised 01/03/00*

# AMENDMENT #1 TO LETTER OF AGREEMENT

This AMENDMENT #1 TO LETTER OF AGREEMENT Santa Rosa, dated as of December 1, 2003 (this "Amendment") is by and between MedQuist ("Vendor") and Kaiser Foundation Hospitals ("KFH") (collectively referred to as the "Parties").

## RECITALS

**Whereas,** Vendor and KFH entered into that certain Letter of Agreement entered into as of 12/27/00 (the "Agreement");

**Whereas,** the Parties wish to amend certain provisions of the Agreement in accordance with the terms set forth herein; and

**Whereas,** unless otherwise defined herein, defined terms are used herein as defined in the Agreement.

**NOW, THEREFORE,** the Parties hereby agree that the Agreement shall be revised and amended as follows:

## AGREEMENT

1. <u>Amendments</u>. Vendor and KFH hereby amend the Agreement by adding a new section to the end of the Agreement as follows:

   "Neither this agreement nor any duties or obligations under this agreement may be assigned or subcontracted by the vendor without the prior written consent of Kaiser Foundation Hospitals, which may be withheld in Kaiser Foundation Hospitals' sole discretion. Any attempt by vendor to make such assignment, to assign any duty or obligations under this agreement without the prior written consent of Kaiser Foundation Hospitals shall be void."

2. <u>Agreement in Full Force</u>. This Amendment shall be deemed to be an amendment to the Agreement, and the Agreement, as amended hereby, is hereby ratified, approved and confirmed in each and every respect. All references to the Agreement in any other document, instrument, agreement or writing shall hereafter be deemed to refer to the Agreement as amended hereby.

3. <u>Successors and Assigns</u>. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4. <u>Severability</u>. In the event any one or more of the provisions contained in this Amendment shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

#231473

5.   <u>Governing Law</u>.  This Amendment shall be governed by and construed in accordance with the laws of the State of California (regardless of the laws that might otherwise govern under applicable California principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

6.   <u>Counterparts</u>.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

7.   <u>Entire Agreement</u>.  This Amendment, together with the Agreement, constitute the entire agreement among the parties hereto with respect to the subject matter hereof.  Any previous agreement or understanding between the parties with respect to the subject matter hereof, whether written or oral, is superseded hereby and thereby.

    IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first set forth above.


**MEDQUIST**                          **KAISER FOUNDATION HOSPITALS**


Signed: _____          Signed: _Andrew W Deems_

Name: _____            Name: _ANDREW W. DEEMS_

Title: _____            Title: _Sr. VP  Area Manager_

2

#231473

EXHIBIT P



Lynn Bruening
CSC Manager
1260 B Street, Suite 325
Hayward, CA 94541
510-247-3000
fax: 510-247-3023

November 29, 2000

Diane Seip
Transcription Supervisor
Kaiser Santa Clara Medical Center
900 Kiely Blvd.
Santa Clara, CA 95051-5329



**EXHIBIT**

**P**

Dear Ms. Seip:

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser Santa Clara Medical Center ("Client") as a provider of backlog transcription services. It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 90 days from the date of acceptance by Client. Following the initial term, this agreement shall be automatically renewed for additional 30-day periods. Either party may cancel this agreement with 30 days written notice. In the event Client enters into a three (3) year exclusive agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Client's digital dictation system. MedQuist will re-record dictation to a dictation system at aMedQuist location. If MedQuist is supplying Client with access to one of MedQuist's digital dictation systems, Client shall pay to MedQuist an additional fee of $.005 per line (as defined below) for use of the system and phone costs.

- Document Transmission and Storage – Client will provide and maintain, at its cost, a computer with modem, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing.

- Measurement of Work and Price – The price will be $.17 per defined line plus any other charges set forth herein. A defined line is any line having 65 "characters". A character is defined as any letter, number, symbol, data or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer. A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to arrive at the number of defined lines. The price may be increased at any time upon thirty (30) days' notice to Client.

- Billing and Payment – An invoice will be generated each month, payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month from the date of invoice. Client shall pay any costs of collection, including, reasonable legal fees

Page 2

and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time Kaiser Santa Clara Medical Center is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,

Lynn Bruening
CSC Manager
MedQuist Transcriptions, Ltd.

Kaiser Santa Clara Medical Center

Agreed to by Michelle Scroggins

Title: Quality + Service Leader

Date: 12/18/00

# EXHIBIT Q

July 14, 2000

Ms. Laurel Ullrich
Director
Health Information Management
1200 El Camino Real
South San Francisco, CA. 94080

Dear Laurel;

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser South San Francisco ("Client") as a provider of backlog transcription services. It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 90 days from the date of acceptance by Client. Following the initial term, this agreement shall be automatically renewed for additional 30-day periods. Either party may cancel this agreement with 30 days written notice. In the event Client enters into a three (3) year exclusive agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Client's digital dictation system.

- Document Transmission and Storage – For the purpose of transmitting reports via modem, MedQuist will provide a computer and will upload reports to that computer, which will be located at Client's offices. Client will provide and maintain, at its cost, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing.

- Measurement of Work and Price – The price will be $.165 per defined line plus any other charges set forth herein. A defined line is any line having 65 "characters". A character is defined as any letter, number, symbol, data or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer. A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to arrive at the number of defined lines. The price may be increased at any time upon thirty (30) days' notice to Client.

**EXHIBIT**

**Q**

tabbies

Page 2

- Billing and Payment – An invoice will be generated each month, payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month from the date of invoice. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time Kaiser Permanente – South San Francisco is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,

*＊ Kaiser will not provide a
1-880 number for access
to our RTAS Dictation System*

Greg Pantelis
Western Vice President
MedQuist Transcriptions, Ltd.

Kaiser South San Francisco

Agreed to by: _____

Title: _____BSF Leader_____

Date: _____7/29/00_____

Revised 01/03/00

**EXHIBIT A**
**PRICING AND BENCHMARKS**

| Work Type | Input Code | Turnaround | Price | Unit of Measure |
|-----------|------------|------------|-------|-----------------|
| Discharge Summary | | 24 hours | $0.165 | AAMT line |
| Consult | | 24 hours | $0.165 | AAMT line |
| H&P | | 24 hours | $0.166 | AAMT line |
| OP | | 24 hours | $0.169 | AAMT line |
| | | | | |
| | | | | |

**Worktype:** As defined and mutually agreed upon between Vendor and Client and determined by the dictating provider through digital input to the appropriate dictation system.

**Input Code:** This is the one or two digit numeric code input to the dictation system by the dictator determining the desired work type.

July 31, 2001

Ms. Laurel Ullrich
Director
Health Information Management
1200 El Camino Real
South San Francisco,.CA. 94080

Dear Laurel;

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser South San Francisco ("Client") as a provider of backlog transcription services. It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 90 days from the date of acceptance by Client. Following the initial term, this agreement shall be automatically renewed for additional 30-day periods. Either party may cancel this agreement with 30 days written notice. In the event Client enters into a three (3) year exclusive agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Client's digital dictation system. MedQuist will furnish an 800 number for access to the dictation system at Client's expense. 800 number will be included as a invoiced line item.

- Document Transmission and Storage – For the purpose of transmitting reports via modem, MedQuist will provide a computer and will upload reports to that computer, which will be located at Client's offices. Client will provide and maintain, at its cost, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing. Turn around time for all work types shall be Twenty – four ( 24) hours as described in Exhibit A

- Measurement of Work and Price – The price will be $.165 per defined line plus any other charges set forth herein. A defined line is any line having 65 "characters". A character is defined as any letter, number, symbol, data or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer. A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to arrive at the number of defined lines. The price may be increased at any time upon thirty (30) days' notice to Client.

Page 2

- Billing and Payment – An invoice will be generated each month; payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month from the date of invoice. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time Kaiser Permanente – South San Francisco is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,

Greg Pantelis
Western Vice President
MedQuist Transcriptions, Ltd.

Kaiser South San Francisco

Agreed to by: _Julie Petrini_

Title: _Sr. Vice President / Area Manager_

Date: _10/18/01_

**EXHIBIT A**
**PRICING AND BENCHMARKS**

| Work Type | Input Code | Turnaround | Price | Unit of Measure |
|-----------|-----------|------------|-------|-----------------|
| Discharge Summary | | 24 hours | $0.165 | AAMT line |
| Consult | | 24 hours | $0.165 | AAMT line |
| H&P | | 24 hours | $0.165 | AAMT line |
| OP | | 24 hours | $0.165 | AAMT line |
| | | | | |
| | | | | |
| | | | | |

**Worktype:** As defined and mutually agreed upon between Vendor and Client and determined by the dictating provider through digital input to the appropriate dictation system.

**Input Code:** This is the one or two digit numeric code input to the dictation system by the dictator determining the desired work type.





**MedQuist**™

Kathy Cameron, Senior Vice President
515 13th Street
Suite 204
Modesto, CA 95354
Phone: 209-526-5135
Fax: 209-526-5283

March 1, 2003

Ms. Laurel Ulrich
Director
Health Information Management
1200 El Camino Real
South San Francisco, CA, 94080

Dear Laurel;

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser South San Francisco ("Client") as a provider of backlog transcription services. It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 90 days from the date of acceptance by Client. Following the initial term, this agreement shall be automatically renewed for additional 30-day periods. Either party may cancel this agreement with 30 days written notice. In the event Client enters into a three (3) year exclusive agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Client's digital dictation system. MedQuist will furnish an 800 number for access to the dictation system at Client's expense. An 800 number will be included as an invoiced line item.

- Document Transmission and Storage – For the purpose of transmitting reports via modem, MedQuist will provide a computer and will upload reports to that computer, which will be located at Client's offices. Client will provide and maintain, at its cost, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing. Turn around time for all work types shall be twenty-four (24) hours as described in Exhibit A

- Measurement of Work and Price – The price will be $.1675 per defined line plus any other charges set forth herein. A defined line is any line having 65 "characters". A character is defined as any letter, number, symbol, data or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer. A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to arrive at the number of defined lines. The price may be increased at any time upon thirty (30) days' notice to Client.

March 1, 2003
Page Two

- Billing and Payment – An invoice will be generated each month; payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month from the date of invoice. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time Kaiser Permanente – South San Francisco is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,

*Kathy Camera*

Kathy Cameron
Senior Vice President
MedQuist Transcriptions, Ltd.

Kaiser South San Francisco

Agreed to by:     *Andrew u Jeems*

Title:     *Se Vice President, Area Manager*

Date:     *9-22-03*

*Revised 03/01/03*



MedQuist Inc.
Corporate Offices
1000 Bishops Gate Boulevard, Suite 300
Mount Laurel, New Jersey 08054-4632

Kathy Cameron, Senior Vice President
1111 "J" Street, Ste G108
Modesto, CA 95354

December 8, 2004

Rick Tenerowicz
Interim Director, Health Information Management
Kaiser Permenente
1200 El Camino Real
South San Francisco, CA 94080

Dear Mr. Tenerowicz:

This Letter Agreement (the "Agreement") will serve to document the scope of services to be performed by MedQuist as a provider of transcription services for Kaiser Permanente, South San Francisco location ("Client"). It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this Agreement shall commence on the date of execution by Client below and shall expire upon Client's migration to the Vendor's DocQment™ Enterprise Platform (the "Migration Effective Date"). Prior to the Migration Effective Date, MedQuist and Client will negotiate a new Transcription Services Agreement which will take effect on the Migration Effective Date and thereby supercede this Letter Agreement. Either party may cancel this Agreement at any time with thirty (30) days prior written notice to the other party

MedQuist and Client agree to the following:

1.  <u>Dictation Access</u> – The dictation will reside on the Client's digital dictation system.

2.  <u>Document Transmission and Storage</u> – For the purpose of transmitting reports via modem, MedQuist will provide a computer and will upload reports to that computer, which will be located at Client's offices. Client will provide and maintain, at its cost, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing. Turnaround Time for all worktypes shall be 24 hours. Turnaround Time shall be measured from the time at which the report is available to MedQuist to the time at which the report is transcribed.

3.  <u>Measurement of Work and Price</u> – The per report prices as set forth below are based on historical averages set forth in <u>Exhibit 1</u> attached hereto. Bill counts will be based on the formatted document as it appears in MedQuist's platform.

| | |
|---|---|
| Colonoscopy (COLO) | $14.64 |
| Discharge Summary (DISC) | $20.48 |
| Echocardiogram (ECHO) | $15.00 |
| Endoscopy (ENDO) | $18.63 |
| History & Physical (HIST) | $24.16 |
| Inpatient Consultation (CONS) | $18.54 |
| Operative Report (OPER) | $17.11 |
| Outpatient Consultation (OCON) | $18.53 |
| Transfer Summary (TRAN) | $28.90 |

MedQuist™

**Kathy Cameron, Senior Vice President**
**1111 "J" Street, Ste G103**
**Modesto, CA 95354**

MedQuist Inc.
Corporate Offices
1000 Bishops Gate Boulevard, Suite 300
Mount Laurel, New Jersey 08054-4632

4. <u>Billing and Payment</u> – An invoice will be generated each month and payment is due within thirty (30) days of the date of invoice. Any overdue amount shall accrue interest at the rate of 1½% per month, or the maximum allowable under applicable law, until paid in full. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any overdue amount. MedQuist may also suspend services immediately or terminate the Agreement in the event payment is not received when due. MedQuist may bill at any time for previously unbilled amounts. The price above may be increased at any time upon thirty (30) days' prior written notice to Client.

5. <u>Confidential Information</u> – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

6. <u>Privacy Law</u> - To the extent required by the provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C., 1171 et seq. and regulations promulgated thereunder, MedQuist agrees to maintain the confidentiality of any Protected Health Information ("PHI") obtained from Client as a Business Associate pursuant to this Agreement. To the extent required by the provisions of HIPAA and the regulations promulgated thereunder, specifically, MedQuist agrees not to use or further disclose any PHI other than as permitted by this Agreement or as legally required to prevent such disclosure and to use appropriate safeguards to prevent use or disclosure other than as provided for by this Agreement. To the extent required by the provisions of HIPAA and the regulations promulgated thereunder, MedQuist agrees to report to Client any disclosure of which it becomes aware which was not provided for in this Agreement, to obligate its subcontractors contractually to abide by the provisions of this Agreement, to make PHI available where legally permitted, to make its records regarding the use and disclosure of PHI available to the U.S. Secretary of Health and Human Services, to incorporate any corrections requested by Client to PHI when notified in accordance with applicable law, to make available the information legally required to provide an accounting of disclosures and to return or destroy all PHI to Client at the termination of this Agreement. Client understands and agrees that MedQuist transmits unsigned, transcribed reports to Client. The parties understand that Client may, at its discretion, modify the finalized transcribed reports from time to time without MedQuist's knowledge. Client understands and agrees that MedQuist provides medical transcription services and is not in the business of maintaining original records by or for Client and that data maintained by MedQuist is a copy only.

7. During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

8. At such time Client is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

MedQuist™    MedQuist Inc.
Corporate Offices
1000 Bishops Gate Boulevard, Suite 300
Mount Laurel, New Jersey 08054-4632

Kathy Cameron, Senior Vice President
1111 "J" Street, Ste G108
Modesto, CA 95354

Please acknowledge the foregoing by signing where indicated below and returning a signed copy of this letter via fax to: **MedQuist Contracts Department at (602) 288.7820. Services cannot commence or continue until a signed letter is received by MedQuist.** Thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization.

Sincerely,

*Kathy Cameron*

Senior Vice President
MedQuist Transcriptions, Ltd.

KAISER PERMANENTE, SOUTH SAN FRANCISCO

Agreed to by: _____

Name: Linda Jensen

Title: _____

Date: _____

MedQuist™ MedQuist Inc.
Corporate Offices
1000 Bishops Gate Boulevard, Suite 300
Mount Laurel, New Jersey 08054-4632

Kathy Cameron, Senior Vice President
1111 "J" Street, Ste G108
Modesto, CA 95354

## EXHIBIT 1

| Dates | Account | Service | Report | Amt | Avg Price |
|---|---|---|---|---|---|
| Aug. 16, 2003 thru Aug 31, 2004 | 84255 | COLO | 8 | $117.15 | $14.64 |
| | | CONS | 14 | $259.55 | $18.54 |
| | | DISC | 692 | $14,170.20 | $20.48 |
| | | ENDO | 9 | $167.64 | $18.63 |
| | | HIST | 7 | $169.13 | $24.16 |
| | | OCON | 4,707 | $77,818.46 | $16.53 |
| | | OPER | 2,148 | $36,751.28 | $17.11 |
| | | TRAN | 2 | $53.79 | $26.90 |
| | | Totals | 7,587 | $129,507.16 | $17.07 |

# EXHIBIT R



Teresa Overton, CMT
Vice President, Western Region
1260 B Street, Suite #325
Hayward, CA 94541
Phone: 510 247-3085
Fax: 510 728-7342
E-mail: toverton@medquist.com

February 8, 2000

Kathy Ball
Director, Health Information Management
Kaiser Santa Teresa Community Hospital
250 Hospital Parkway
San Jose, CA  95119

Dear Ms. Ball:

This letter will serve to document the scope of services to be performed by MedQuist for Kaiser Santa Teresa Community Hospital as a provider of backlog transcription services. It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 90 days from the date of acceptance by Client. Following the initial term, this agreement shall be automatically renewed for additional 30-day periods. Either party may cancel this agreement with 30 days written notice. In the event Client enters into a three (3) year exclusive agreement, additional discounts will be available.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Client's digital dictation system. MedQuist will re-record dictation to dictation system at MedQuist location. If MedQuist is supplying Client with access to one of MedQuist's digital dictation systems, Client shall pay to MedQuist an additional fee of $ .005 per defined line (as defined below) for use of the system and phone costs.

- Document Transmission and Storage – For the purpose of transmitting reports via modem, MedQuist will provide a computer and will upload reports to that computer, which will be located at Client's location.   Client will provide and maintain, at its cost, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing.

- Measurement of Work and Price – The price will be $.17 per defined line plus any other charges set forth herein. A defined line is any line having 65 "characters". A character is defined as any letter, number, symbol, function key or data necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer. A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to arrive at the number of defined lines. The price may be increased at any time upon thirty (30) days' notice to Client.

- Billing and Payment – An invoice will be generated each month, payment terms are net 30 days. Any invoice not paid when due shall accrue interest at the rate of 1½% per month from the date of invoice. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

Continued



EXHIBIT

R

February 8, 2000                              Kaiser Santa Teresa Community Hospital
Page 2                                        Kathy Ball

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time Kaiser Santa Teresa Community Hospital is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,

*Teresa Overton*

Teresa Overton, CMT
Vice President, Western Region
MedQuist Transcriptions, Ltd.

Kaiser Santa Teresa Community Hospital

Agreed to by:  *Catherine D Ball, RHIA*

Title:  *H.I.M. Supervisor*

Date:  *March 1, 2000*

*Revised 02/08/00 do*



# EXHIBIT S

# TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of October 1, 1997, by and between THE PERMANENTE MEDICAL GROUP, INC. ("Client"), and TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

## BACKGROUND

Client desires to engage Vendor to perform medical transcription and document management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

## ARTICLE I

## SERVICE DESCRIPTION AND SPECIFICATIONS

| Paragraph 1.1 | Service Description: Vendor shall provide medical transcription and document management services to Client pursuant to the terms of this Agreement. |
|---|---|
| Paragraph 1.2 | Dictation Equipment: For the purpose of providing the services, Vendor shall obtain, locate and maintain at Vendor's offices, at no cost to Client, a direct dial digital dictation system (the "Dictation System"). The Client shall maintain its own system located in Client's office and to provide sufficient access to said system for Vendor to perform transcription. |
| Paragraph 1.3 | Transcription Equipment: Vendor shall obtain and maintain sufficient transcription processing equipment in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Vendor shall obtain and maintain appropriate personal computer system or systems, configured with a modem and a laser printer for purposes of receiving electronically transmitted reports and printing same reports at Client location (the "Client System"). Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports. |
| Paragraph 1.4 | Delivery of Dictation to Vendor: Client physicians may dictate into the Dictation System at any time, twenty-four hours per day, seven days per week. |
| Paragraph 1.5 | Delivery of Transcribed Documents to Client: Vendor shall deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transmitted electronically to the Client. |

EXHIBIT

S

**Paragraph 1.6**    Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

## ARTICLE II

### TERM AND TERMINATION

**Paragraph 2.1**    Term: The term of this Agreement shall be for 6 months commencing on October 1, 1997 and ending on April 30, 1998.

**Paragraph 2.2**    Notice of Default: If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, ten (10) working days' notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement.

## ARTICLE III

### PAYMENTS AND CHARGES

**Paragraph 3.1**    Payment to Vendor: Client shall pay to Vendor a payment of $ .1250 for each AAMT line. An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines.

   **3.1.1**    Additional Format Changes: Upon execution of this agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

   **3.1.2**    Other Unanticipated Changes or Additional Services: In the event that Client changes the manner in which it conducts business or requires services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

DEC. 3. 1997 11:13AM    OUTPATIENT MEDICAL RECORDS    NO. 0797    P. 3

Paragraph 3.2    Billing: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith. Departments serviced by this Agreement will receive separate monthly bills based on physician entry of work type codes.

Paragraph 3.3    Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. In addition, Client shall be responsible for all reasonable costs of collection, including reasonable attorney fees, incurred by Vendor in its efforts to collect any overdue amount.

Paragraph 3.4    Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

Paragraph 3.5    Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and to pay to Vendor any portion of such disputed amount which Client, in its sole discretion, has determined to be substantiated. Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations the dispute shall be settled by arbitration, in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall be conducted in the Philadelphia, Pennsylvania metropolitan area. The decision reached through arbitration shall be final and binding on both parties. Vendor shall continue to provide services under the terms of this Agreement during the arbitration, at the fees then in effect. This Paragraph 3.5 shall also apply to any other dispute between the parties under this Agreement.

## ARTICLE IV

### CONFIDENTIAL INFORMATION

Paragraph 4.1    Confidential Information: Vendor agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence and with the understanding that it constitutes valuable business information developed by Client at great expenditure of time, effort and money. Vendor agrees that it shall not, without express prior written consent of Client, use the confidential information for any purpose other than the performance of this Agreement. Vendor further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client.

-3-

To the extent required by licensing, accreditation, and certification standards, ultimate administrative and professional responsibility with respect to "HOSPITAL SERVICES" provided to "MEMBERS" shall remain with Kaiser Permanente.

**Paragraph 4.2**

Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

**Paragraph 4.3**

Remedies: The parties acknowledge and agree that since a remedy at law for any breach or attempted breach of the provisions of the Article IV shall be inadequate, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist by law. The non-breaching party also waives any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

## ARTICLE V

### MAINTENANCE OF EQUIPMENT

**Paragraph 5.1**

Maintenance of Equipment: Vendor shall maintain the Dictation System, the Transcription Equipment and the Client System. Client shall notify Vendor promptly of any problems with the Client System. In the event that any of the Client System is not in good working order or any equipment of Vendor is damaged as a result of Client's or its agents' negligence or intentional act, Client shall repair or replace said equipment promptly.

## ARTICLE VI

### MISCELLANEOUS

**Paragraph 6.1**

Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith (including) reasonable attorney's fees (collectively, "Damages") caused directly or indirectly as a result of services provided in the Agreement. Once a physician signs a report, Vendor is released

from liabilities with respect to the content of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 6.2    Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

Paragraph 6.3    Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties to the subject matter hereof.

Paragraph 6.4    Assignment: Client may assign all of its rights hereunder at any time without the prior consent of Vendor. Vendor may not assign any of its rights hereunder without the prior written consent of Client, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Vendor may assign all of its rights hereunder to its lenders as collateral security.

Paragraph 6.5    Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto, their respective successors and assigns, if any.

Paragraph 6.6    Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

Paragraph 6.7    Liability: Notwithstanding anything in this Agreement to the contrary (i) in no event shall the cumulative liability of Vendor, pursuant to this Agreement exceed the amount of fees paid by Client to Vendor during the twelve (12) month period immediately prior to the occurrence resulting in such liability, and (ii) in no event shall Vendor be responsible for consequential or incidental damages or for any lost profits or any claim or demand of any nature or kind, whether asserted by Client or against Client by any other individual or entity.

Paragraph 6.8    Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, addressed to the party to whom it is to be given as follows:

If to Client:    The Permanente Medical Group, Inc.
1600 Eureka Road
Roseville, CA 95661
Attn: Brian Manning
Administrative Services Manager

If to Vendor:    Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Attn: Chief Operating Officer

-5-

With a copy to: Transcriptions, Ltd.
· Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Attn: General Counsel

Paragraph 6.9    Agency: Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other.

Paragraph 6.10    Exclusive Agreement: During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other transcription service to perform client's medical dictation/transcription work currently included in this contract, other than work that Vendor can not or will not perform.

Paragraph 6.11    Force Majeure: Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

-6-

DEC. 5. 1997 11:10AM    OUTPATIENT MEDICAL RECORDS    NO. 0157    P. 7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

By: _AM GA_
Title:

TRANSCRIPTIONS, LTD.

By: _____
Title: Executive Vice President and/
Chief Operating Officer

Rev: March 5, 1997

-7-

# EXHIBIT T

Copy to:
    \_\_\_\_J. Abate
    \_\_\_\_A. Carl
    \_\_\_\_D. Rice
    \_\_X\_\_File



**MEDQUIST** ®

**Letter of Committed Assistance**

Teresa Overton, CMT
Vice President, Western Region
1260 B. Street, Suite #325
Hayward, CA 94541
Phone: 510 247-3085
Fax: 510 728-7342
e-mail: toverton@medquist.com

July 26, 2000

Gerry Bajada
The Permanente Medical Group
1950 Franklin Street, 19th Floor
Oakland, CA 94612

Dear Mr. Bajada:

This letter will serve to document the scope of services to be performed by MedQuist ("Vendor") for The Permanente Medical Group ("Client") as a provider of backlog transcription services. It describes the scope of service and pricing for MedQuist to access the dictation and transcribe medical record reports.

The term of this agreement shall be 180 days from the date of acceptance by Client. Following the initial term, this agreement shall be automatically renewed for additional 30-day periods. After the initial term of this agreement, either party may cancel this agreement with 30 days written notice.

MedQuist and Client agree to the following:

- Dictation Access – The dictation will reside on the Vendor's digital dictation system. MedQuist will furnish an 800 number for access to the dictation system at no charge to client.

- Document Transmission and Storage – For the purpose of transmitting reports via modem, MedQuist will provide a computer and will upload reports to that computer, which will be located at Client's offices. Lease fees will be $300.00 per personal computer per month. Personal Computer lease fees will be waived for for each month that transcription services billable revenue exceeds $1500.00 per PC. Client will provide and maintain, at its cost, a dedicated laser printer that is HP compatible and a dedicated phone line for use with the foregoing.

- Measurement of Work and Price – The price will be $ .15 per defined line plus any other charges set forth herein. A defined line is any line having 65 "characters". A character is defined as any letter, number, symbol, data or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold and any character contained within the macro, header or footer. A defined line is calculated by counting all characters contained within a document and dividing the total number of characters by 65 to arrive at the number of defined lines. After the initial term of this agreement, the price may be increased at any time upon thirty (30) days' notice to Client. A batch summary log will be provided with each transmission and will include total number of transcribed lines per report.

- Turnaround Time – Routine Emergency Department Reports will be transcribed within 24 hours. MedQuist understands this will be approximately 95% of the overall volume dictated. In the event a Stat report is needed, a Stat Emergency Department Report will be transcribed within 2 hours. A surcharge of $2.00 per report will be added to these Stat reports.

Continued



EXHIBIT
T



Page 2
July 26, 2000

Gerry Bajada
The Permanente Medical Group

®

- Billing and Payment – An invoice will be generated each month, payment terms are net 30 days. Client shall pay any costs of collection, including, reasonable legal fees and expenses, that MedQuist may incur to collect any past due invoices. MedQuist may also suspend services immediately or terminate the agreement in the event payment is not made when due. MedQuist may bill at any time for previously unbilled amounts.

  In the event of a dispute between the parties regarding performance under this agreement, Vendor and Client shall promptly enter into good faith negotiations in an effort to resolve such dispute. If the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations, the dispute shall be settled by final and binding arbitration. The arbitration shall be conducted in the county in which the non-moving party is located and in accordance with the commercial arbitration rules of the American Arbitration Association in such location. If Client disputes an invoice, it must notify Vendor in writing of such dispute within 30 days after receipt of the invoice. If Client fails to notify Vendor of an invoice dispute in a timely manner, Client shall waive the right to dispute the invoice in the future.

- Confidential Information – MedQuist agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence. MedQuist further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client, except as may be permitted by applicable laws.

- During the term of this Agreement, and for a period of one (1) year after its termination, Client shall not hire or engage any person who was an employee or medical transcriptionist of MedQuist during such period of time.

Again, thank you for the opportunity to be of service and we look forward to a long and satisfying relationship with your organization. Please sign the original of this agreement where indicated below and return to me at your earliest convenience to the address above.

At such time The Permanente Medical Group is interested in a more comprehensive outsourcing arrangement, MedQuist can offer a full array of services including the provision and maintenance of a digital dictation system. The full outsourcing solution could also include an interface with the hospital's information systems, as well as auto-fax, intra-net and distributed printing capabilities. A full service agreement also provides specific performance deliverables and preferred pricing discounts.

Sincerely,

John W. Quaintance
Senior Vice President

MedQuist Transcriptions, Ltd.

Agreed to by:

Name:
Title: VP of Finance

The Permanente Medical Group

Revised 01/03/00 7-26-00 t/o

# EXHIBIT U

May-16-06    03:30pm    From-KAISER ADMIN                                +714-284-6671    ( 1 )    T-737    P.063/071    F-443

File

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of May 1, 1999, by and between KAISER FOUNDATION HOSPITAL, ORANGE COUNTY, a Corporation/SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP (SCPMG), ORANGE COUNTY, a Partnership, ("Client"), and MEDQUIST MRC, Inc., a Missouri Corporation ("Vendor").

### BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

### ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

| | |
|---|---|
| Paragraph 1.1 | Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement. |
| Paragraph 1.2 | Dictation Equipment: For the purpose of providing the services, Client shall maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System"). |
| Paragraph 1.3 | Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Vendor shall supply to Client one personal computer system with Vendor's proprietary software installed, a monitor and a modem for purposes of receiving electronically transmitted reports at Client location (the "Client System") at a cost of $300 per month per Client System; provided, however, Vendor shall waive such charge for each month in which the monthly charge to Client for services rendered hereunder exceeds $3,000 per Client System (so long as Client pays each invoice within thirty (30) days). Client shall, at its own cost and expense, supply a laser printer configured to operate with the Client System and all paper products and printer supplies necessary for printing reports or Vendor will supply a laser printer to Client for a one time charge of $1,300 plus applicable taxes, delivery costs and set-up charges, if any. |



**EXHIBIT**

tabbies

U

**Paragraph 1.4**  Delivery of Dictation to Vendor: Vendor shall access the Client's Dictation System utilizing telephone lines provided by the Client.

**Paragraph 1.5**  Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transmitted electronically to the Client.

**Paragraph 1.6**  Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client. After reports have been counted for billing purposes, they will be converted to ASCII format and electronically delivered to Client.

## ARTICLE II

## TERM AND TERMINATION

**Paragraph 2.1**  Term: The term of this Agreement shall be for three (3) years commencing on May 1, 1999 and ending on April 30, 2002. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

**Paragraph 2.2**  Termination for Default of Vendor: Either party may terminate this Agreement upon the happening of any of the following:

2.2.1  Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

2.2.2  Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

Paragraph 2.3

Notice of Default: If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, ten (10) working days' notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

### PAYMENTS AND CHARGES

Paragraph 3.1

Payment to Vendor: Client shall pay to Vendor a payment of $0.15 for each unit (as set forth below) transcribed for Client for the first year of the contract. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement.

The unit of pricing applicable to this Agreement is as designated below:

AAMT Line. An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines.

3.1.2  Additional Format Changes: Upon execution of this agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.3  Other Unanticipated Changes or Additional Services: In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

Paragraph 3.2

Billing: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

May-16-06   03:31pm   From-KAISER ADMIN                 +714-284-6671        T-797   P.066/071   F-443

| | |
|---|---|
| Paragraph 3.3 | Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies. |
| Paragraph 3.4 | Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises. |
| Paragraph 3.5 | Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and to pay to Vendor any portion of such disputed amount which Client, in its sole discretion, has determined to be substantiated. |

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations the dispute shall be settled by arbitration, in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall be conducted in the Philadelphia, Pennsylvania metropolitan area. The decision reached through arbitration shall be final and binding on both parties. Vendor shall continue to provide services under the terms of this Agreement during the arbitration, at the fees then in effect. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

### CONFIDENTIAL INFORMATION

Paragraph 4.1

Confidential Information: Vendor agrees and acknowledges that confidential patient and other information shall be disclosed to it in confidence and with the understanding that it constitutes valuable business information developed by Client at great expenditure of time, effort and money. Vendor agrees that it shall not, without express prior written consent of Client, use the confidential information for any purpose other than the performance of this Agreement. Vendor further agrees to keep strictly confidential and hold in trust all confidential information and not disclose or reveal such information to any third party without the express prior written consent of Client.

Paragraph 4.2

Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3

Remedies: The parties acknowledge and agree that since a remedy at law for any breach or attempted breach of the provisions of the Article IV shall be inadequate, the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist by law. The non-breaching party also waives any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

## ARTICLE V

### MAINTENANCE OF EQUIPMENT

Paragraph 5.1

Maintenance of Equipment: Vendor shall maintain the Dictation System, the Transcription Equipment and the Client System. Client shall notify Vendor promptly of any problems with the Client System. In the event that any of the Client System is not in good working order or any equipment of Vendor is damaged as a result of Client's or its agents' negligence or intentional act, Client shall repair or replace said equipment promptly.

## ARTICLE VI

## MISCELLANEOUS

**Paragraph 6.1**   Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly or indirectly as a result of services provided in the Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report.  Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

**Paragraph 6.2**   Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

**Paragraph 6.3**   Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof.

**Paragraph 6.4**   Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

**Paragraph 6.5**   Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

**Paragraph 6.6**   Liability: Notwithstanding anything in this Agreement to the contrary (i) in no event shall the cumulative liability of Vendor, pursuant to this Agreement exceed the amount of fees paid by Client to Vendor during the twelve (12) month period immediately prior to the occurrence resulting in such liability, and (ii) in no event shall Vendor be responsible for consequential or incidental damages or for any lost profits, whether asserted by Client or against Client by any other individual or entity.

**Paragraph 6.7**   Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the party to whom it is to be given as follows:

If to Client:    Kaiser, Orange County
1011 South East Street
Anaheim, CA 92805
Fax #:  714-284-6625
Attn.:  Medical Records Administrator

If to Vendor:          MedQuist, Inc.
                       Five Greentree Centre, Suite 311
                       Marlton, New Jersey 08053
                       Fax #: 609-797-5949
                       **Attn:** Chief Operating Officer

With a copy to:        MedQuist, Inc.
                       Five Greentree Centre, Suite 311
                       Marlton, New Jersey 08053
                       Fax #: 609-797-5949
                       **Attn:** General Counsel

Paragraph 6.8          Agency: Vendor is an independent contractor and this Agreement shall not be
                       construed as constituting either party as an employee, agent, partner, or joint
                       venture of the other.

Paragraph 6.9          Exclusive Agreement: During the term of this Agreement and any renewal
                       thereof, Client agrees that it will not contract with any other transcription
                       service to perform client's medical dictation/transcription work other than work
                       that Vendor can not or will not perform.

Paragraph 6.10         Force Majeure: Each party to this Agreement shall not be liable to the others
                       for failure to perform any of its obligations hereunder due to a cause or causes
                       beyond its reasonable control, including, but not limited to, acts of God or
                       public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes,
                       blackouts, telephone outage, war or war operations, restraints of government,
                       or other causes which cannot with reasonable diligence be controlled or
                       prevented by such party.

Paragraph 6.11         Medicare Clause: The Vendor agrees to allow the Secretary of the Department
                       of Health and Human Services and the Comptroller General, or their duly
                       authorized representatives, access upon request to this Agreement and to the
                       books, documents and records of the Vendor that are necessary to verify the
                       nature and extent of costs of services furnished under this Agreement. The
                       Vendor also agrees that if the Vendor carries out any duties of the Agreement
                       through a subcontract, with a value or cost of Ten Thousand Dollars
                       ($10,000.00) or more over a twelve (12) month period with a related
                       organization, the subcontract must contain a clause to the effect that the related
                       organization must make available, upon written request, to the Secretary, or
                       upon request to the Comptroller General, or their duly authorized
                       representatives, the subcontract and the books, documents and records of the
                       related organization that are necessary to verify the nature and extent of the
                       costs. Such access shall be until the expiration of four (4) years after the
                       services are furnished under this Agreement.

Paragraph 6.12          **Effective Date:**  If Client does not execute this Agreement within thirty (30) days after Vendor sends it to Client, then this Agreement shall be null and void, absent Vendor's express written consent to the contrary.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

KAISER FOUNDATION HOSPITAL          MEDQUIST, INC..
SCPMG

By: _____         By: _____
Name: *Sara /Lynch, RRA*                 John A. Donohoe, Jr.
Title: *Medical Records*            Title:  President and Chief Operating Officer
       *Department Administrator*

May-18-06    03:32pm   From-KAISER ADMIN                +714-284-6671      T-737  P.071/071  F-443

## EXHIBIT A

### TURNAROUND TIME

Health Information reports                    24 to 48 hours

Stat Reports                                 2 hours

# EXHIBIT V

MedQuist Legal Dept. ONLY:
Contract No. _101308_

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of November 1, 2001, by and between KAISER FOUNDATION HOSPITAL, ORANGE COUNTY, a Corporation/SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP (SCPMG), ORANGE COUNTY, a Partnership ("Client"), and MEDQUIST TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor").

### BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

### ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

| | |
|---|---|
| Paragraph 1.1 | Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement. |
| Paragraph 1.2 | Dictation Equipment: For the purpose of providing the services, Vendor shall maintain at Vendor's offices, at no cost to Client, a direct dial digital dictation system (the "Dictation System"). |
| Paragraph 1.3 | Transcription Equipment: Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Vendor shall, at its own cost and expense, supply four (4) personal computer systems, monitors, modem and two (2) laser printers configured to operate with the Vendor's System. Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports. |
| Paragraph 1.4 | Delivery of Dictation to Vendor: Client physicians may dictate into the Dictation System at any time, twenty-four hours per day, seven days per week. |



EXHIBIT

V

Paragraph 1.5      Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transcribed.

Paragraph 1.6      Format: All reports will be formatted and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

## ARTICLE II

## TERM AND TERMINATION

Paragraph 2.1      Term: The term of this Agreement shall be for three (3) years commencing on November 1, 2001 and ending on September 30, 2004. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

Paragraph 2.2      Termination for Default: Either party may terminate this Agreement upon the happening of any of the following:

         2.2.1    Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

         2.2.2    Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

Paragraph 2.3      Notice of Default: If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, written notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder. Vendor shall then have ninety (90) working days' from receipt of said notice in which to cure said default. If Vendor shall fail to cure such default within said ninety (90) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

## ARTICLE III

### PAYMENTS AND CHARGES

Paragraph 3.1       Payment to Vendor:  Client shall pay to Vendor a payment of $0.14 for each unit (as set forth below) transcribed for Client for the first year of the contract and any other amounts set forth on Exhibit C attached hereto. Should the annual contracted work volume increase by 10% or more the payment will not be increased. Should the annual contracted work volume not increase by 10%, the payment shall be increased three percent (3%) on the anniversary date of this Agreement. Failure to implement a price increase shall not constitute a waiver of the right to such increase and Vendor may bill at any time for previously unbilled amounts.

The unit of pricing applicable to this Agreement is as designated below:

AAMT Line.  An AAMT line is defined as any line having 65 "characters".  A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer.  A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines.  Client acknowledges that the charges set forth in this Agreement are based upon the fact that character counts shall be determined using Vendor's software system and shall not be derived from any third party software or interface systems.

3.1.1   Additional Format Changes:  Upon execution of this Agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client.  After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.2   Interface Requirements:  The interface requirements of this Agreement are as designated below:

No interface requirements.

3.1.3   Other Unanticipated Changes or Additional Services:  In the event that Client materially changes the manner in which it conducts business, reduces the expected transcription volume by 10% or more or requests services above and beyond that anticipated at the time of execution of

this Agreement, Vendor may charge a reasonable fee for such changes and for additional services.

**Paragraph 3.2**    Billing: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

**Paragraph 3.3**    Payment: Client shall pay Vendor the amount of each invoice within forty-five (45) days after the date of the invoice. Any overdue amount shall be subject to a late fee of five (5%) percent and shall accrue interest at the rate of one-and-one half (1 1/2%) percent per month until paid. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

**Paragraph 3.4**    Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

**Paragraph 3.5**    Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and shall pay to Vendor any portion of such disputed amount which has been substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations, the dispute shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Arbitration shall be conducted in the jurisdiction of the principal headquarters of the party not raising the dispute. The decision reached through arbitration shall be final and binding on both parties. This Paragraph 3.5 shall also apply to any other dispute between the parties.

## ARTICLE IV

## CONFIDENTIAL INFORMATION

**Paragraph 4.1**  Confidential Information: Vendor agrees and acknowledges that confidential patient information shall be disclosed to it in confidence. Vendor agrees to keep strictly confidential and hold in trust all confidential patient information in compliance with applicable laws and the HIPAA Regulations (as defined in Article VII).

**Paragraph 4.2**  Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor or to de-compile, reverse engineer or otherwise use such Information. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

**Paragraph 4.3**  Remedies: The parties acknowledge and agree that a remedy at law for any breach or attempted breach of the provisions of this Article IV shall be inadequate and that the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist at law.

**Paragraph 4.4**  Certain Exceptions: The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis and in compliance with applicable laws or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

**Paragraph 4.5**  Non-Solicitation of Transcriptionists and Employees: During the term of this Agreement and for a period of twelve (12) months after Vendor ceases to provide services to Client, Client shall not solicit, hire or engage any person who during the term is or has been an employee or transcriptionist of Vendor.

## ARTICLE V

### MAINTENANCE OF EQUIPMENT

Paragraph 5.1      Maintenance of Equipment: The party providing the Dictation System pursuant to Section 1.2 hereof shall be responsible for the repair and maintenance of the Dictation System. Vendor shall be responsible for the repair and maintenance of the Transcription Equipment. Client shall be responsible for the repair and maintenance of any other equipment located at Client's offices.

## ARTICLE VI

### MISCELLANEOUS

Paragraph 6.1      Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly or indirectly as a result of services provided in the Agreement. Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 6.2      Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

Paragraph 6.3      Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof. All Exhibits attached hereto are incorporated herein, and made a part hereof.

Paragraph 6.4      In the event MedQuist and Kaiser Permanente agree to a Kaiser Corporate Vendor contract, and that Corporate contract would benefit Client, Client will be incorporated into said contract effective the date the contract is fully executed.

Paragraph 6.5      Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

Paragraph 6.6      Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected

**Paragraph 6.7**    Liability: Notwithstanding anything in this Agreement to the contrary, in no event shall Vendor be responsible for special, exemplary, punitive, consequential or incidental damages or for any damages other than, or in addition to, actual damages.

**Paragraph 6.8**    Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the party to whom it is to be given as follows:

If to Client:    Kaiser, Orange County
1011 South East Street
Anaheim, CA 92805
Fax #: 714-284-6625
Attn: Sara Lynch, RHIA

If to Vendor:    MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
Attn: Chief Operating Officer

With a copy to:    MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
Attn: General Counsel

**Paragraph 6.8**    Agency: Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other.

**Paragraph 6.9**    Exclusive Agreement: During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other transcription service to perform client's medical dictation/transcription work other than work that Vendor can not or will not perform.

**Paragraph 6.10**    Force Majeure: Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

Paragraph 6.11          Medicare Clause: The Vendor agrees to allow the Secretary of the Department
                        of Health and Human Services and the Comptroller General, or their duly
                        authorized representatives, access upon request to this Agreement and to the
                        books, documents and records of the Vendor that are necessary to verify the
                        nature and extent of costs of services furnished under this Agreement. The
                        Vendor also agrees that if the Vendor carries out any duties of the Agreement
                        through a subcontract, with a value or cost of Ten Thousand Dollars
                        ($10,000.00) or more over a twelve (12) month period with a related
                        organization, the subcontract must contain a clause to the effect that the related
                        organization must make available, upon written request, to the Secretary, or
                        upon request to the Comptroller General, or their duly authorized
                        representatives, the subcontract and the books, documents and records of the
                        related organization that are necessary to verify the nature and extent of the
                        costs. Such access shall be until the expiration of four (4) years after the
                        services are furnished under this Agreement.

Paragraph 6.12          Effective Date: If Client does not execute this Agreement within thirty (30)
                        days after Vendor sends it to Client, then this Agreement shall be null and void,
                        absent Vendor's express written consent to the contrary.

## ARTICLE VII

## HIPAA

Paragraph 7.1           Confidential Patient Health Information: In connection with the performance
                        of services hereunder, Client discloses to Vendor certain information that will
                        be subject to protection under the Health Insurance Portability and
                        Accountability Act of 1996 ("HIPAA"), Public Law 104-191. Vendor, as a
                        recipient of protected information from Client, is a "Business Associate" as that
                        term is defined in HIPAA and regulations promulgated by the U.S. Department
                        of Health and Human Services to implement certain provisions of HIPAA
                        (herein "HIPAA Regulations"). Pursuant to said HIPAA Regulations, all
                        Business Associates of entities such as Client must agree in writing to certain
                        mandatory provisions regarding the use and disclosure of individually
                        identifiable health information (within the meaning of 45 CFR, §164.501 of
                        HIPAA, hereafter "Protected Health Information" or "PHI). In order to satisfy
                        the requirements of the HIPAA Regulations effective upon the applicable
                        compliance dates set forth in 45 CFR, §164.534 (the "Effective Time"), Client
                        and Vendor agree as follows effective as of the Effective Time:

                        7.1.1   Unless otherwise provided in this Agreement, capitalized terms in this
                                Paragraph 7.1 shall have the meanings given to them in the HIPAA
                                Regulations.

7.1.2    Vendor will:

a.    not use or further disclose the PHI other than as permitted or required by this Agreement or as required by law;

b.    use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement;

c.    report to Client any use or disclosure of the PHI not provided for by this Agreement of which Vendor becomes aware;

d.    ensure that any agents, including a subcontractor, to whom it provides PHI received from, or created or received by Vendor on behalf of, the Client agrees to the same restrictions and conditions that apply to the Vendor with respect to such PHI;

e.    make available PHI in accordance with and within the period of time permitted under 45 CFR, §164.524, in the format requested unless it is not readily producible in such format, in which case it shall be produced in hard copy format.    The foregoing shall be applicable only if the records of Vendor are considered a Designated Record Set (as defined in 45 CFR, §164.501) at the time of the request.    Vendor may charge a reasonable, cost-based fee as permitted under 45 CFR, §164.524 (c)(4).

f.    for so long as PHI of an individual is maintained in and only if such information is considered a Designated Record Set maintained by Vendor for Client, make available PHI for amendment and incorporate any amendments to PHI in accordance with 45 CFR, §164.526.

g.    make available the information required to provide an accounting of disclosures in accordance with 45 CFR, §164.528.

h.    make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Vendor on behalf of, the Client available to the Secretary of the U.S. Department of Health and Human Services for purposes of determining the Client's compliance with HIPAA; and

i.    at termination of this Agreement, if feasible, return or destroy all PHI received from, or created or received by Vendor on behalf of, the Client that the Vendor still maintains in any form and retain no copies of such information or, if such return is not feasible, extend the protections of this Agreement to the information and limit

further uses and disclosures to those purposes that make the return or destruction of the information feasible.

7.1.3    Vendor, in its capacity as Business Associate to Client, shall be permitted to use and disclose PHI in a manner that would not violate the requirements of the HIPAA Regulations as follows:

    i.    for the proper management and administration of Vendor;

    ii.   to carry out the legal responsibilities of Vendor; and

    iii.  to provide data aggregation services relating to the health care operations of Client.

7.1.4    Client is authorized to terminate this Agreement if Client determines that Vendor has violated a material term of this Paragraph 7.1 in accordance with the terms of this Agreement.

7.1.5    This Paragraph 7.1 shall survive the expiration or termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

[CLIENT]                                MEDQUIST TRANSCRIPTIONS, LTD.

By: _Sara Lynch, RHIA_                  By: _____
Name: Sara Lynch, RHIA                  Name: John A. Donohoe, Jr.
Title: Medical Records Admn.            Title: President & Chief Operating Officer
    12-10-01

Revised as of 08/14/01
MEDQTLTRANSERVAGT

## EXHIBIT A

### TURNAROUND TIMES

| | |
|---|---|
| Stat History and Physical | 1-2 hours |
| Stat Consult | 1-2 hours |
| Stat PN-ICU/Peds | 1-2 hours |
| Progress Note | 1-2 hours |
| ER Consult | 24 hours |
| Operative Report/Procedure/Deliveries | 24 hours |
| Transfer Summary | 1 hour |
| Medicare and Peds Discharge Summary | 24-48 hours |
| Discharge Summary | 48 hours |
| FPN | 48 hours |
| Outpatient Medical Records/Letter | 24-48 hours |

Vendor will not be held accountable for failure to meet turnaround time when a physician dictates more than one report per job number (batched dictations).

May-16-06    03:29pm    From-KAISER ADMIN                    +714-284-6671        T-737  P.047/071   F-449

## EXHIBIT B

## INTERFACE

No interface required.

## EXHIBIT C

### OTHER CHARGES

As applicable, Client shall pay to Vendor a monthly payment as follows:

| | |
|---|---|
| $1,000.00 | Transcription port access for up to 15 Kaiser full-time employed transcriptionists. |
| $100.00 | Transcription port access for each additional Kaiser full-time employed transcriptionist over and above 15. |

Said charges will not apply until such time as Client is converted to Vendor-owned dictation system.

# EXHIBIT W

## TRANSCRIPTION SERVICES AGREEMENT

This Transcription Services Agreement (this "Agreement") dated as of September 18, 2000 (the "Effective Date"), is between Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. ("Kaiser") having corporate offices located at 2101 East Jefferson Street, Rockville, MD 20852 and MedQuist Transcriptions, Limited, with corporate offices located at 5 Greentree Centre, Suite 311, Marlton, NJ 08503 ("Supplier").

### RECITALS

A. Kaiser operates a health maintenance organization and has agreed to provide or arrange for transcription services for the benefit of its exclusive provider of physician services, the Mid-Atlantic Permanente Medical Group ("MAPMG") in connection with MAPMG's provision of health care in the Baltimore-Washington metropolitan area to Kaiser members.

B. Supplier is in the business of performing transcription services for providers such as MAPMG in the Baltimore-Washington metropolitan area.

C. Kaiser and Supplier desire to enter into an agreement pursuant to which Supplier shall perform transcription services on behalf of Kaiser.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

**Section 1.    Definitions.**

"Document" means the written report produced by Supplier from a Voice File.

"Provider" means any individual authorized by Kaiser to create Voice Files, in accord with Section 3.d., below.

"Report Type" means the specific format of a Document as selected by a Provider when creating a Voice File.

"Services" means the transcription services and all other services provided by Supplier set forth in this Agreement.

"System" means the hardware, software and the telecommunications facilities utilized by Supplier in the provision of the Services.

"Voice File" means the information dictated by a Provider that is captured by Supplier, and stored by Supplier within the System as a digital file.



EXHIBIT

W

### Section 2.    Term.

The term of this Agreement shall be twenty-four (24) months commencing within sixty (60) days of the Effective Date, unless sooner terminated as described in Section 12. Kaiser shall have the sole option to extend this Agreement for up to an additional twenty-four (24) months, upon the provision of at least sixty (60) days advance written notice to Supplier prior to the expiration of the original twenty-four (24) month term.

### Section 3.    Transcription Services.

a.      Supplier shall transcribe the Voice Files into Documents and shall deliver the Documents to Kaiser in accordance with the process set forth in Exhibit A.

b.      Supplier shall provide Kaiser's Transcription Services Manager, or their designate, with unlimited access to listen to any Voice File, at any time, and without request. Supplier shall provide Kaiser's Transcription Services Manager, or their designate, with sufficient training and security access, to facilitate such unlimited access.

c.      Supplier shall destroy each Voice File fourteen (14) days from the date the Document produced as a result of the Voice File is delivered to Kaiser.

d.      Kaiser will notify Supplier in writing of each Provider who is authorized to create Voice Files and otherwise gain access to the System, and Supplier shall promptly thereafter establish access by that Provider to the System. Kaiser will notify Supplier in writing of the termination of any Provider's authorization and Supplier shall block access to such Provider within twenty-four (24) hours of such notice.

e.      Supplier shall perform the Services through qualified contracting transcriptionists, each of whom shall enter into an agreement with Supplier in the form of Exhibit B.

f.      Prior to the commencement of the provision of the Services by Supplier, the parties shall complete the actions in accordance with the time frames set forth in the implementation plan, set forth in Exhibit C, which shall be mutually developed by the parties within ten (10) business days after the execution of this Agreement. The parties agree to dedicate the resources necessary to complete their respective actions in the time frames set forth therein.

### Section 4.    Turnaround Time

a.      All Voice Files shall be processed into Documents by Supplier, in strict accordance with the turnaround times set forth in Exhibit D, corresponding to the Report Type set forth therein (the "Turnaround Times"). On a monthly basis, Supplier shall provide Kaiser with a written report which sets forth Supplier's performance with regard to achieving the appropriate Turnaround Times. Supplier warrants that Supplier shall take any action necessary so that Supplier provides the Services in strict accordance with the Turnaround Times.

b.      The Turnaround Time measurement shall commence from the moment a Provider sends a Voice File to Supplier, to the moment that the Document is delivered to Kaiser. For the STAT Report Type the Turnaround Time measurement shall commence from the moment a Provider sends a Voice File to Supplier and notifies Supplier. The Turnaround Time requirement for the STAT Report Type shall apply provided the average daily volume of STAT reports does not exceed three percent (3%) of the total daily volume of reports dictated.

2

c.    Supplier shall not be required to comply with the Turnaround Times in the event that Kaiser sends more than one hundred ten (110%) percent of Kaiser's average daily volume of Voice Files to Supplier, during any given business day (the "Turnaround Time Threshold"). The Turnaround Time Threshold shall be calculated by determining the total number of minutes of recorded Voice Files sent by Kaiser during each business day during the previous three (3) calendar months and dividing by the total number of business days occurring during the same period.  The Turnaround Time Threshold shall be compared to the current average daily volume to determine if Supplier shall be entitled to deviate from the Turnaround Times. The calculations shall be completed by Supplier and presented to Kaiser.  In the event that Kaiser has exceeded the Turnaround Time Threshold and Supplier shall not meet the Turnaround Times, Supplier shall notify Kaiser's Transcription Services Manager or their designate within two (2) business days, and an action plan which is acceptable to the parties hereto shall be collectively developed and implemented in order to minimize the impact on Kaiser's operations.

d.    In the event that Supplier shall not meet the Turnaround Times, Supplier shall process the Voice Files in an amount of time equivalent to the Turnaround Time plus twelve (12) hours for Report Type "Pre-Operative" and the Turnaround Time plus twenty-four (24) hours for all other Report Types, which shall be referred to as the "Extended Turnaround Times".

e.    In the event that Kaiser exceeds the Turnaround Time Threshold during four (4) out of any ten (10) consecutive business days, then Supplier shall have fifteen (15) business days to adjust Supplier's resources, so that Supplier is subsequently able to process the Voice Files in accordance with the Turnaround Times.  In the event that Kaiser provides Supplier with twenty (20) business days advanced notice of a material projected volume increase, Supplier shall provide for sufficient resources to process the Voice Files in accordance with the Turnaround Times.

**Section 5.    Payment for Transcription Services.**

a.    In consideration for the provision of the Services, Kaiser shall pay Supplier at the applicable rate per Line set forth in Exhibit E, attached hereto and incorporated herein by reference, for each Line transcribed by Supplier when processing a Voice File into a Document. A "Line" shall mean any alphabetical or numerical string of text having Characters.  A "Character" shall mean any letter, number, symbol or function key necessary for the final appearance and content of a Document including, but limited to: the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. The total number of Lines for a given Document shall be determined by establishing the total number of Characters for the Document and dividing by sixty-five (65).

b.    Exhibit E sets forth rates per Line that vary with the annualized number of Lines processed.  Within ten (10) days subsequent to the close of every calendar quarter, the parties shall determine the number of Lines processed by Supplier during that quarter, and shall multiply the number by four (4) to arrive at the annualized number of Lines.  The rate set forth on Exhibit E for the annualized number of Lines so determined shall be applicable during the succeeding calendar quarter. The calculations shall be completed by Supplier and presented to Kaiser. From the Effective Date through the end of the calendar quarter next occurring, the applicable rate per Line shall be fourteen and one-half ($0.145) cents.

c.    Upon execution of this Agreement and for a period that terminates sixty (60) days after the Effective Date, Supplier shall set up formats and macros in the System for each Report

3

Type set forth in Exhibit D, as required by Kaiser at no charge to Kaiser. Any additional changes required by Kaiser, or new Report Types added by Kaiser, subsequent to completion of such period, shall be performed by Supplier, at a charge of one hundred twenty-five dollars ($125.00) per hour or portion thereof, up to a maximum amount of two hundred dollars ($200.00) for any individual change.

d.    Charges for additional services that may be provided by Supplier, throughout the term of this Agreement are set forth in Exhibit E. In the event that the parties agree that Supplier shall provide other services in addition to those set forth in this Agreement, then the parties shall negotiate in good faith to determine the amount of the charges that Kaiser shall pay for such new services. Prior to Supplier providing such new services and Kaiser incurring any additional charges, the parties shall amend this Agreement, in writing, specifying the nature of the new services and the associated charges.

e.    The rates and charges set forth in Exhibit E shall remain fixed and unchanged for the entire initial twenty-four (24) month term of this Agreement. In the event Kaiser elects to extend this Agreement, as set forth in Section 2, the rates for the new term shall not be greater than one hundred five percent (105%) of the current charges set forth in Exhibit E, as negotiated by the parties at the time of such extension by Kaiser. If the parties fail to agree on the amount of the increase by the effective date of any renewal period, then Supplier shall have the right to terminate this Agreement upon provision of ninety (90) days advanced written notice to Kaiser. The current rates shall remain in effect for the duration of the ninety (90) day termination period.

f.    Supplier agrees to provide Kaiser with an invoice, in a format acceptable to Kaiser, within ten (10) business days of the end of each calendar month, summarizing all charges assessed for processing each Document during said calendar month, in accord with this Section 3 and Exhibit E. Kaiser shall have forty-five (45) calendar days from the date of such invoice to remit payment to Supplier. Any overdue amount shall accrue simple interest at the rate of one-and-one half percent (1 ½%) per month until paid. Supplier shall provide Kaiser with an additional discount equivalent to the value set forth in Exhibit D, which shall be applied to the total charge for any Document, where Supplier fails to achieve the Extended Turnaround Times as set forth in Section 4. In any given invoice period where such additional discounts may be taken by Kaiser, the total value of the additional discount taken may not exceed three percent (3%) of the total invoice value for such period. Kaiser must notify Supplier within ten (10) days from the receipt of any invoice of Kaiser's intent to take such additional discounts and shall only be entitled to apply such additional discounts when the invoice is paid within sixty (60) days of receipt by Kaiser. Such additional discounts shall not apply for failure to meet the Extended Turnaround Times if such failure results directly or indirectly from acts outside the reasonable control of Supplier as set forth in Section 18.n. or where the Voice File is not provided in an understandable manner, or in accordance with this Agreement.

g.    Each party shall independently monitor the number of Lines processed by Supplier throughout the term of this Agreement. The parties shall validate the method each party shall use to calculate the number of Lines processed. The parties agree to take the necessary actions so that both calculations achieve the same result.

h.    In the event that any invoiced amount is disputed by Kaiser, Kaiser shall deliver written notice of such disputed amount to Supplier within three hundred sixty (360) days of receipt by Kaiser of the invoice. In the absence of Kaiser timely giving said notice, Kaiser waives any right to dispute said invoice. Supplier shall, upon receipt of Kaiser's request, deliver promptly to Kaiser any backup or other information which supports the correctness of such

disputed amount. Upon receipt of such information, Kaiser shall have fifteen (15) days in which to examine such information and to pay to Supplier any portion of such disputed amount which Kaiser, in its sole discretion, has determined to be substantiated. Thereafter, if any dispute still remains with respect to any disputed amount, Supplier and Kaiser shall immediately enter into good faith negotiations to resolve the remaining dispute. In the event the parties are unable to resolve such dispute within fifteen (15) business days of entering into negotiations, the dispute shall be settled by arbitration, in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall be conducted in the location of the corporate offices of the party not initiating the dispute. The decision reached through arbitration shall be final and binding on both parties. The parties shall select the arbitrator by mutual agreement and the commercial arbitration rules of the American Arbitration Association ("AAA") then in effect shall govern. Notwithstanding the rules of the AAA, the arbitrator shall have no authority to award punitive damages. The parties shall be responsible for their own costs and shall share equally the costs of the arbitration. Supplier shall continue to provide services under the terms of this Agreement during the arbitration, at the fees then in effect. This Section 5.h shall also apply to any other dispute between the parties.

### Section 6.    Supplier's Quality Assurance Process.

a.      Supplier shall maintain and implement its quality assurance process as set forth in Exhibit F. On a quarterly basis, Supplier shall provide Kaiser's Transcription Services Manager with a written report which shall set forth Supplier's quantitative measurements of Supplier's performance for the previous quarter and any corrective or remedial action taken as a result of the data contained in such report.

b.      Supplier shall promptly honor all requests made by Kaiser's Transcription Services Manager to provide quality audits of a given Provider's Documents, or a given transcriptionist's Documents, in whatever frequency Kaiser deems necessary.

c.      Supplier warrants that it will strive to attain and maintain an overall threshold of ninety-eight (98%) percent error-free Lines in any Document transcribed by Supplier. Allowing for the inconsistencies inherent in individual speech, diction, and punctuation, Supplier will work closely with Kaiser to monitor performance and provide appropriate feedback as necessary. Supplier warrants that ninety-eight (98%) percent of the Lines in any Document transcribed by Supplier under this Agreement shall be free from error with regard to spelling and format.

### Section 7.    Supplier's Provision of the System.

a.      To enable Supplier to provide the Services, Supplier shall, at its sole cost and expense, provide, maintain and upgrade, as necessary, the System. Supplier warrants that the System shall be available for use by the Providers, continuously and without interruption, twenty-four (24) hours per day, three hundred sixty-five (365) days per year.

b.      Providers shall access the System, through local telephone lines or toll-free telephone lines at Supplier's discretion. If Kaiser accesses such local or toll-free telephone lines at the location and in the manner intended by Supplier, then Kaiser shall not incur any telephone charges associated with accessing the System via such local or toll-free telephone lines. Throughout the term of this Agreement, if Kaiser requires Supplier to provide additional

telecommunications equipment to Kaiser, Supplier may pass on the costs without mark-up associated with the use of such additional equipment to Kaiser. Prior to providing such additional equipment and Kaiser incurring any additional charges, the parties shall amend this Agreement, in writing, specifying the nature of the additional equipment and the associated charges.

      c.      With regard to Supplier's confidentiality obligations, as set forth in Section 13, Supplier warrants that Supplier shall use commercially reasonable efforts to design, configure and maintain the System in such a manner, so as to prevent any information contained in a Voice File or Document from being observed, manipulated, corrupted or disseminated by any unauthorized third party. Supplier's current data security standards, methods, and processes are set forth in Exhibit G. At all times throughout the term of this Agreement and any renewal thereof, and during any time which Supplier is responsible for the System, Supplier shall be in compliance with all applicable local, state, and federal statutes, regulations guidelines and policies and procedures of whatever origin, as amended, related directly or indirectly, to the System and the arrangement and provision of Services. Furthermore, Supplier shall require all its employees, agents and independent contractors to comply with all applicable law as described in this Section 7.c.

      d.      At the request of Kaiser, Supplier shall provide Kaiser with assistance to create an automated interface between the System and Kaiser's automated medical records system. After determining the scope of such work, Supplier shall provide Kaiser with a written estimate of the cost to perform such work for Kaiser's review. Upon written acceptance by Kaiser and agreement by the parties on such other documentation of the terms and conditions for completing the work Supplier shall undertake the work, and Kaiser shall make payment of fifty percent (50%) upon contract signing and fifty percent (50%) upon completion of reasonable acceptance testing. Supplier shall not undertake any work related to an interface between Kaiser's or MAPMG's automated medical records systems, except at the request of an authorized representative of Kaiser in accord with this section.

      e.      Supplier shall provide to Kaiser the management reports in the frequency set forth in Exhibit H. If Kaiser requires any custom management reports from Supplier, Supplier shall, after determining the scope of such work, provide Kaiser with a written estimate of the cost to perform such work, based on an hourly rate of one hundred fifty dollars ($150.00), for Kaiser's review. Upon written acceptance by Kaiser, Supplier shall complete the work, and Kaiser shall make payment in full upon completion of reasonable acceptance testing.

**Section 8.**     **Provider Training and Support.**

      a.      Supplier shall provide all Providers with sufficient on-site training, at their respective Kaiser locations, and written instructions to enable the Providers to fully utilize the System and Services.

      b.      Supplier shall further maintain a help desk operation to assist Kaiser or any Provider with solving any problems or answering any inquiries related to the proper utilization of the System and Services. Such help desk operation shall be available to Kaiser or any Provider twenty-four (24) hours per day, three hundred sixty-five (365) days per year.

6

### Section 9.    Services Warranty

a.      Supplier represents and warrants that its employees, agents and contractors, have the qualifications and skills necessary to perform the Services in a timely, competent, first class and professional manner in accordance with the highest industry standards and all applicable governmental requirements, laws, regulations, ordinances, rules and regulations, as amended or implemented, in the future and that Supplier is able to fulfill the technical service requirements and all other requirements of this Agreement. Supplier shall, within a reasonable period of time after a change in applicable laws, rules or regulations, take reasonable steps to come into compliance with such new laws, rules or regulations. If Supplier shall fail or refuse to do so, Kaiser may terminate this agreement upon written notice.

b.      If in Kaiser's reasonable judgment any of Supplier's employees, agents, or contractors fail to perform the Services in strict accordance with this Agreement or are deemed unfit or otherwise reasonably unsatisfactory to Kaiser, then Kaiser may require that such employees, agents or contractors cease performing Services for Kaiser.  Kaiser's exercise of its rights under this Section 9.b. shall not limit Kaiser's ability to terminate this Agreement pursuant to Section 12.a.

### Section 10.   Indemnification.

a.      <u>General Indemnity</u>.  Supplier shall indemnify and hold harmless (and, at Kaiser's request, defend) Kaiser, and all other persons or organizations cooperating in the conduct of the health care program commonly known as the "Kaiser Permanente Medical Care Program," and each of their officers, directors, partners, shareholders, employees and agents from and against any and all demands, debts, liens, claims, losses, damages, liabilities, costs, expenses, judgments, or obligations, actions or causes of action (including without limitation, reasonable attorneys' fees and costs) arising out of or in any way connected to Supplier's acts or omissions (including those of its agents and/or contractors) under this Agreement.  Notwithstanding the foregoing, Supplier's liability under this Agreement shall not apply to any loss, cost, damage or expense to the extent arising from the negligence or willful misconduct of Kaiser.  Once a Provider signs a Document, Supplier is released from liabilities with respect to the content and accuracy of such Document. Kaiser hereby indemnifies and holds Supplier harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses caused by the action of Kaiser or its agents or as a result of Services provided pursuant to this Agreement.

b.      <u>Proprietary Rights Indemnity</u>.  Supplier warrants that it is the owner and/or licensee of the System and that the System will not infringe upon or violate any patent, copyright, trade secret right or other proprietary or intellectual property rights of any third party. Supplier shall indemnify, defend, save and hold Kaiser their respective officers, employees and agents harmless from all claims, actions, losses, damages, liabilities, judgments, awards, costs and expenses, including reasonable attorneys' fees and costs, arising out of claims that the System infringes the patent, trademark, copyright, trade secret or other proprietary or intellectual property rights of others. Kaiser shall promptly notify Supplier in writing if Kaiser becomes

7

subject to any such claims. Kaiser shall, upon Supplier's request and at Supplier's expense and to the extent Kaiser's interests are not adverse to Supplier, provide reasonable assistance to Supplier in the defense of such action. Supplier shall have the sole control of the defense and settlement of such claims and Supplier shall be entitled to replace or modify the System so that it becomes noninfringing, provided that Kaiser's use of the System is uninterrupted and the performance of the System is not materially impaired thereby.

### Section 11.    Insurance.

Supplier shall procure and maintain in effect the following policies of insurance covering liability arising from this Agreement:

a.    All insurance coverages required by Federal and State law, including workers' compensation and employer's liability all with statutory minimum limits;

b.    Commercial general liability insurance with not less than a Ten Million Dollar ($10,000,000.00) combined single limit and aggregate, including personal injury, or death of any persons and injury to or destruction of property, including loss of use resulting therefrom, and also including a contractual liability endorsement covering Supplier's liability under Section 10 of this Agreement.

c.    Supplier shall, upon execution of this Agreement, provide Kaiser with a certificate of insurance and endorsements evidencing these coverages, naming Kaiser as additional insureds and providing that no such coverage shall be subject to cancellation or material reduction in coverage without thirty (30) days prior written notice to Kaiser. The insurance requirements hereunder shall not limit or relieve Supplier of its duties, responsibilities or liabilities under this Agreement.

### Section 12.    Termination.

a.    Either party may terminate this Agreement immediately, by giving written notice of termination to the other party specifying the reasons therefor if:

(1) Such other party fails to perform its obligations substantially in accordance with the terms of this Agreement and, within sixty (60) days after written notice from the other party specifying the nature of the alleged default, such party fails to cure such default (or, in the case of a default which cannot, with due diligence, be cured within a period of sixty (60) days, if such party fails to proceed promptly to cure such default as soon as possible with all due diligence as acceptable to the non-defaulting party), or

(2) Such party makes an assignment for the benefit of creditors, or is adjudged a bankrupt, or if a petition is filed by or against such party under the provisions of any state insolvency law or under the provisions of the Bankruptcy Code, as amended, or a receiver, whether permanent or temporary, of such parties property or any part thereof, shall be appointed by a court of competent authority, or if such party shall make a general assignment for the benefit of its creditors.

b.    Upon termination or expiration of this Agreement:

(1). Supplier shall work cooperatively with Kaiser to transition the delivery of the Services to such other supplier as Kaiser may select, or to Kaiser;

(2), Each party promptly shall return, or at the written direction of the other party, destroy, the confidential and proprietary information of the other party, as defined in Section 13,

8

below.  Supplier shall immediately return to Kaiser all Documents in Supplier's possession and shall destroy any voice files in Supplier's possession.

### Section 13.    Ownership of Information and Confidentiality.

a.       Supplier acknowledges and agrees that all Voice Files and Documents and the information contained therein (together, the "Patient Information") are the property of Kaiser or its Providers, and Supplier has no right to use, disclose, alter or reproduce the Patient Information in any form or format for any purpose, except as specifically required by this Agreement in connection with Supplier's fulfillment of its obligations hereunder, or as required by law.

b.       Supplier acknowledges that it and its employees, agents or contractors shall, in the course of performance of this Agreement, be exposed to or acquire information which is proprietary to or confidential to Kaiser, its affiliated companies, its Providers, Kaiser members or other patients of Kaiser or its Providers.  This information includes the Patient Information and may also include, but is not limited to, data relating to the products, equipment, inventions, discoveries, trade secrets, secret processes, financial data, personnel records, patient records, medical records, test results, computer programs, marketing information and any other information relating to the business affairs of Kaiser.  All such information obtained by Supplier or its employees, agents and contractors, shall be deemed to be the confidential and proprietary information of Kaiser (together, the "Kaiser Confidential and Proprietary Information").  Supplier agrees to hold the Kaiser Confidential and Proprietary Information in strict confidence and not to use, sell, reproduce, alter or disclose such information for any purpose other than the provision of the Services to Kaiser under this Agreement and to take appropriate actions by agreement with each of its employees, agents and contractors to keep such information confidential.  If Supplier breaches this provision, damages may not be an adequate remedy and, notwithstanding the obligation of the parties to arbitrate a dispute as set forth in this Agreement, Supplier agrees that Kaiser shall be entitled to injunctive relief to restrain such breach, whether threatened or actual without posting bond therefor.  If it is determined that the scope of the provisions of this Section 13 are unenforceable then they shall be modified to be whatever is determined by a court to be reasonable in order to obtain enforcement and the parties hereto accept such determination subject to any appeals.

c.       Kaiser Confidential and Proprietary Information shall not include information: (i) which is or becomes generally available to the public without the wrongful act or breach of this Agreement by Supplier; (ii) which is disclosed with the prior written consent of Kaiser; (iii) which is lawfully in the possession of Supplier from a third party prior to the date of this Agreement without obligation of confidentiality; or, (iv) which is required to be disclosed by court order or other legal or administrative process, provided that Supplier shall give Kaiser timely notice prior to disclosing such information.

d.       Supplier shall not, without Kaiser's prior written consent, divulge any of the provisions of this Agreement to any third parties except as may be required by law.

e.       Confidentiality Statement.  Supplier shall have each of Supplier's employees, agents and contractors, who shall provide the Services, execute a confidentiality statement acceptable to Kaiser, prior to the time that such employee provides the Services.

f.       Kaiser agrees and acknowledges that the System and other information provided or utilized by Supplier in order to provide its services hereunder are confidential and proprietary

9

information owned or licensed by Supplier ("Supplier Information"). Kaiser agrees to keep strictly confidential and hold in trust the Supplier Information and not to disclose or reveal or discuss such Supplier Information to or with any third party without the express prior written consent of Supplier. Kaiser acknowledges that all inventions, improvements, modifications, replacements or other changes to the Supplier Information ("Developments") shall be the exclusive property of Supplier free and clear of any claims by Kaiser of any kind or character whatsoever. Kaiser hereby assigns and transfers Kaiser's right, title and interest in and to all such Developments except for Developments for which Kaiser has incurred fees, costs or other amounts in addition to the fees paid for Services hereunder.

      g.      The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis, or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law.

### Section 14.    Independent Contractor

      Neither party has authorization to enter into any contracts, assume any obligations or make any warranties or representations on behalf of the other party. Nothing in this Agreement or any exhibit hereto shall be construed to establish a relationship of co-partner or joint venture between the parties. Kaiser shall not be responsible to Supplier, the employees or contractors of Supplier or any governing body for taxes on the payroll of Supplier. As between the parties, Supplier shall be responsible for paying all compensation, fringe benefits, insurance, including workers compensation, taxes, and any other related obligations to its employees, contractors, or suppliers.

### Section 15.    Taxes

      a.      Kaiser shall pay all state sales or use taxes to Supplier as a result of the sale of Products or provision of Services under this Agreement. All other taxes, however designated, imposed on Services or Products and any other taxes, including, but not limited to, taxes based on Supplier's net income shall be paid by Supplier.

      b.      Supplier shall be liable for all interest and penalties imposed by any taxing authorities due to Supplier's failure to pay taxes or file or complete necessary tax statements in a timely or proper manner.

### Section 16.    Publicity.

      Supplier shall not, without the prior written consent of Kaiser, use in advertising, publicity or otherwise the names, trade names, service marks, trade dress or logo of Kaiser, or the Kaiser Permanente Medical Care Program, or refer to the existence of this Agreement in any press releases, advertising or materials distributed to prospective customers or other third parties.

### Section 17.    Nondiscrimination and Medicare

      Supplier recognizes that as a government contractor Kaiser is subject to various federal laws, executive orders and regulations regarding equal opportunity and affirmative action which may also be applicable to subcontractors. Supplier, therefore, agrees that all applicable equal

opportunity and affirmative action clauses shall be incorporated herein to the extent required by federal laws, executive orders, and regulations, which include the following:

      a.     The nondiscrimination and affirmative action clauses contained in: Executive Order 11246, as amended, relative to equal opportunity for all persons without regard to race, color, religion, sex or national origin; the Vocational Rehabilitation Act of 1973, as amended, relative to the employment of qualified handicapped individuals without discrimination based upon their physical or mental handicaps; the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended, relative to the employment of disabled veterans and veterans of the Vietnam Era, and the implementing rules and regulations prescribed by Secretary of Labor in Title 41, Part 60 of the Code of Federal Regulations (CFR).

      b.     The utilization of small and minority business concerns clauses contained in: the Small Business Act, as amended; Executive Order 11625; and the Federal Acquisition Regulation (FAR) at 48 CFR Chapter 1, Part 19, Subchapter D, and Part 52, Subchapter H, relative to the utilization of minority business enterprises, small business concerns and small business concerns owned and controlled by socially and economically disadvantaged individuals, in the performance of contracts awarded by federal agencies.

      c.     The utilization of labor surplus area concerns clauses contained in: the Small Business Act, as amended; Executive Order 12073; 20 CFR Part 654, Subpart A; and the FAR at 48 CFR Chapter 1, Part 20 of Subchapter D and Part 52 of Subchapter H, relative to the utilization of labor surplus area concerns in the performance of government contracts. If this Agreement is determined to be subject to the provisions of Section 952 of P.L. 96-499, which governs access to books and records of subcontractors of services to Medicare providers where the cost of value of such services under the contract exceeds $10,000.00 over a 12-month period, then Supplier agrees to permit representatives of the Secretary of the Department of Health and Human Services and of the Comptroller General to have access to the contract and books, documents and records of Supplier, as necessary to verify the costs of the contract, in accordance with criteria and procedures contained in applicable Federal regulations.

### Section 18.    Miscellaneous.

      a.     Entire Agreement. This Agreement including all Exhibits, embodies the entire Agreement and understanding of the parties with respect to this subject matter. There are no restrictions, promises, representations, warranties, covenants, or undertakings other than those expressly set forth or referred to herein. This Agreement supersedes any and all prior agreements and understandings between the parties with respect to such subject matter.

      b.     Amendment. This Agreement may be amended only in writing, signed by any authorized representative of both parties. Notwithstanding the foregoing, if government officials with jurisdiction over Kaiser require any modification of this Agreement in order for this Agreement to be in conformity with federal or state law, or if Kaiser reasonably concludes that an amendment to this Agreement is required because of federal or state law, Kaiser shall notify Supplier of such proposed modification(s) ("Legally-Required Modifications"). Such Legally Required Modifications shall be deemed accepted by Supplier and this Agreement so amended, if Supplier does not, within thirty (30) days following the date of the notice, deliver to Kaiser its written rejection of such Legally-Required Modifications. Receipt of notice of Supplier's rejection shall require the parties to negotiate a good faith compromise within thirty (30) days. If the parties fail to negotiate a compromise, then, notwithstanding the requirement of the parties to

arbitrate set forth in this Agreement. Kaiser shall have the right to terminate this Agreement upon written notice.

c.      Waiver. No waiver shall be effective against either party unless it is in writing, signed by that party.  Any such waiver shall not constitute or be construed as a waiver of any other provision of this Agreement, or a future waiver of the same provision.

d.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

e.      Notices. All notices or other communications required or permitted to be given under this Agreement shall be, in writing, delivered personally, or mailed registered, or certified, postage prepaid, return receipt requested, to each party at the following address (or to such other addresses as either party may specify by due notice to the other):

Kaiser:                        Director, Materials Management
                               Kaiser Foundation Health Plan of the
                                     Mid-Atlantic States, Incorporated
                               12201 Plum Orchard Drive
                               Silver Spring, MD 20904

Supplier:                      General Counsel
                               MedQuist, Incorporated
                               5 Greentree Centre
                               Suite 311
                               Marlton, NJ 08053

f.      Headings. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

g.      Severability. The invalidity or unenforceability of any provision of this Agreement shall not impair the validity or enforceability of any other provision. This Agreement shall be interpreted and construed according to its fair meaning, without consideration as to which party drafted it.

h.      Successors and Assigns. This Agreement shall be binding upon the parties and their respective successors and assigns. It is expressly recognized that this is an agreement for services and that Supplier may not assign, sell, or otherwise transfer this Agreement without the express prior written consent of Kaiser which shall not be unreasonably withheld. Kaiser may assign this Agreement or any interest herein, (i) to any parent, subsidiary, affiliate, or successor corporation of Kaiser or its affiliates; or (ii) any corporation with which Kaiser or its affiliates may merge consolidate or enter into an agreement for the sale of substantially all its assets.

i.      Governing Laws. This Agreement shall be governed by the laws of the State of Maryland.  The parties agree that the jurisdiction for any legal action regarding this Agreement shall be in the state and federal courts located on Montgomery and Prince George's Counties, respectively.

12

      j.      Surviving Sections. The following Sections of this Agreement shall survive the termination or expiration of this Agreement and any extension(s) or renewal(s) thereof: Section 10. Indemnification, Section 13. Confidentiality and Section 16. Publicity.

      k.      Remedies Cumulative. The rights and remedies of Kaiser provided in this Agreement shall not be exclusive and are in addition to any other rights and remedies provided by law.

      l.      Authorization. Each individual executing this Agreement hereby represents and warrants that he or she has the full power and authority to execute this Agreement on behalf of the named parties.

      m.      Exclusive Agreement. During the term of this Agreement and any renewal thereof, Kaiser agrees that it will send to Supplier, ninety (90%) percent of the annual volume of Lines that Kaiser, in Kaiser's sole judgement, determines shall be processed by an independent contractor, exclusively utilizing such contractor's systems and processes. However, the foregoing shall not be construed to limit Kaiser's ability to utilize independent contractors to process work performed by Kaiser utilizing Kaiser's processes and systems.

      n.      Force Majeure. Each party to the Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

IN WITNESS WHEREOF, Kaiser and Supplier have caused this Agreement to be executed as of the day and year first above written.

KAISER FOUNDATION HEALTH PLAN OF THE MID-ATLANTIC STATES, INC.

By: _____

Richard L. Newman
Regional Director, Materials Management

MEDQUIST TRANSCRIPTIONS, LTD

By: _____

John A. Donohoe, Jr.
Chief Operating Officer

## EXHIBITS

| | |
|---|---|
| Exhibit A | Supplier's Process |
| Exhibit B | Supplier's Agreement with Supplier's Contractors |
| Exhibit C | Implementation Plan |
| Exhibit D | Turnaround Times |
| Exhibit E | Supplier's Charges |
| Exhibit F | Supplier's Quality Assurance Process |
| Exhibit G | Supplier's Data Security Standards, Methods, and Processes |
| Exhibit H | Available Management Reports |

Jun-28-2007  16:10    From-KAISER PERMANENTE                    301-816-7240        T-391  P.016/021  F-850

**Exhibit A**    **Supplier's Process**

Capitalize terms set forth in this Exhibit shall have the same meaning as the capitalized
terms set forth in the Agreement.

The following actions shall occur to transcribe Voice Files into Documents:
1. Providers dictate information and create a Voice File.
2. Supplier logs the receipt of the Voice File into Supplier's Lifecycle Management
   database.
3. The Voice File is assigned to a transcriptionist.
4. A transcriptionist is notified that Voice Files are available.
5. The transcriptionist dials in to the System and records the Voice File or begins to
   transcribe the Voice File on-line. The transcriptionist completes transcribing the
   Voice File into a Document.
6. The transcriptionist sends the Document back to Supplier.
7. Supplier logs receipt of the Document into Supplier's Lifecycle Management
   database.
8. The System then evaluates the Document to determine if the Document has been
   prepared within the quality control tolerances.
9. If the System subsequently so determines, the Document is sent to Supplier's Quality
   Assurance department for additional editing.
10. When determined to meet the accuracy standard set forth in the Agreement, the
    Document is held in queue to be sent to Kaiser.
11. Supplier dials into Kaiser's system and delivers all Documents pending in the queue.

Jun-28-2007  16:11    From-KAISER PERMANENTE              301-816-7240          T-391  P.016/021  F-850

## EXHIBIT B
## Supplier's Agreement with Supplier's Contractors

## CONFIDENTIALITY REQUIREMENT

I understand that legal aspects of the medical record play a vital role in the daily operations of our clients. If we are to fulfill our obligations to our client health care providers and the patients they serve, we must be fully aware of the legal environment which prevails. All MedQuist associates must adhere to the strictest confidentiality requirements for all medical and personal information that is at our disposal through our role as a medical transcription service. In consideration of my employment or engagement by MedQuist, I agree as follows:

I shall hold in confidence and not disclose any medical information regarding a patient unless specifically authorized in writing to do so by a Senior Vice President or the President of the Company.

I shall not discuss the particulars of any reports with anyone who is not a representative of MedQuist (such as friends, family, and acquaintances) or any representative of MedQuist not having a legitimate need to know such information.

If discussion of a report with a supervisor or company representative is necessary in the performance of my job, I shall use reasonable efforts to avoid disclosing information that identifies the patient.

I understand that failure to adhere to this policy may result in my immediate dismissal or contract termination, and entrance into my record the reason for my dismissal.

I will also keep in confidence and not disclose to, reverse engineer or decompile any software or other confidential information of the Company.

I have read the preceding confidentiality policy of MedQuist. The ramifications of this policy have been fully explained to me, and I further agree, without reservation to adhere to this policy.

---

Independent Contractor                     Date

## Medical Transcription Contract

### This AGREEMENT made is made between

MedQuist Transcriptions, Ltd., a New Jersey Corporation
("MedQuis:"), with an address at
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053

### AND

<u>< <NAME> ></u>
("the Contractor")

with an address at: _____
(city, state, zip)

Trading as: _____

Employer ID # or Social
Security Number: _____

MedQuist provides electronic medical transcription services to hospitals and healthcare
providers across the nation.

Contractor is a certified or qualified medical transcriptionist.

MedQuist wishes to engage Contractor as an independent contractor to provide medical
transcription services.

It is agreed as follows:

### ENGAGEMENT

MedQuist engages Contractor to transcribe dictated medical records reports.  This Agreement
shall automatically renew for successive three (3) month periods ending March 31, June 30,
September 30 and December 31.  If Contractor ceases to provide services under this Agreement
during any such term, or defaults and this agreement is terminated, Contractor shall not be
entitled to any contract completion or other pay for that period in excess of the base line rate.

### DUTIES OF CONTRACTOR

Contractor shall accurately transcribe, type, and prepare the transcription of the medical reports
and will review same in order to correct any errors which may occur in the transcription.

Contractor shall be advised by MedQuist as to the required turnaround time. The quality of the transcription services performed by Contractor shall conform, at a minimum, to the quality standard for the medical transcription profession, and that which is set forth by Hospital guidelines and any applicable State and Federal Regulatory Agencies. MedQuist shall not control the manner in which said services are performed, but Contractor shall meet the quality and turnaround time requirements.

## TIME DEVOTED TO SERVICES

Contractor shall, from time to time, provide MedQuist a schedule specifying the days and times Contractor will be available to perform services hereunder. MedQuist may rely upon said schedule when determining allocation of work.

## DURATION

MedQuist makes no guarantee as to the amount of work, if any, to be provided to Contractor hereunder.

## FEE FOR SERVICES

For services rendered under this Agreement, Contractor shall be entitled to payment as set forth on Exhibit A. The Company may modify such pay rate from time to time.

## LEGAL STATUS

Contractor acknowledges and agrees that Contractor is being engaged as an independent contractor and not an employee. Contractor may perform similar services for other parties; provided, however, Contractor shall not solicit business from, or perform services for, any client of MedQuist for whom Contractor provides services hereunder until one (1) year after Contractor ceases to perform services under this Agreement. In addition, during the term and until two (2) years after termination of this Agreement, Contractor shall not solicit for employment or engagement, or hire or engage any person who then is a medical transcriptionist of MedQuist or who was a medical transcriptionist of MedQuist within one (1) year prior to Contractor ceasing to provide services to MedQuist. As an independent contractor, Contractor acknowledges that Contractor and is employees are not eligible to participate in any employee benefit plans and will only be entitled to participate in state provided plans (such as employment disability) if Contractor pays any required amounts to the appropriate government agency.

## EQUIPMENT; EXPENSES; OFFICE

Contractor shall provide any equipment and be responsible for all expenses necessary to perform services hereunder. Contractor shall provide Contractor's own workspace in order to perform services hereunder.

## TAXES

As an independent contractor, Contractor shall be responsible for payment of all income and self-employment taxes, except as otherwise provided below. MedQuist shall withhold Social Security (FICA) taxes and, unless Contractor requests otherwise, will withhold federal income taxes. Unemployment taxes, disability taxes, worker compensation and other state or government required withholding amounts are Contractor's responsibility, except in certain limited states.

## AGREEMENT

This agreement constitutes the entire agreement of the parties and supersedes any previous oral or written communications or agreements and may only be modified or amended by mutual written agreement signed by all parties hereto.

## PARTIES BOUND

This Agreement shall be binding on the Contractor and MedQuist, its successors and assigns. Any assignment or transfer of this Agreement by Contractor shall be void.

## GOVERNING LAW

This agreement and any of its terms or provisions, as well as the rights and duties of the parties to this agreement, shall be construed in accordance with the laws of the State of New Jersey without regard to its conflict of law principles.

IN WITNESS WHEREOF, the parties execute this agreement on the day and year first written above.


**CONTRACTOR:**                                  **TRANSCRIPTIONS, LTD.:**


_____                      _____


**DATE:**

Jun-29-2007  16:11     From-KAISER PERMANENTE          301-816-7240      T-391   P.020/021   F-950

# EXHIBIT A

**EMPLOYEE'S NAME:**

**DATE:**

**Rate of Pay Details: <u>A 65 character line at $ 0.XX per line</u>**

STN/MedQuist TL
Confidentiality Requirement
C:\My Documents\transcription\TSAKaiserExhibitB.doc

Jun-28-2007  16:11    From-KAISER PERMANENTE              301-816-7240      T-391   P.021/021   F-850

# EXHIBIT C

## FORM IMPLEMENTATION PLAN

| ID | O | Task Name | Dept | Comments | Feb 1, '96 M T W T F S |
|----|---|-----------|------|----------|------------------------|
| 1 | | New Client Install | | | |
| 2 | | Phase I - Pre Sales Activity | | | |
| 3 | | Pre Sales Data Collection | S&M | Client Profile Questionnaire - Lotus Notes | |
| 4 | | Proposal | | | |
| 5 | | Sales & Marketing | S&M | | |
| 6 | | Client Service | CS | Basic Service Pricing, TAT, Terms & Conditions | |
| 7 | | Finance | F&A | Resource analysis and planning | |
| 8 | | Information Systems | IS | Billing Issues | |
| 9 | | QM | QM | Site Analysis, System Design & Equipment Pricing, etc. | |
| 10 | | Contract Negotiation & Acceptance | S&M | | |
| 11 | | Phase II - Implementation Planning | | | |
| 12 | | Identify Implementation Team | | S&M, Finance, IS, CS, QM | |
| 13 | | Internal Organization Meeting | | At Team members receive assignments | |
| 14 | | On-site meeting with client | | Completion of Pre-Sales Questionnaire | |
| 15 | | Identify Client Contacts | | HIM,Telecom,IS | |
| 16 | | HIM Issues | TL | | |
| 17 | | Report Types & Samples | IS | | |
| 18 | | Volume | IS | | |
| 19 | | IS / Telecom Information | | | |
| 20 | | Location of Equipment | IS | | |
| 21 | | Dictation System | IS | | |
| 22 | | Disk-n-PC | IS | | |
| 23 | | Server ??? | IS | | |
| 24 | | Medical Records System | IS | | |
| 25 | | Dictation system issues | | | |
| 26 | | Hospital Phone System | IS | # New Phone Lines required & timing | |
| 27 | | Client Access | IS | Dr. ID, Work Type, Patient ID, Keypad, Listening Access, Multiple Patients/Report,etc | |
| 28 | | Current Dictation Features | IS | Network Access & IP addresses if appropriate | |
| 29 | | Network Issues | IS | | |
| 30 | | Integration Requirements | IS | | |
| 31 | | ADT? | IS | Value added Service.? | |
| 32 | | Upload Requirements | IS | Value added Service ? | |
| 33 | | Internal / FTP Issues | IS | Value added Service ? | |
| 34 | | Report Formatting | IS | | |
| 35 | | Phase III - Implementation | | | |

**Exhibit D     Turnaround Time Requirements and Discounts:**

Capitalize terms set forth in this Exhibit shall have the same meaning as the capitalized terms set forth in the Agreement.

## Turnaround Time Requirement:

| Report Type | Turnaround Time Requirement |
|---|---|
| Stat | 6 hours |
| Pre-Operative | 12 hours |
| Operative | 24 hours |
| Consultation | 24 hours |

## Turnaround Time Discount:

| Amount of time the Document is returned after the Extended Turnaround Times | Amount of Discount |
|---|---|
| 24 | 2% |
| 48 | 5% |
| 72 | 7% |

**Exhibit E    Supplier's Charges**

Capitalize terms set forth in this Exhibit shall have the same meaning as the capitalized terms set forth in the Agreement.

**Charges for Lines Processed**

| Actual annual Line volume transcribed by Supplier: | Cost per Line: |
|---|---|
| 1-2,000,000 | $0.1450 |
| 2,000,001-5,000,000 | $0.1425 |
| 5,000,001-10,000,000 | $0.1400 |

**Charges for Additional Services Available:**

**Extended Storage:** For electronic storage of Documents for a period longer than 60 days, there will be a $250.00 set up fee and a $100 per month ongoing fee.

**Clerical Support:** Supplier shall re-send any previously sent Document to Kaiser at a charge of $3.00 per Document. However, Supplier shall re-send batches of Documents which were not legible to Kaiser upon receipt by Kaiser, at no additional charge to Kaiser.

**Medical Staff Roster:** If Kaiser is unable to provide Supplier with medical staff information required by Supplier to set-up the System, in any electronic format, as determined by Kaiser, an hourly charge of $75.00 will be billed for development, data entry, and maintenance.

**Technical Support:** There will be a $125.00 hourly fee for on-site installation and or maintenance of the System on Kaiser's hardware subsequent to the initial installation and implementation period. Any custom programming required to effect such on-site installation will incur a $150.00 hourly charge.

**Software:** ESIG/Compendium (electronic signature and integration software) is available at a range of $50,000 - $150,000 based upon upload capabilities, electronic signature requirements, number of users, etc.

Interfaces (ADT download and HIS upload) are available in Batch ASCII, HL7 and Real time versions. The costs are $7500, $10,000 and $12,000 respectively plus a 15% annual maintenance fee.

Exhibit F     Quality Assurance

1.     What metrics do you use to measure the performance of your transcriptionists?

MQ will strive to attain and maintain a threshold of 98% error-free typed lines.
MQ is committed to the highest document quality but recognizes the
inconsistencies inherent in individual speech, diction, terminology and
punctuation. MQ will work closely with the client to monitor performance and
provide appropriate feedback as necessary.

2.     Provide a detailed explanation of your edit process. What level of accuracy does
your process allow your organization to contractually guarantee?

MQ's commitment to quality begins with our transcription staff who are hired for
their qualifications and commitment to excellence. We insist that each
transcriptionist have a minimum of one-year experience in an acute care
environment or participate in our apprenticeship program to enhance their skills
and prepare them for a transcription production environment.

Each new transcriptionist undergoes a rigorous training period where every
document they transcribe is audio reviewed by our Quality Information
Management (QIM) staff. Feedback is routinely provided regarding document
accuracy and completion. Failure to reach or maintain 98% accuracy results in
termination. Transcriptionists with superior skills can receive greater pay.

Our physician led quality management program is responsible for the quality of
the report content, accurate patient demographic information, and correct
provider identification. The QIM staff work closely with our transcriptionists and
clients to assure that all transcribed reports meet established documentation
standards.

- QIM reviews all transcriptionists logs daily to address problems such as
  medical blanks, incomplete doctor information, etc.
- QIM provides routine feedback to transcriptionists regarding accounts (i.e.,
  changes in formats, new doctor rosters)
- QIM provides continuing education for transcriptionists including the
  distribution of a drug newsletter, a monthly newsletter, and seminars on
  medical specialties.
- QIM performs daily quality control checks for transcription work performed by
  all transcriptionists and takes appropriate measure to ensure that output
  meets established quality standards.
  - QIM randomly audits medical reports for accuracy, proofreading the report
    for medical spelling, grammar, and punctuation. The results are compiled
    and reviewed with the transcriptionists daily or weekly.

3.  What process do you propose that KP could utilize so that our Transcription Services Manager could independently monitor the quality of your output?

MQ will report management statistics depicting quality performance every quarter.  These reports will summarize findings as well as describe remedial actions taken to prevent further occurrences.   Additionally, the QIM staff will proactively work with the client and provider staff to minimize errors and to modify dictation practices that contribute to transcription error.

The Transcription Services Manager is encouraged to interact with the QIM staff and may request quality audits as identified by providers or associated with a specific transcriptionist identification number.

Jun-28-2007  16:14    From-KAISER PERMANENTE                301-816-7240        T-392   P.007/021   F-851

# EXHIBIT G

## MedQuist, Inc.
## Overview of Security for Data and Voice Files

## Overview of PGP

## MedQuist, Inc.
## Overview of Security for Data and Voice Files

In response to your request at our last meeting, below is a simple explanation of the security features built into our dictation systems.

As indicated in our proposal MedQuist Mid-Atlantic operates a regional dictation center available 24 hours a day 7 days a week.  Currently, we utilize the Digital Voice, Voice Power 2000 system as our dictation system of choice.  The dictation system is a Windows NT based system employing all of the network security authentication features built into Windows NT.  As a result anyone logging into the network would have to have a valid user ID and password as well as access permissions to the voice files stored on the server.  Currently these permissions are only granted to system administrators.  These servers sit on our internal private network here in our Columbia office and are not available to the Internet or any other external network.

In addition to the Windows NT security, Digital Voice has its own layer of security which is employed at the dictation and transcription session level.  This security requires a valid user ID and PIN number which is assigned by the system administrator.  This security has various option levels which can be set to allow or not allow users to listen to other dictators jobs.  However once a job is marked complete by a dictator, the original job cannot be modified.

Furthermore it is our practice to purge the voice files from the dictation system as soon as possible.  Therefore we do not store any dictated voice files any longer than necessary.  Backup copies of the dictated files are not kept.

I hope you find this information helpful.  Should you have any additional questions please do not hesitate to call.

Jun-28-2007 16:14    From-KAISER PERMANENTE                301-816-7240        T-392  P.008/021  F-851

# Overview of PGP

### Introduction

PGP (short for Pretty Good Privacy) is a public key encryption program originally written by Phil Zimmermann in 1991. Over the past few years, PGP has gotten thousands of adherent supporters all over the globe and has become a de-facto standard for encryption of email on the Internet.

## How PGP works

PGP combines some of the best features of both conventional and public key cryptography. PGP is a *hybrid cryptosystem*. When a user encrypts plaintext with PGP, PGP first compresses the plaintext. Data compression saves modem transmission time and disk space and, more importantly, strengthens cryptographic security. Most cryptanalysis techniques exploit patterns found in the plaintext to crack the cipher. Compression reduces these patterns in the plaintext, thereby greatly enhancing resistance to cryptanalysis. (Files that are too short to compress or which don't compress well aren't compressed.)

PGP then creates a *session key*, which is a one-time-only secret key. This key is a random number generated from the random movements of your mouse and the keystrokes you type. This session key works with a very secure, fast conventional encryption algorithm to encrypt the plaintext; the result is ciphertext. Once the data is encrypted, the session key is then encrypted to the recipient's public key. This public key-encrypted session key is transmitted along with the ciphertext to the recipient.



plaintext is encrypted
with session key

session key is encrypted
with public key

ciphertext +
encrypted session key

*Figure 1-4. How PGP encryption works*

Decryption works in the reverse. The recipient's copy of PGP uses his or her private key to recover the temporary session key, which PGP then uses to decrypt the conventionally-encrypted ciphertext.



*Figure 1-5. How PGP decryption works*

The combination of the two encryption methods combines the convenience of public key encryption with the speed of conventional encryption. Conventional encryption is about 1, 000 times faster than public key encryption. Public key encryption in turn provides a solution to key distribution and data transmission issues. Used together, performance and key distribution are improved without any sacrifice in security.

# Keys

A key is a value that works with a cryptographic algorithm to produce a specific ciphertext. Keys are basically really, really, really big numbers. Key size is measured in bits; the number representing a 1024-bit key is darn huge. In public key cryptography, the bigger the key, the more secure the ciphertext.

However, public key size and conventional cryptography's secret key size are totally unrelated. A conventional 80-bit key has the equivalent strength of a 1024-bit public key. A conventional 128-bit key is equivalent to a 3000-bit public key. Again, the bigger the key, the more secure, but the algorithms used for each type of cryptography are very different and thus comparison is like that of apples to oranges.

While the public and private keys are mathematically related, it's very difficult to derive the private key given only the public key; however, deriving the private key is always possible given enough time and computing power. This makes it very important to pick keys of the right size; large enough to be secure, but small enough to be applied fairly quickly. Additionally, you need to consider who might be trying to read your files, how determined they are, how much time they have, and what their resources might be.

Larger keys will be cryptographically secure for a longer period of time. If what you want to encrypt needs to be hidden for many years, you might want to use a very large key. Of course, who knows how long it will take to determine your key using tomorrow's faster, more efficient computers? There was a time when a 56-bit symmetric key was considered extremely safe.

Keys are stored in encrypted form. PGP stores the keys in two files on your hard disk; one for public keys and one for private keys. These files are called *keyrings*. As you use PGP, you will typically add the public keys of your recipients to your public keyring. Your private keys are stored on your private keyring. If you lose your private keyring, you will be unable to decrypt any information encrypted to keys on that ring.

# Digital signatures

A major benefit of public key cryptography is that it provides a method for employing *digital signatures*. Digital signatures enable the recipient of information to verify the authenticity of the information's origin, and also verify that the information is intact. Thus, public key digital signatures provide *authentication* and data *integrity*. A digital signature also provides *non-repudiation*, which means that it prevents the sender from claiming that he or she did not actually send the information. These features are every bit as fundamental to cryptography as privacy, if not more.

A digital signature serves the same purpose as a handwritten signature. However, a handwritten signature is easy to counterfeit. A digital signature is superior to a handwritten signature in that it is nearly impossible to counterfeit, plus it attests to the contents of the information as well as to the identity of the signer.

Some people tend to use signatures more than they use encryption. For example, you may not *care* if anyone knows that you just deposited $1000 in your account, but you do want to be darn sure it was the bank teller you were dealing with.

The basic manner in which digital signatures are created is illustrated in *Figure 1-6*. Instead of encrypting information using someone else's public key, you encrypt it with your private key. If the information can be decrypted with your public key, then it must have originated with you.



*Figure 1-6. Simple digital signatures*

## Hash functions

The system described above has some problems. It is slow, and it produces an enormous volume of data — at least double the size of the original information. An improvement on the above scheme is the addition of a one-way *hash function* in the process. A one-way hash function takes variable-length input — in this case, a message of any length, even thousands or millions of bits — and produces a fixed-length output; say, 160-bits. The hash function ensures that, if the information is changed in any way — even by just one bit — an entirely different output value is produced.

PGP uses a cryptographically strong hash function on the plaintext the user is signing. This generates a fixed-length data item known as a *message digest.* (Again, any change to the information results in a totally different digest.)

Then PGP uses the digest and the private key to create the "signature." PGP transmits the signature and the plaintext together. Upon receipt of the message, the recipient uses PGP to recompute the digest, thus verifying the signature. PGP can encrypt the plaintext or not; signing plaintext is useful if some of the recipients are not interested in or capable of verifying the signature.

As long as a secure hash function is used, there is no way to take someone's signature from one document and attach it to another, or to alter a signed message in any way. The slightest change in a signed document will cause the digital signature verification process to fail.



*Figure 1-7. Secure digital signatures*

Digital signatures play a major role in authenticating and *validating* other PGP users' keys.

# Digital certificates

One issue with public key cryptosystems is that users must be constantly vigilant to ensure that they are encrypting to the correct person's key. In an environment

where it is safe to freely exchange keys via public servers, *man-in-the-middle* attacks are a potential threat. In this type of attack, someone posts a phony key with the name and user ID of the user's intended recipient. Data encrypted to — and intercepted by — the true owner of this bogus key is now in the wrong hands.

In a public key environment, it is vital that you are assured that the public key to which you are encrypting data is in fact the public key of the intended recipient and not a forgery. You could simply encrypt only to those keys which have been physically handed to you. But suppose you need to exchange information with people you have never met; how can you tell that you have the correct key?

*Digital certificates,* or *certs,* simplify the task of establishing whether a public key truly belongs to the purported owner.

A certificate is a form of credential. Examples might be your driver's license, your social security card, or your birth certificate. Each of these has some information on it identifying you and some authorization stating that someone else has confirmed your identity. Some certificates, such as your passport, are important enough confirmation of your identity that you would not want to lose them, lest someone use them to impersonate you.

A digital certificate is data that functions much like a physical certificate. A digital certificate is information included with a person's public key that helps others verify that a key is genuine or *valid.* Digital certificates are used to thwart attempts to substitute one person's key for another.

A digital certificate consists of three things:

- A public key.

- Certificate information. ("Identity" information about the user, such as name, user ID, and so on.)

- One or more digital signatures.

The purpose of the digital signature on a certificate is to state that the certificate information has been attested to by some other person or entity. The digital signature does not attest to the authenticity of the certificate as a whole; it vouches only that the signed identity information goes along with, or *is bound to,* the public key.

Thus, a certificate is basically a public key with one or two forms of ID attached, plus a hearty stamp of approval from some other trusted individual.

Jun-28-2007  16:14    From-KAISER PERMANENTE                301-816-7240        T-392   P.014/021   F-851



*Figure 1-8. Anatomy of a PGP certificate*

Jun-28-2007  16:15    From-KAISER PERMANENTE              301-816-7240      T-392  P.015/021  F-851

# EXHIBIT H

## SAMPLE REPORTS

MONTHLY CLIENT INVOICE
MONTHLY CLIENT INVOICE SUPPORTING DETAIL
MONTHLY TURNAROUND TIME REPORT BY REPORT TYPE
MONTHLY TURNAROUND TIME REPORT BY DICTATOR
MONTHLY INCOMING MINUTES OF DICTATION BY DAY
MONTHLY MONTH-TO-DATE VOLUMES

Exhibit H:  Available Management Reports

Sample Report 1:  **Client Invoice**

***MedQuist***
                ***Mid-Atlantic***

*Invoice*

12/31/1999

*Bill To:*

*Attention:*

| | |
|---|---|
| *Invoice Number:* | **2000-0835** |
| *Payment Terms:* | Net 30 Days |
| *Invoice Period:* | 12/1/99 Thru 12/31/99 |
| *PO Number:* | |

**Acct # 69235-990     Department of Cardiology**

| Report Type | Description | | No. Rpts | Unit | Bill Units | Amount |
|---|---|---|---|---|---|---|
| CAT | Cardiology-Cath/PTCA/Ltr | | 228 | L | 19,208 | $2,881.20 |
| PTC | PTC | | 54 | L | 3,438 | $515.70 |
| | | *Account Totals* | 282 | | 22,646 | $3,396.90 |
| | | *Report Totals* | 282 | | 22,646 | $3,396.90 |

*Remittance Address:*
*Transcriptions Limited, Inc.*
*P.O.Box 10832*
*Newark, NJ 07193-0832*

**Total Due This Invoice**    $3,396.90



MedQuist Inc.
Century Plaza Complex
Building 1000
10630 Little Patuxent Pkwy.
Suite 300
Columbia, Maryland 21044
410-772-7400
410-772-2241 FAX

September 19, 2002

Richard L. Newman
Regional Director, Materials Management
Kaiser Permanente
Kaiser Foundation Health Plan of the
  Mid-Atlantic States, Incorporated
Materials Management Department
12201 Plum Orchard Drive
Silver Spring, MD 20904

Re: Transcription Services Agreement Extension

Dear Mr. Newman:

Please accept this letter, as noted by your signature below, as our mutual letter of intent between MedQuist Transcriptions, Ltd. and Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. to extend our medical transcription service agreement, originally signed in September 2000. This letter of intent will extend the current agreement from the original expiration date of November 17, 2002 through March 31, 2003. During this extension period, all terms of the original agreement shall remain in force with the exception of the percentage of work addressed in Section 18, Paragraph which shall be seventy (70) percent.

It is the intent of both parties to negotiate and complete a new medical transcription service agreement by this date. If no agreement has been reached by March 31, 2003, the aforementioned agreement and this letter of intent will expire absent a second extension.

Upon sixty (60) days advance written notice to MedQuist, Kaiser shall have the option of a second extension to the original agreement. The term of the second extension shall be three (3) months from April 1 to June 30, 2003. With the exception of the removal of Section 18, Paragraph m., all terms of the original agreement shall remain in force during the period covered by the second extension.

In accordance with Section 2 of the original agreement, Kaiser shall have the sole option to extend the original agreement with at least sixty (60) days advance written notice to MedQuist prior to the expiration of the original twenty-four (24) month term. Both parties agree that the final notice date shall be extended to September 30, 2002.

Richard L. Newman
September 19, 2002
Page two of two


Thank you for your further consideration of Medquist as your medical dictation and transcription partner. If this letter of intent is with your agreement, please note by signing below and returning letter to Ava Onisick at the address above at your earliest convenience.

Sincerely,

David A. Plummer
Regional Vice President

Richard L. Newman, Regional Director
Materials Management


cc:    A. Onisick
       K. Mulford



# EXHIBIT X

MedQuist Legal Dept.
ONLY:
Contract No. *8 2990*

## TRANSCRIPTION SERVICES AGREEMENT

THIS AGREEMENT, entered into as of December 1, 2000 by and between Kaiser Permanente, ("Client"), and MEDQUIST TRANSCRIPTIONS, LTD., a New Jersey Corporation ("Vendor")

### BACKGROUND

Client desires to engage Vendor to perform medical transcription and related health information management services pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual terms and conditions hereof, the parties hereby agree as follows:

### ARTICLE I

### SERVICE DESCRIPTION AND SPECIFICATIONS

Paragraph 1.1     Service Description: Vendor shall provide medical transcription and related health information management services to Client pursuant to the terms of this Agreement.

Paragraph 1.2     Dictation Equipment: For the purpose of providing the services

Client shall maintain at Client's offices, at no cost to Vendor, a direct dial digital dictation system (the "Dictation System")

Paragraph 1.3     Transcription Equipment:    Vendor shall maintain transcription processing equipment necessary in order to fulfill its obligations and duties under this Agreement (the "Transcription Equipment"). Client shall, at its own cost and expense, supply all paper products and printer supplies necessary for printing reports.

Vendor will provide to Client a personal computer system including a monitor, network card and modem at no cost. Vendor will be responsible for the hardware and software related to this personal computer system.



EXHIBIT
X

Paragraph 1.4    Delivery of Dictation to Vendor: Client physicians may dictate into the Dictation System at any time, twenty-four hours per day, seven days per week. Vendor to transcribe from Client's digital dictation system. Client to give Vendor 24-hour notice of scheduled maintenance downtime. In the event of unscheduled downtime, client will notify vendor.

Paragraph 1.5    Delivery of Transcribed Documents to Client: Vendor shall use commercially reasonable efforts to deliver to Client each report transcribed by Vendor before or within the time period applicable to such report as set forth on Exhibit A with methodology as set forth on Exhibit C. The time period for delivery of such reports shall be measured from the time at which the dictation of the report is available to Vendor to the time at which the report is transcribed.

Paragraph 1.6    Format: All reports will be formatted according to the guidelines set forth by client and transcribed by Vendor using a ten pitch type (ten characters per inch) and a courier type style in accordance with format specifications and standards established by Client.

## ARTICLE II

## TERM AND TERMINATION

Paragraph 2.1    Term: The term of this Agreement shall be for ~~one~~ *three* (3) years commencing on February 1, 2001 and ending on January 31, 2004. Client may terminate this Agreement after thirty (30) days' notice following the procedures outlined in Paragraph 2.3.

Paragraph 2.2    Termination for Default: Either party may terminate this Agreement upon the happening of any of the following:

2.2.1    Insolvency: If Vendor or Client is unable to pay its debts as they become due or becomes insolvent, files a petition in bankruptcy, or a receiver, whether permanent or temporary, of Vendor or Client's property or any part thereof, shall be appointed by a court of competent authority, or if Vendor or Client shall make a general assignment for the benefit of its creditors.

2.2.2    Default: If Client fails to make payment when due or if Vendor or Client materially breaches or defaults in the performance of any other covenants, terms or conditions of this Agreement, which breach or default shall not have been cured as provided in Paragraph 2.3.

2

2.2.3 <u>Convenient Termination:</u>    Client acknowledges that the pricing afforded to client under this agreement has been offered by Vendor on the basis of this agreement being for a term of three (3) years.  Client may terminate this agreement without cause by giving Vendor thirty (30) days prior written notice as specified in paragraph 6.7.

<u>Paragraph 2.3</u>    <u>Notice of Default:</u> If the Vendor defaults in the performance of any of the covenants, terms or conditions of this Agreement, the Client shall deliver to Vendor by registered mail, return receipt requested, written notice of default, which notice shall enumerate those acts which constitute a breach or default hereunder.  Vendor shall then have thirty (30) working days' from receipt of said notice in which to cure said default.  If Vendor shall fail to cure such default within said thirty (30) working day period, Client shall have the absolute right to terminate this Agreement, as per Paragraph 2.1.

3

## ARTICLE III

## PAYMENTS AND CHARGES

Paragraph 3.1    Payment to Vendor: Client shall pay to Vendor a payment of $.135 for each unit (as set forth below) transcribed for Client for the first year of the contract and any other amounts set forth on Exhibit B attached hereto. This payment shall be increased five percent (5%) annually for each of the subsequent contract years on the anniversary date of this Agreement. Failure to implement a price increase shall not constitute a waiver of the right to such increase and Vendor may bill at any time for previously unbilled amounts.

The unit of pricing applicable to this Agreement is as designated below

AAMT Line. An AAMT line is defined as any line having 65 "characters". A character is defined as any letter, number, symbol or function key necessary for the final appearance and content of a document including, without limitation, the space bar, carriage return, underscore, bold, and any character contained within the macro, header, or footer. A defined line is calculated by counting all characters contained within a document and simply dividing the total number of characters by 65 to arrive at the number of defined lines. Client acknowledges that the charges set forth in this Agreement are based upon the fact that character counts shall be determined using Vendor's software system and shall not be derived from any third party software or interface systems.

3.1.1    Additional Format Changes: Upon execution of this Agreement and before the commencement date, Vendor shall set up formats and macros for report types, physician listings, abbreviation lists and standard reports as required by Client at no charge to Client. After Client approves such formats and macros, any additional formatting or macros shall be charged at a rate of $200.00 per change.

3.1.2   Interface Requirements. The interface requirements of this Agreement are as designated below.

No interface requirements at this time, SoftMed interface currently exits.

**Paragraph 3.2**

Billing: Vendor will invoice the Client monthly for services rendered pursuant to the terms and conditions listed herewith.

**Paragraph 3.3**

Payment: Client shall pay Vendor the amount of each invoice within thirty (30) days after the date of the invoice. Client shall be responsible for all reasonable costs of collection, including, without limitation, reasonable attorney fees and costs, incurred by Vendor in its efforts to collect any overdue amount. In addition to any other remedies available to Vendor, if Client shall fail to make payment when due, Vendor may, from time to time, modify payment, billing and other terms of this Article III, including, without limitation, a requirement of pre-payment, cash-on-delivery or modifications to such other terms or conditions as Vendor, in its discretion, deems necessary in order to continue to perform under this Agreement. Any such modifications shall not be deemed an election of remedies and Vendor may also terminate this Agreement immediately for failure to make payment when due.

**Paragraph 3.4**

Charges: The Client is responsible for all phone charges and supplies relating to the equipment located on the Client's premises.

**Paragraph 3.5**

Dispute Resolution: In the event that any invoiced amount is disputed by Client, Client shall deliver written notice of such disputed amount to Vendor within thirty (30) days of receipt by Client of the invoice. In the absence of Client timely giving said written notice, Client waives any right to dispute said invoice in the future. Vendor shall promptly deliver to Client any backup or other information which supports the correctness of such disputed amount. Upon receipt of such information, Client shall have fifteen (15) days in which to examine such information and shall pay to Vendor any portion of such disputed amount which has been substantiated.

Thereafter, if any dispute still remains with respect to any disputed amount, Vendor and Client shall immediately enter into good faith negotiations to resolve any remaining dispute. All effort for resolution will be exhausted by both parties prior to taking the issue to arbitration. In the event the parties are unable to resolve such dispute within fifteen (15) days of entering into negotiations, the dispute shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Arbitration shall be conducted in the jurisdiction of the principal headquarters of the party not raising the dispute. The decision reached through arbitration shall be final and binding on both parties. This Paragraph 3 5 shall also apply to any other dispute between the parties.

## ARTICLE IV

### CONFIDENTIAL INFORMATION

Paragraph 4.1    Confidential Information: Vendor agrees and acknowledges that confidential patient information shall be disclosed to it in confidence. Vendor agrees to keep strictly confidential and hold in trust all confidential information in compliance with applicable laws.

Paragraph 4.2    Proprietary Information: Client agrees and acknowledges that the computer hardware, software and other information provided or utilized by Vendor in order to provide its services hereunder are confidential and proprietary information owned or licensed by Vendor ("Information"). Client agrees to keep strictly confidential and hold in trust the Information and not to disclose or reveal or discuss such Information to or with any third party without the express prior written consent of Vendor or to de-compile, reverse engineer or otherwise use such Information. Client acknowledges that all inventions, improvements, modifications, replacements or other changes to the Information ("Developments") shall be the exclusive property of Vendor free and clear of any claims by Client of any kind or character whatsoever. Client hereby assigns and transfers Client's right, title and interest in and to all such Developments.

Paragraph 4.3    Remedies: The parties acknowledge and agree that a remedy at law for any breach or attempted breach of the provisions of this Article IV shall be inadequate and that the non-breaching party shall be entitled to specific performance and injunctive or other equitable relief in case of such breach or attempted breach, in addition to whatever other remedies may exist at law.

6

Paragraph 4.4          Certain Exceptions:   The foregoing undertakings of confidentiality shall not apply to information that, (i) has been received from a third party, (ii) is in such form so as not to permit patient identification and then only if used for patient care, clinical research or clinical analysis and in compliance with applicable laws or (iii) is disclosed pursuant to a subpoena, court order or as required or permitted by law

## ARTICLE V

## MAINTENANCE OF EQUIPMENT

Paragraph 5.1          Maintenance of Equipment: The party providing the Dictation System pursuant to Section 1.2 hereof shall be responsible for the repair and maintenance of the Dictation System. Vendor shall be responsible for the repair and maintenance of the Transcription Equipment. Client shall be responsible for the repair and maintenance of any other equipment located owned and located at Client's offices.

## ARTICLE VI

## MISCELLANEOUS

Paragraph 6.1          Indemnity - Vendor: Vendor hereby indemnifies and holds Client harmless from and against any and all liability, loss, damage, claim or cause of action, and expenses connected therewith, including, without limitation, reasonable attorney's fees and expenses (collectively, "Damages") caused directly or indirectly as a result of services provided in the Agreement Once a physician signs a report, Vendor is released from liabilities with respect to the content and accuracy of such report. Client hereby indemnifies and holds Vendor harmless from and against any and all Damages caused, directly or indirectly, by the action of Client or its agents.

Paragraph 6.2          Counterparts: This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same Agreement.

7

Paragraph 6.3      Entire Agreement: This Agreement contains the entire Agreement of the parties hereto and supersedes all prior agreements, contracts and understandings whether written or oral between the parties and related to the subject matter hereof. All Exhibits attached hereto are incorporated herein, and made a part hereof.

Paragraph 6.4      Successors and Assigns: This Agreement shall be binding upon and shall be for the benefit of the parties hereto and their respective successors and assigns.

Paragraph 6.5      Severability: If any part, term or provision of this Agreement is illegal, invalid or unenforceable the remaining portions or provisions of the Agreement, and any other application of such part, term, or provision shall not be affected.

Paragraph 6.6      Liability: Notwithstanding anything in this Agreement to the contrary, in no event shall Vendor be responsible for special, exemplary, punitive, consequential or incidental damages or for any damages other than, or in addition to, actual damages.

Paragraph 6.7      Notice: Any notice required or permitted by this Agreement shall be in writing and shall be deemed given at the time it is deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, overnight courier or by facsimile transmission addressed to the party to whom it is to be given as follows:

If to Client:      Kaiser Permanente
16601 East Center Tech Parkway
Aurora, CO 80011
Fax #: 303-326-7655
Attn.: Ms. Kathy Pate, RHIT

If to Vendor:      MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
**Attn:** Chief Operating Officer

With a copy to:      MedQuist Transcriptions, Ltd.
Five Greentree Centre, Suite 311
Marlton, New Jersey 08053
Fax #: (856) 797-5949
**Attn:** General Counsel

8

Paragraph 6.8        Agency: Vendor is an independent contractor and this Agreement shall not be construed as constituting either party as an employee, agent, partner, or joint venture of the other

Paragraph 6.9        Exclusive Agreement: During the term of this Agreement and any renewal thereof, Client agrees that it will not contract with any other transcription        service        to        perform        client's        medical dictation/transcription work other than work that Vendor can not or will not perform.

Paragraph 6.10       Force Majeure: Each party to this Agreement shall not be liable to the others for failure to perform any of its obligations hereunder due to a cause or causes beyond its reasonable control, including, but not limited to, acts of God or public enemy, fires, floods, storms, tornadoes, earthquakes, riots, strikes, blackouts, telephone outage, war or war operations, restraints of government, or other causes which cannot with reasonable diligence be controlled or prevented by such party.

Paragraph 6.11       Medicare Clause: The Vendor agrees to allow the Secretary of the Department of Health and Human Services and the Comptroller General, or their duly authorized representatives, access upon request to this Agreement and to the books, documents and records of the Vendor that are necessary to verify the nature and extent of costs of services furnished under this Agreement. The Vendor also agrees that if the Vendor carries out any duties of the Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period with a related organization, the subcontract must contain a clause to the effect that the related organization must make available, upon written request, to the Secretary, or upon request to the Comptroller General, or their duly authorized representatives, the subcontract and the books, documents and records of the related organization that are necessary to verify the nature and extent of the costs. Such access shall be until the expiration of four (4) years after the services are furnished under this Agreement.

Paragraph 6.12        Effective Date:  If Client does not execute this Agreement within
                      thirty (30) days after Vendor sends it to Client, then this Agreement
                      shall be null and void, absent Vendor's express written consent to the
                      contrary.

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of
the date first written above.

         [CLIENT]                              MEDQUIST TRANSCRIPTIONS, LTD.

By: _Kathley Pate, RHIA_              By: _____
Name: _Kathy Pate_                            Name:  John A. Donohoe, Jr.
Title: _Director, Health Info_                Title:   President & Chief Operating Officer
        _Services, Kaiser_
        _Permanente_

10

## EXHIBIT A

### TURNAROUND TIMES

**Turnaround time shall be calculated on the 9am assignment of jobs and/or faxed receipt by Vendor of jobs to be transcribed.**

**Reports will be returned to the Client within 24 hours of receipt of listing of jobs.**

### PENALTY CLAUSES

Monthly penalty for not meeting the specified transcription turnaround times:

| Turnaround Time | Penalty |
|---|---|
| All work returned 24 hours after the contracted turnaround time | Reduced 2.5 percent |
| All work returned 48 hours after the contracted turnaround time | Reduced 5 percent |
| All work returned 72 hours after the contracted turnaround time | Reduced 7.5 percent |

*Any penalty deductions must be identified within five (5) days from receipt of invoice and can only be taken if the invoice is paid within thirty (30) days. In no event shall turnaround time be less than five (5) times the duration of the dictation. Stat Report turnaround time shall be measured from the time Vendor is notified by Client of Stat Report status until report is transcribed. Vendor shall not be penalized for failure to meet turnaround time if such failure results directly or indirectly from acts outside of the reasonable control of Vendor (e.g., equipment failure; phone line failure; force majeure). Physicians shall be responsible for dictating in an understandable manner and in appropriate time frame in accordance with applicable rules and regulations of the Client.*

*Under no circumstances would the total amount of penalty for non-compliance related issues exceed 3% of total amount of invoice and shall be subject to all terms and conditions of the above paragraph.*

# EXHIBIT B

## INTERFACE

No interface requirements at this time, SoftMed interface currently exits.

12

## EXHIBIT C

## SCHEDULE

Per our discussion we have achieved completion of the backlog portion of the transcription workload and are attempting to assess our needs for ongoing support. We agree that some experimentation will need to take place in order to adequately define this need. To begin this process, Kaiser Permanente will assign 300 reports per week to MedQuist. We have further agreed to the following schedule:

- By 9.00 a.m. Kaiser Permanente will have jobs assigned. A list of assigned jobs will be faxed to the MedQuist office.
- MedQuist will have all reports typed, proofed and returned to Kaiser Permanente.
- Kaiser Permanente staff will be committed to reassigning the little number to a big number as frequently as possible throughout the day.
- Should any report be missing from the previous day's work Kaiser Permanente will fax a list to MedQuist at 720-206-1245.
- MedQuist will respond to this list.
- If a bad medical record number is involved, MedQuist will notify Kaiser Permanente and Kaiser Permanente will respond

According to this schedule, the entire process from assigning work to having it available in the patient records should be completed in a maximum of 34 hours. This will meet the turnaround needs for Kaiser Permanente. Reports requiring additional information, manual intervention for processing will be excluded from the Turnaround Times penalties listed in Exhibit A. This schedule is subject to change as volume, process and technology impacts daily operations. Client and Vendor will mutually agree upon changes to this schedule

# EXHIBIT D

## QUALITY ASSURANCE

Kaiser Permanente will add MedQuist, Inc to the monthly quality assurance monitoring program. Transcriptionists at Kaiser Permanente are asked to meet a 97% quality measure and MedQuist, Inc will be compared with the Kaiser Permanente transcriptionisits MedQuist, Inc will continue to perform their own internal quality monitoring . Kaiser Permanente will provide the results of quality measures as well as supportive documentation regarding reports selected, errors, job numbers and any other required information   The voice recording will be saved for one week and MedQuist, Inc. will be permitted access for quality verification.

Kaiser Permanente has the right to request that a specific transcriptionist be taken off the account if the quality of his/her work is not adequate.

### MedQuist, Inc Quality Assurance

### Recruitment

At MedQuist/Transcriptions, Ltd., quality assurance begins with rigorous employment requirements for our medical transcriptionists. We demand each to be a generalist, familiar with all medical specialties, and to have a minimum of two years of medical transcription experience. Each transcriptionist has passed our stringent pre-employment test, which is designed to challenge transcription expertise in every medical specialty.

### Orientation/Training

All work processed by a new transcriptionist is verified with the corresponding dictation and is not released until it has met our standards as well as those of our clients. The syntax, usage and form standards adapted for use at MedQuist/Transcriptions, Ltd. are based on our extensive library of medical and transcription references, including the American Association for Medical Transcription's (AAMT) Style Guide. Each transcribed report has been spell-checked with MedQuist/Transcriptions, Ltd.'s comprehensive computerized dictionary, which includes an extensive directory of medical terms developed by MedQuist/Transcriptions, Ltd.; this dictionary is continually updated with new terminology.

## Ongoing Quality Assessment and Improvement

MedQuist/Transcriptions, Ltd. is one of the few medical transcription services that maintains a staff of proofreaders. The proofreader's responsibilities are to ensure the medical accuracy and procedural consistency of all reports. The obligation of the proofreading staff is to review work, make corrections and fill in blanks that may be on reports due to items that may not be clear to the transcriptionist. Reports can be filtered to proofreaders on a vast array of criteria including transcriptionist, physician, report type, and whether a report has been flagged with a deficiency.

A routine sampling of each transcriptionist's work is monitored on a periodic basis for content, grammar, spelling and medical contextual accuracy, with frequency based upon the time employed and previous performance. If opportunities to improve the quality of transcription are identified, appropriate action is taken to improve or correct the problem. All quality assurance activities are performed by Certified Medical Transcriptionists with extensive transcription and supervisory experience.

## Continuing Education

MedQuist/Transcriptions, Ltd. is a corporate member of the American Association for Medical Transcription and strongly supports and contributes to educational workshops on a local, state and national level, encouraging attendance by transcriptionists. In addition, reference material updates and handouts are provided to transcriptionists as they become available.

## Hiring Criteria

Potential transcriptionists must have two or more years of recent experience transcribing acute care hospital reports including discharge summaries, operative reports, history and physical, and consultations. Potential transcriptionists must satisfactorily pass both a written test and a transcribing test.

## Probationary Period Monitoring and Evaluation

A sampling of new transcriptionists' work is monitored on a daily basis by the transcriptionist supervisor for both accuracy rates and turnaround rates. Data is collected and tabulated for each error type, and regular accuracy rate feedback is provided daily to the transcriptionist. Opportunities for improvement are identified. Accuracy and turnaround patterns are established for each probationary transcriptionist. Accuracy rate will be measured by number of errors divided by number of words monitored, with the acceptable standard being 99% accuracy.

## Ongoing Quality Assessment and Improvement

A sampling of transcriptionist's work is monitored on a monthly or quarterly basis depending on the length of time employed. Again, both accuracy rates and turnaround rates are monitored, with data collected and tabulated for each error type. The same procedures are followed as during the probationary period monitoring. If opportunities to improve the quality of transcription are identified, appropriate action is taken to improve or correct the problem, and the effectiveness of the action if taken is assessed through continued monitoring of the transcription accuracy.

## QUALITY CONTROL

Transcriptionist employment requirements: Minimum two years of experience in a hospital medical records transcription department setting or comparable schooling or training. All candidates are required to pass an actual transcription test and a spelling word test and grammar test.

New Transcriptionists: All new transcriptionists have all of their reports proofread until it is ascertained that they are meeting our quality standards. Quality Control reports are kept on new transcriptionists monthly until they meet our high standard of quality. All transcriptionists have a percentage of reports proofread at least once a month.

Quality Control Report: This is kept for each hospital requesting it on a monthly basis. Checked are neatness, appearance of reports, correct formatting, and correct usage of medical and English terminology and punctuation. Quality standards are based on English spelling, grammar and punctuation competency, medical terminology knowledge and accuracy Also included in the quality checks is the transcriptionist's ability to follow formats as set up by the various hospitals. Total allowable errors per report are three. Random Quality Check Reports are done on transcriptionists, as time allows, by the proofreaders. Number of reports reviewed and checked against tapes and digital recording varies from month to month, again as time allows.

All new experienced transcriptionists are required to train in the office for at least two to three weeks. During that time, they have all of their reports checked against the tapes before the reports
are sent to the hospitals Trainees are required to train in the office for at least six months to one year. During that time, they have all their reports checked against the tapes or digital recording before the reports are sent to the hospital

With authorization from the hospital or customer, the only transcriptionist editing that is to be done is to clean up grammar and tenses, make sentences if dictator speaks in "phrases", and spell out dictated abbreviations the first time dictated and in final diagnoses. Transcriptionists will also insert format headings if these are not dictated. If a

16

transcriptionist is found to be arbitrarily leaving items out of reports or changing dictation, he/she is severely reprimanded and may face possible termination. Second offenders are automatically dismissed.

## PRODUCTION REVIEW

**AMOUNT:**    5% of total dictated pages per month or ten full pages reviewed daily.

**CRITERIA.**    Random samples encompassing all types of reports and all transcriptionists transcribing hospital's work.

**ERRORS:**    Each error listed has an assigned value of (1)

1. Medical misspelling and/or misuse.
2. English work misspelling and/or misuse.
3. Omissions. Less than two blanks per page, exception being tapes of inferior quality/reception. Tapes to be provided to hospital.
4. Typographical errors.

**STANDARD:** Overall 99%. Variance range 2% (97%)

In the event that the range should fall below the maximum acceptable range (97%) for two consecutive months, TL will perform expanded monitoring to identify the problem.

TL will report the findings of their expanded study in writing along with solutions, plans, and timetables for correction to hospital.

———————————

MedQuist/Transcriptions, Ltd. separates all medical transcriptionists into the following three categories:

**LEVEL 1    QUALIFIED TRANSCRIPTIONIST** – Employee who has been proofread sufficiently to determine that he/she is qualified and versed in all medical aspects and physician specialties and can now be intermittently "spot checked", as determined by the transcription manager. In order to be eligible to receive the highest pay scales, these transcriptionists must be AAMT certified or determined by Transcriptions, Ltd to be at least as accomplished as a CMT in background and practical experience. MedQuist/Transcriptions, Ltd. will administer a "TL" examination to any employee who might not wish to join the AAMT.

**LEVEL 2     NEW TRANSCRIPTIONIST** - Employee recently hired whose qualifications and practical experience have not yet been determined by the transcription manager. New employees will undergo a probationary period during which time their work will be intensely scrutinized until such time as their practical level of skill is assessed and an employment plan has been presented to him/her. A new transcriptionist has approximately six months to one year to become a CMT or equivalent and be categorized as a Level 1 – "Qualified Transcriptionist".

**LEVEL 3     TRAINEE** - Employee who expresses strong interest in learning medical transcription, who possesses excellent English and grammar skills and possibly medical secretarial background

# QUALITY ASSURANCE

## LEVEL 1    QUALIFIED TRANSCRIPTIONISTS:

After transcriptionist work is received in the office, the computer network automatically assigns the work a certain status, i.e. incomplete, deficient, needs clarification, etc. Driven by this status, the proofreaders will electronically receive reports that have deficiencies, etc and make the necessary corrections before upgrading the status, allowing transmission to the hospital. Deficiencies cannot be filled in until the proofreader has the dictated tape or calls into the digital system to listen to the dictation. When handling deficiencies, the proofreader is required to review the entire report, which also satisfies part of the random proofreading sampling for QA for that particular "qualified transcriptionist". There should always be a constant amount of communication that takes place between the transcriptionist and proofreader for clinical feedback, answering of questions, corrections, etc.

All "qualified transcriptionist" work is sent to the hospital as soon as possible to accommodate turnaround time  However, proofreaders must spot check each transcriptionist several times per month.

## LEVEL 2    NEW TRANSCRIPTIONISTS:

When an experienced new transcriptionist is hired, every report that is typed is checked with the tape or digital review before it is available for transmission to the hospital. After adequate training, as deemed suitable by training supervisor and transcription manager, the transcriptionist is elevated to Level 1 - the qualified transcriptionist category.

## LEVEL 3    TRAINEES:

Trainees are subject to an intensive training-learning period, usually six months to one year. All reports typed by trainees are checked with the dictated tape, returned to the trainee for correction and then sent to the appropriate hospital. Trainees are evaluated for performance weekly while they are training and work jointly with a proofreader several hours each day. All trainees are required to incur their training in the office.

## QUALITY REPORTS

Attached are quality check sheets that we use when spot checking the Level 1 transcriptionists and some general quality check reports to be used for checking Level 2 transcriptionists.

Ideally ALL TRANSCRIBED REPORTS would be proofread. However, due to turnaround time constraints, this is not possible; therefore, the quality check sheet is used for spot checking Level 1 transcriptionists only, and the quality report is used for Level 2 transcriptionists.

19

Proofreaders also try to check one hospital log sheet of each transcriptionist's reports, as time allows. These reports are all compared with the actual dictation files, and a quality check sheet is completed. Monthly transcriptionist quality check reports can be sent to all hospitals requesting them.

The following reports are brief illustrations of MedQuist/Transcriptions, Ltd 's continuous quality assurance program for our transcriptionists and the hospitals. There are several different proofreaders reviewing work for quality, medical terminology expertise and correct formatting. All work will be systematically reviewed by a different proofreader as many times as possible. The proofreaders will listen to the dictation as they review the work.

The primary emphasis is knowledge of correct medical terminology, accuracy of transcription, and proper hospital format. This program is required by a majority of our customers to align with their in-house quality assurance programs. We also believe that our program provides a great benefit to each of our transcriptionists. It is always helpful to get feedback and clarification on the work that we process.

# QUALITY CHECK SHEET

Transcriptionist:_____ Account:_____ Review Date:_____

| Transcribed | | | | | | | Totals (Across) | Error Points (by Type) |
|---|---|---|---|---|---|---|---|---|
| Job # | | | | | | | | |
| Rept. Tpe | | | | | | | | |
| Dictator | | | | | | | | |
| Proofer | | | | | | | | |
| #1: Medical Word Misuse | | | | | | | | |
| #2: Omitted Dictation | | | | | | | | |
| #3. Medical Misspellings | | | | | | | | |
| #4. Word/Punctuation Misspelling or Misuse | | | | | | | | |
| #5: Incorrect Verbiage | | | | | | | | |
| #6: Inapprop. Blanks | | | | | | | | |
| #7: Grammar Error | | | | | | | | |
| #8: Punctuation Error | | | | | | | | |
| #9: Misc. and Typos | | | | | | | | |
| #10: Format Error | | | | | | | | |
| Error Points | | | | | | | | |
| Doc. Lines | | | | | | | | |
| Accuracy % | | | | | | | | |

Comments:_____

1. Medical Word Misuse    = 2.00 points    6. Inappropriate Blanks    = 0.50 points
2. Omitted Dictation    = 2.00 points    7. Grammar Error    = 0.50 points
3. Medical Misspellings    = 0.75 points    8. Punctuation Error    = 0.50 points
4. Word Misspelling    = 0.75 points    9. Misc. & Typo    = 0.25 points
5. Incorrect Verbiage    = 0.75 points    10. Format Error    = 0.25 points

Total points divided by total line count equals total error fraction. 1.0 minus total error fraction equals accuracy fraction; multiply by 100 for percentage.

21

## MEDQUIST/TRANSCRIPTIONS, LTD.
## CONTINUOUS QUALITY ASSURANCE REPORT

TL#_____

DATE_____

As part of our continuous quality assurance program, a sampling of your transcription has come up for review this week by _____    _____.

COMMENT: (Example)

In looking at the selected reports, we were very impressed with the quality/improvement of your work. There was an indication that you may not have the latest updates or formats. The following are some areas that may need clarification.

   1.

   2.

   3.

As you review your corrected reports, please make note of any grammar, English, medical terminology corrections.

Our goal is to help one another to become the best that we can be. We really enjoy having you as a part of our team and would appreciate any input or clarification that will help us all to improve and grow as quality transcriptionists and especially as a successful team

I will be overseeing the quality assurance program  Please remember that my door is always open and I am here to be a resource to each of you  My personal goal is to see that each and every one of us continue as professionals and reach our fullest potential.

Sincerely,

Jane Doe, CMT
Transcription Manager

# QUALITY ASSURANCE CRITERIA

The following are the criteria used by MedQuist/Transcriptions, Ltd.
_____ office for QA reviews:

_____    All patient identification information dictated is verified via census sheet.

_____    Medical Record # is correct.

_____    Tape or Job # and date of dictation are correct on report and log.

_____    File name is correct on report and on log

_____    Format is correct per format book, pagination, etc.

_____    CCs required are present.

JUN-29-2006 12:13 From:KP TRANSCRIPTION    3034044550    To:51027166734    P.24/25

**TO:** _____    **TL#:** _____

**FROM:** _____    **DATE:** _____

**RE:    QUALITY ASSURANCE REVIEW**

As part of our Ongoing Quality Assurance program, your work has been reviewed from _____ to _____. The following reports are being returned to you for your information.

_____    content problems _____

_____    work not transcribed as dictated _____

_____    spelling error

_____    missing/incorrect words

_____    physician names misspelled

_____    file name problems

___    no deficiency

_____    cc's missing and/or incorrect

_____    format problems _____

# pages reviewed    _____

Comments. _____

_____

_____

_____

24

# EXHIBIT B

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark L. Hogge (pro hac vice appln pending)<br>Greenberg Traurig LLP<br>2101 L Street, N.W., Suite 1000<br>Washington, D.C. 20037<br>TELEPHONE NO: 202-331-3100    FAX NO. *(Optional)*: 202-331-3101<br>E-MAIL ADDRESS *(Optional)*: hoggem@gtlaw.com<br>ATTORNEY FOR *(Name)*: Plaintiffs | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Alameda**
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: Rene C. Davidson Alameda County Courthouse
CITY AND ZIP CODE: Oakland, 94612
BRANCH NAME: Civil Division

PLAINTIFF/PETITIONER: Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc., et al.

DEFENDANT/RESPONDENT: MedQuist, Inc., and MedQuist Transcriptions, Ltd.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>RG 08391487 |
|---|---|

TO *(insert name of party being served)*: MedQuist, Inc., and MedQuist Transcriptions, Ltd., c/o Neal R. Marder

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: June 16, 2008

Mark L. Hogge
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. ☒ A copy of the summons and of the complaint.
2. ☒ Other *(specify)*: ADR Information

*(To be completed by recipient):*

Date this form is signed:

Neal Marner for MedQuist, Inc.
_____
TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory se
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.USCourtForms.com

# EXHIBIT C

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANTS:**
*(AVISO AL DEMANDADO):*
MedQuist, Inc. and MedQuist Transcriptions, Ltd.

**YOU ARE BEING SUED BY PLAINTIFFS**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* Kaiser Foundation Health Plan,
Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc., Southern
California Permanente Medical Group, Kaiser Foundation Health Plan of the Mid-Atlantic
States, Inc. and Kaiser Foundation Health Plan of Colorado

```
FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ENDORSED
FILED
ALAMEDA COUNTY

JUN - 6 2008

CLERK OF THE SUPERIOR COURT
By _____ S. Halcrombe _____
                              Deputy
```

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a
copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the
court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more
information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse
nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may
lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an
attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services
program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California
Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito
en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por
escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted
pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de
California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no
puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta
su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un
servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios
legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de
California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California,
(www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* 08391487 |

Superior Court of the State of California for the County of Alameda
Rene C. Davidson Alameda County Courthouse
1225 Fallon Street
Oakland, CA 94612.

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David Perez, Esq.                                         650-328-8500
Greenberg Traurig, LLP
1900 University Avenue, 5th Floor
East Palo Alto, CA 94303

| DATE:  JUN - 6 2008 | PAT S. SWEETEN | Clerk, by  S. Halcrombe | , Deputy |
|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**

| [SEAL] | 1. ☐ as an individual defendant. |
|---|---|
| | 2. ☐ as the person sued under the fictitious name of *(specify)*: |
| | 3. ☐ on behalf of *(specify)*: |
| | under: ☐ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor) |
| | ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee) |
| | ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person) |
| | ☐ other *(specify)*: |
| | 4. ☐ by personal delivery on *(date)*: |

Page 1 of 1

| Form Adopted for Mandatory Use | SUMMONS | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|
| Judicial Council of California | | American LegalNet, Inc. |
| SUM-100 [Rev. January 1, 2004] | | www.USCourtForms.com |

WDC 371633371v1

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| David Perez (SBN 238136)<br>Greenberg Traurig, LLP<br>1900 University Avenue, 5th Floor<br>East Palo Alto, CA 94303<br>TELEPHONE NO.: 650-328-8500   FAX NO.: 650-328-8508<br>ATTORNEY FOR (Name): Plaintiffs | ENDORSED<br>FILED<br>ALAMEDA COUNTY<br><br>JUN - 6 2008<br><br>CLERK OF THE SUPERIOR COURT<br>By _____ S. Halcrombe _____ Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Alameda**
STREET ADDRESS: Rene C. Davidson Alameda County Courthouse
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Civil

CASE NAME: Kaiser Foundation Health Plan, Inc., et al. v. MedQuist, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 08391487 |
|---|---|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☒ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☒ is  ☐ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties  d. ☒ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel  e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve      in other counties, states, or countries, or in a federal court
   c. ☒ Substantial amount of documentary evidence  f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. ☒ monetary  b. ☒ nonmonetary; declaratory or injunctive relief  c. ☒ punitive
4. Number of causes of action (specify): Five
5. This case ☐ is  ☒ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: June 6 2008
David Perez, Esq.
_____ ►_____
(TYPE OR PRINT NAME)   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

Short Title: Kaiser Foundation Health Plan, Inc., et al. vs. MedQuist, Inc., et al.    Case Number:

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE**
**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[X] Oakland, Rene C.Davidson Alameda County Courthouse (446)

[ ] Hayward Hall of Justice (447)

[ ] Pleasanton, Gale-Schenone Hall of Justice (448)

| | | | | |
|---|---|---|---|---|
| Auto Tort | Auto Tort (22) | [ ] | 34 | Auto tort (G) |
| | | | | Is this an uninsured motorist case? [ ] yes [ ] no |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] | 79 | Bus tort/ unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [X] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial    Is the deft. in possession |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential    of the property? |
| | Drugs (38) | [ ] | 21 | Unlawful Detainer - drugs    [ ] Yes [ ] No |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] | 49 | Writ of mandate |
| | | | | Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [ ] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 08 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 08 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] | 08 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

202-19 (5/1/00)

American LegalNet, Inc.
www.FormsWorkflow.com

CM-015

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>David Perez (SBN 238136)<br>Greenberg Traurig, LLP<br>1900 University Avenue, 5th Floor<br>East Palo Alto, CA 94303<br>TELEPHONE NO.: 650-328-8500    FAX NO. (Optional): 650-328-8508<br>E-MAIL ADDRESS (Optional): perezdj@gtlaw.com<br>ATTORNEY FOR (Name): Plaintiffs | FOR COURT USE ONLY<br><br>ENDORSED<br>FILED<br>ALAMEDA COUNTY<br><br>JUN - 6 2008<br><br>CLERK OF THE SUPERIOR COURT<br>S. Halcrombe<br>By___ 08591 ___ Deputy<br>Case Number: |

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda<br>STREET ADDRESS: Rene C. Davidson Alameda County Courthouse<br>MAILING ADDRESS: 225 Fallon Street<br>CITY AND ZIP CODE: Oakland, CA 94612.<br>BRANCH NAME: Civil Division | |
| PLAINTIFF/PETITIONER: Kaiser Foundation Health Plan, Inc., Kaiser Foundation<br>Hospitals, The Permanente Medical Group, Inc., et al.,<br>DEFENDANT/RESPONDENT: MedQuist, Inc., and MedQuist Transcriptions, Ltd. | Case Number: 08591<br><br>JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT.: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1.  a.  Title: South Broward Hospital District, et al. vs. MedQuist, Inc., et al.

    b.  Case number: Civil No. 05-CV-2206-(JBS-JBR)

    c.  Court: ☐  same as above

        ☒  other state or federal court *(name and address):* U.S.D.C. for New Jersey District, Camden Vicinage

    d.  Department:

    e.  Case type: ☐ limited civil ☒ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

    f.  Filing date: September 7, 2004

    g.  Has this case been designated or determined as "complex?"  ☐  Yes ☒  No

    h.  Relationship of this case to the case referenced above *(check all that apply):*

        ☒  involves the same parties and is based on the same or similar claims.

        ☒  arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐  involves claims against, title to, possession of, or damages to the same property.

        ☐  is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

        ☒  Additional explanation is attached in attachment 1h

    i.  Status of case:

        ☐  pending

        ☒  dismissed ☒  with ☐ without prejudice

        ☐  disposed of by judgment

2.  a.  Title:

    b.  Case number:

    c.  Court: ☐  same as above

        ☐  other state or federal court *(name and address):*

    d.  Department:

Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007]<br>WDC 371631469v1    **NOTICE OF RELATED CASE**

Cal. Rules of Court, rule 3.300
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

CM-015

| | |
|---|---|
| PLAINTIFF/PETITIONER:   Kaiser Foundation Health Plan, Inc. | CASE NUMBER: |
| DEFENDANT/RESPONDENT: MedQuist, Inc. | |

2. *(continued)*

    e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

    f. Filing date:

    g. Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

    h. Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

           ☐ Additional explanation is attached in attachment 2h

    i. Status of case:

        ☐ pending

        ☐ dismissed  ☐ with  ☐ without prejudice

        ☐ disposed of by judgment

3.  a. Title:

    b. Case number:

    c. Court: ☐  same as above

        ☐ other state or federal court *(name and address):*

    d. Department:

    e. Case type: ☐ limited civil  ☐ unlimited civil  ☐ probate  ☐ family law  ☐ other *(specify):*

    f. Filing date:

    g. Has this case been designated or determined as "complex?"  ☐ Yes  ☐ No

    h. Relationship of this case to the case referenced above *(check all that apply):*

        ☐ involves the same parties and is based on the same or similar claims.

        ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

        ☐ involves claims against, title to, possession of, or damages to the same property.

        ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

           ☐ Additional explanation is attached in attachment 3h

    i. Status of case:

        ☐ pending

        ☐ dismissed  ☐ with  ☐ without prejudice

        ☐ disposed of by judgment

4. ☐  Additional related cases are described in Attachment 4. Number of pages attached:_____

Date: June 6, 2008

David Perez

(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

                            (SIGNATURE OF PARTY OR ATTORNEY)

American LegalNet, Inc.
www.FormsWorkflow.com

Kaiser Foundation Health Plan, Inc., et al. vs. MedQuist, Inc., et al          Case No:

## ATTACHMENT 1h

On or about September 7, 2004 Plaintiffs South Broward Hospital District, et al. filed a putative class action against MedQuist, Inc. and MedQuist Transcriptions, Ltd., as well as a number of individual current or former employees of MedQuist, Inc. and MedQuist Transcriptions, Ltd., Civil No. 05-CV-2206, in the United States District Court for the District of New Jersey, Camden Vicinage ("the South Broward action"). The plaintiffs in this action were members of the putative class in the South Broward action, in which the named plaintiffs, on behalf of those similarly situated, challenged the overbilling practices of the defendants. No class was ever certified in the South Broward action, and it was dismissed with prejudice on or about May 28, 2008. The plaintiffs in this action were not part of the settlement of the South Broward action, and no disposition was ever entered with respect to plaintiffs in this action as a result of the South Broward action.

## *Superior Court of California, County of Alameda*



## *Notice of Judicial Assignment for All Purposes*

Case Number: RG08391487
Case Title:    Kaiser Foundation Health Plan VS Medquest, Inc.
Date of Filing: 06/06/2008

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

This case is hereby assigned for all purposes to:

| | |
|---|---|
| Judge: | Lawrence John Appel |
| Department: | 16 |
| Address: | Administration Building |
| | 1221 Oak Street |
| | Oakland CA 94612 |
| Phone Number: | (510) 267-6932 |
| Fax Number: | (510) 267-1504 |
| Email Address: | |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

**Please note: In this case, any challenge pursuant to Code of Civil Procedure §170.6 must be exercised within the time period provided by law.  (See Govt. Code 68616(i); Motion Picture and Television Fund Hosp. v. Superior Court (2001) 88 Cal.App.4th 488, 494; and Code Civ. Proc. §1013.)**

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

<u>General Procedures</u>

All pleadings and other documents must be filed in the clerk's office at any court location except when the Court permits the lodging of material directly in the assigned department. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

ASSIGNED FOR ALL PURPOSES TO
JUDGE Lawrence John Appel
DEPARTMENT 16

Counsel are expected to know and comply with the Local Rules of this Court, which are available on the Court's website at: http://www.alameda.courts.ca.gov/courts/rules/index.shtml and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

The parties are always encouraged to consider using various alternatives to litigation, including mediation and arbitration, prior to the Initial Case Management Conference. The Court may refer parties to alternative dispute resolution resources.

## Schedule for Department 16

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held: Tuesdays through Thursdays from 9:45 a.m. to 4:30 p.m.
- Case Management Conferences are held: Initial Case Management Conferences: Tuesdays through Fridays at 9:00 a.m.
- Case Management Conference Continuances: Tuesdays through Thursdays at 9:30 a.m.
- Law and Motion matters are heard: Mondays at 9:00 a.m. and 3:00 p.m.
- Settlement Conferences are heard: Fridays at 10:00 a.m.
- Ex Parte matters are heard: Tuesdays and Fridays at 9:00 a.m.

## Law and Motion Procedures

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

- Motion Reservations
  Phone:         (510) 267-6932

  Fax (510) 272-6171

- Ex Parte Matters
  Phone:         (510) 267-6932

  Fax (510) 272-6171

## Tentative Rulings

The court will issue tentative rulings in accordance with the Local Rules. Tentative rulings will become the Court's order unless contested in accordance with the Local Rules. Tentative rulings will be available at:

- Website: www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 16
- Phone: 1-866-223-2244

Dated:  06/09/2008

Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

---

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown on the attached Notice of Initial Case Management Conference and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 06/10/2008

By _____

Deputy Clerk

**ALTERNATIVE DISPUTE RESOLUTION**
**INFORMATION PACKAGE**
Effective April 15, 2005 (*Revised March 2008*)

---

### Instructions to Plaintiff / Cross-Complainant

In all general civil cases filed in the trial courts after June 30, 2001, **the plaintiff is required to serve a copy of this ADR information package on each defendant.**

California Rules of Court, Rule 3.221 (*excerpt*)

**(a)    Court to provide information package**

Each court must make available to the plaintiff, at the time the complaint is filed in all general civil cases, an alternative dispute resolution (ADR) information package that includes, at a minimum, all of the following:

(1)    General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes....

(2)    Information about the ADR programs available in that court....

(3)    In counties that are participating in the Dispute Resolution Programs Act (DRPA), information about the availability of local dispute resolution programs funded under the DRPA....

(4)    An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

**(b)    Court may make package available on Web site....**

**(c)    Plaintiff to serve information package**

In all general civil cases, the plaintiff must serve a copy of the ADR information package on each defendant together with the complaint. Cross-complainants must serve a copy of the ADR information package on any new parties to the action together with the cross-complaint.

## GENERAL INFORMATION ABOUT ADR

### Introduction to Alternative Dispute Resolution

Did you know that most civil lawsuits settle without a trial? And did you know that there are a number of ways to resolve civil disputes without having to sue somebody? These alternatives to a lawsuit are known as alternative dispute resolution (also called ADR). The most common forms of ADR are mediation, arbitration, and neutral evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. In mediation, for example, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through court-connected and community dispute resolution programs and private neutrals.

### Advantages of Alternative Dispute Resolution

ADR can have a number of advantages over a lawsuit:

- **ADR can be speedier.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- **ADR can save money.** Court costs, attorney fees, and expert witness fees can be saved.

- **ADR can permit more participation.** With ADR, the parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- **ADR can be flexible.** The parties can choose the ADR process that is best for them.

- **ADR can be cooperative.** In mediation, for example, the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- **ADR can reduce stress.** There are fewer, if any, court appearances. And because ADR can be speedier, cheaper, and can create an atmosphere in which the parties are normally cooperative, ADR is easier on the nerves. The parties do not have a lawsuit hanging over their heads. For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute instead of filing a lawsuit. Even when a lawsuit has been filed, ADR can be used before the parties' positions harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

### Disadvantages of Alternative Dispute Resolution

ADR may not be suitable for every dispute.

If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure and review for legal error by an appellate court.

There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

The neutral may charge a fee for his or her services.

If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

Lawsuits must be brought within specified periods of time, known as statutes of limitations. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

Rev. March 2008

## Three Common Types of Alternative Dispute Resolution

This section describes the forms of ADR most often found in the California state courts and discusses when each may be right for a dispute.

### Mediation

In mediation, a neutral (the mediator) assists the parties in reaching a mutually acceptable resolution of their dispute. Unlike lawsuits or some other types of ADR, the mediator does not decide how the dispute is to be resolved; the parties do.

Mediation is a cooperative process in which the parties work together toward a resolution that tries to meet everyone's interests, instead of working against each other where at least one party loses. Mediation normally leads to better relations between the parties and to resolutions that hold up. For example, mediation has been very successful in family disputes, particularly with child custody and visitation.

Mediation is particularly effective when the parties have a continuing relationship, like neighbors or business people. Mediation also is very effective where personal feelings are getting in the way of a resolution. This is because mediation normally gives the parties a chance to let out their feelings and find out how they each see things.

Mediation may not be a good idea when one party is unwilling to discuss a resolution or when one party has been a victim of the other or has unequal bargaining power in the mediation. However, mediation can be successful for victims seeking restitution from offenders. A mediator can meet with the parties separately when there has been violence between them.

### Arbitration

In arbitration, a neutral (the arbitrator) reviews evidence, hears arguments, and makes a decision (award) to resolve the dispute. Arbitration normally is more informal, much quicker, and less expensive than a lawsuit. Often a case that may take a week to try in court can be heard by an arbitrator in a matter of hours, because evidence can be submitted by documents (like medical reports and bills and business records) rather than by testimony.

There are two kinds of arbitration in California:

(1) Private arbitration, by agreement of the parties involved in the dispute, takes place outside of the courts and is normally binding. In most cases, "binding" means that the arbitrator's decision (award) is final and there will not be a trial or an appeal of that decision.

(2) "Judicial arbitration" takes place within the court process and is not binding unless the parties agree at the outset to be bound. A party to this kind of arbitration who does not like a judicial arbitration award may file a request for trial with the court within a specified time. However, if that party does not do better in the trial than in arbitration, he or she may have to pay a penalty.

Arbitration is best for cases where the parties want a decision without the expense of a trial. Arbitration may be better than mediation when the parties have no relationship except for the dispute.

Arbitration may not be a good idea when the parties want to decide on the outcome of their dispute themselves.

### Neutral Evaluation

In evaluation, a neutral (the evaluator) gives an opinion on the strengths and weaknesses of each party's evidence and arguments and makes an evaluation of the case. Each party gets a chance to present his or her side and hear the other side. This may lead to a settlement or at least help the parties prepare to resolve the dispute later on. If the neutral evaluation does not resolve the dispute, the parties may go to court or try another form of ADR.

Neutral evaluation, like mediation, can come early in the dispute and save time and money.

Neutral evaluation is most effective when a party has an unrealistic view of the dispute, when the only real issue is what the case is worth, or when there are technical or scientific questions to be worked out.

Neutral evaluation may not be a good idea when it is too soon to tell what the case is worth or if the dispute is about something besides money, like a neighbor playing loud music late at night.

## Other Types of Alternative Dispute Resolution

There are several other types of ADR besides mediation, arbitration, and neutral evaluation. Some of these are conciliation, settlement conferences, fact-finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR methods. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

The selection of a neutral is an important decision. There is no legal requirement that the neutral be licensed or hold any particular certificate. However, some programs have established qualification requirements for neutrals. You may wish to inquire about the qualifications of any neutral you are considering.

Agreements reached through ADR normally are put in writing by the neutral and, if the parties wish, may become binding contracts that can be enforced by a judge.

You may wish to seek the advice of an attorney about your legal rights and other matters relating to the dispute.

## Help Finding an Alternative Dispute Resolution Provider in Your Community

To locate a dispute resolution program or private neutral in your community:

- **Visit the Court's Web site.** The Alameda County Superior Court maintains a list of court-connected mediators, neutral evaluators, and private arbitrators at http://www.alameda.courts.ca.gov/adr/index.html

- **Contact the Small Claims Court Legal Advisor.** The small claims legal advisor for Alameda County is located at the Wiley W. Manuel Courthouse, Self-Help Center. The phone number is 510-268-7665.

- **Visit the California Department of Consumer Affairs' Web site.** The Department of Consumer Affairs (also called the DCA) has posted a list of conflict resolution programs throughout the state. The list can be found at http://www.dca.ca.gov/consumer/mediation_programs.shtml

  You can also call the Department of Consumer Affairs, Consumer Information Center, at 1-800-952-5210.

- **Contact your local bar association.** You can find a list of local bar associations in California on the State Bar Web site at http://members.calbar.ca.gov/search/ba_results.aspx?txtan=&txtln=&County=&District=&ClassTypes=C

  If you cannot find a bar association for your area on the State Bar Web site, check the yellow pages of your telephone book under "Associations."

- **Look in the yellow pages of your telephone book under "Arbitrators" or "Mediators".**

- **Automotive Repair, Smog Check:** The **California Bureau of Automotive Repair** (also known as BAR) offers a free mediation service for consumers who are dissatisfied with an auto repair or a smog check, or who dispute an invoice for such services. BAR registers and regulates California automotive repair facilities and licenses smog, lamp, and brake inspection stations. Learn more at http://www.smogcheck.ca.gov/StdPage.asp?Body=/Geninfo/Otherinfo/Mediation.htm#What%20is%20a%20Mediator or call 800-952-5210.

- **Attorney Fees:** The **State Bar of California** administers a mandatory fee arbitration program to resolve attorney fee disputes between lawyers and their clients. The program is an informal, low-cost forum and is mandatory for a lawyer if a client requests it. Mediation of attorney fees disputes may also be available in some areas of California. Learn more at http://www.calbar.org/2bar/3arb/3arbndx.htm or call 415-538-2020.

## DISPUTE RESOLUTION PROGRAMS IN ALAMEDA COUNTY

**East Bay Community Mediation**
**1968 San Pablo Avenue, Berkeley, CA 94702-1612**

Phone: (510) 548-2377;  Fax: (510) 548-4051

http://www.ebcm.org/

EBCM is a community-based mediation program created by the union of Berkeley Dispute Resolution Service and Conciliation Forums of Oakland. EBCM offers counseling on options and approaches to resolving a dispute, mediation, large-group conflict facilitation, and conflict resolution skills workshops.

**Catholic Charities of the East Bay: Oakland – Main Office**
**433 Jefferson Street, Oakland, CA 94607**

Phone: (510) 768-3100;  Fax: (510) 451-6998

http://www.cceb.org/

Mediators are responsible for mediation sessions involving the youth, victim and family members to work towards a mutually agreeable restitution agreement. Also, provide free workshops in anger management and mediation.

**Center for Community Dispute Settlement**
**291 McLeod Street, Livermore, CA 94550**

Phone: (925) 373-1035;  Fax:  (925) 449-0945

http://www.trivalleymediation.com/

Provides services in Tri-Valley for all of Alameda County. Program goals are to increase the number of court cases resolved, mediating small claims cases four days per week, and training youth in listening and conflict resolution skills.

# ALAMEDA COUNTY SUPERIOR COURT
# ADR PROGRAM

**ADR Program Administrator**

Pursuant to California Rules of Court, rule 10.783, the presiding judge of the Superior Court of California, County of Alameda designated the Court Executive Officer to serve as ADR program administrator.

A Plaintiff may elect, the parties may stipulate, or a judge may refer a case to Judicial Arbitration. The Judicial Arbitration Program Coordinator may be contacted during regular court business hours at (510) 690-2705.

**The Judicial Arbitration Process**

**Appointment of Arbitrator** (must be appointed within 30 days after referral per CRC 3.815(c)(2)).

⇒ Parties mailed list of five names from which to select (list mailed within 5-10 business days after receipt of referral).

⇒ Each party may reject one of the names listed (10 calendar days per CRC 3.815(b)(3)).

⇒ The administrator randomly appoints the arbitrators from the names remaining on the list or if one name remains then that name is deemed appointed (CRC 3.815(4)).

**Assignment of Case (CRC 3.817)**

⇒ Within 15 days of notice of the appointment, the arbitrator shall contact parties in writing about time, date, and place of the hearing. The parties shall receive at least 30 days notice prior to the hearing.

**Hearings (CRC 3.817)**

⇒ Must be scheduled to be completed not more than 90 days from the date the arbitrator was assigned. For good cause shown, a Judge may continue the case beyond this 90-day period.

**Award of Arbitrator**

⇒ The arbitrator must file an award within 10 days of the conclusion of the arbitration hearing. The arbitrator may apply to the court for an additional 20 days in cases of unusual length or complexity (CRC 3.825(b)).

⇒ Within 30 days of the filing of the award, a party may file a request for trial (CRC 3.826(a)).

⇒ The clerk must immediately enter the arbitration award as a judgment if no party has served and filed a request for trial during the 30-day period after the award is filed (CRC 3.827).

**Return of Case to Court**

⇒ Upon the filing of a request for trial, the action must proceed as provided under an applicable case management order or, if there is no pending order, promptly set for a case management conference. (CRC 3.826(b)).

⇒ When a judgment is entered, the clerk will notify all parties who have appeared in the case including the judge to whom the case is assigned if there is one (CRC 3.827(b)).

⇒ If a case is settled then each plaintiff or other party must notify the arbitrator and the court as required under California Rules of Court, rule 3.1385 (CRC 3.829).

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

| | | |
|---|---|---|
| ☐ Berkeley Courthouse<br>2000 Center Street, 2nd Fl., Berkeley, CA 94704 | ☐ Fremont Hall of Justice<br>39439 Paseo Padre Parkway, Fremont, CA 94538 | ☐ Gale/Schenone Hall of Justice<br>5672 Stoneridge Drive, Pleasanton, CA 94588 |
| ☐ George E. McDonald Hall of Justice<br>2233 Shoreline Drive, Alameda, CA 94501 | ☐ Hayward Hall of Justice<br>24405 Amador Street, Hayward, CA 94544 | ☐ René C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 |
| | ☐ Wiley W. Manuel Courthouse<br>661 Washington Street, Oakland, CA 94607 | |

Case No.: _____

Plaintiff

vs.

**STIPULATION FOR ALTERNATIVE
DISPUTE RESOLUTION (ADR)**

Defendant

The parties by and through their attorneys of record hereby stipulate to submit the within

controversy to the following Alternative Dispute Resolution process:

_____

_____

_____

### ORDER

The foregoing stipulation having been read and considered and good cause appearing, now therefore, IT

IS SO ORDERED.

IT IS FURTHER ORDERED that the matter be set for Order to Show Cause Hearing RE:

Dismissal on _____ at _____ a.m./p.m. in Department _____

Dated:

_____
JUDGE OF THE SUPERIOR COURT

(SEAL)

Rev. March 2008

Greenberg Traurig LLP
Attn: Perez, David
1900 University Avenue
5th Floor i
East Palo Alto, CA  94303

## Superior Court of California, County of Alameda

Kaiser Foundation Health Plan

**Plaintiff/Petitioner(s)**

VS.

Medquest, Inc.

**Defendant/Respondent(s)**
(Abbreviated Title)

No. RG08391487

**NOTICE OF CASE MANAGEMENT
CONFERENCE AND ORDER**
Unlimited Jurisdiction

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD.
Notice is given that a Case Management Conference has been scheduled as follows:

| Date: **10/21/2008**<br>Time: **09:00 AM** | Department: **16**<br>  Location: **Administration Building**<br>    **Third Floor**<br>    **1221 Oak Street, Oakland  CA  94612**<br>  Internet: **http://www.alameda.courts.ca.gov** | Judge: **Lawrence John Appel**<br>Clerk: **Ana Liza Tumonong**<br>Clerk telephone: **(510) 267-6932**<br>E-mail:<br>Fax: **(510) 267-1504** |

### ORDERS

1. You must:
    a. **Serve** all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (CRC 3.110(b));
    b. **Give notice** of this conference to any party not included in this notice and file proof of service;
    c. **Meet and confer**, in person or by telephone, to consider each of the issues identified in CRC 3.724 no later than **30** calendar days before the date set for the Case Management Conference;
    d. **File and serve** a completed Case Management Conference Statement (use of Judicial Council Form CM 110 is <u>mandatory</u>) at least **15** days before the Case Management Conference (CRC 3.725)

2. If you do not follow the orders above, you are hereby ordered to show cause why you should not be sanctioned under CRC 2.30. The hearing on the Order to Show Cause re. Sanctions will be at the same time as the Case Management Conference. Sanctions may include monetary sanctions and any other sanction permitted by law, including striking pleadings or dismissing the action.

3. You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

4. The Direct Calendar Judge will issue orders at the conclusion of the conference that should include:
    a. Referring to ADR and setting an ADR conclusion date
    b. Dismissing or severing claims or parties
    c. Setting a trial date.

*Telephonic appearances at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties may make arrangements by calling 1-888-882-6878, or faxing a service request to 1-888-882-2946. This service is subject to charges by the vendor.

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice of Hearing by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 06/10/2008.

By _____

Deputy Clerk

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark L. Hogge (pro hac vice appln pending)<br>Greenberg Traurig LLP<br>2101 L Street, N.W., Suite 1000<br>Washington, D.C. 20037<br>TELEPHONE NO.: 202-331-3100     FAX NO. *(Optional)*: 202-331-3101<br>E-MAIL ADDRESS *(Optional)*: hoggem@gtlaw.com<br>ATTORNEY FOR *(Name)*: Plaintiffs | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Alameda** |
|---|
| STREET ADDRESS: 1225 Fallon Street |
| MAILING ADDRESS: Rene C. Davidson Alameda County Courthouse |
| CITY AND ZIP CODE: Oakland, 94612 |
| BRANCH NAME: Civil Division |

| PLAINTIFF/PETITIONER: Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc., et al. |
|---|
| DEFENDANT/RESPONDENT: MedQuist, Inc., and MedQuist Transcriptions, Ltd. |

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>RG 08391487 |
|---|---|

TO *(insert name of party being served)*: MedQuist, Inc., and MedQuist Transcriptions, Ltd., c/o Neal R. Marder

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: June 16, 2008

Mark L. Hogge
_____
(TYPE OR PRINT NAME)

▶ *[signature]*
_____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. ☒  A copy of the summons and of the complaint.
2. ☒  Other *(specify)*: ADR Information

*(To be completed by recipient):*

Date this form is signed:

▶

_____
TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

_____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

| | | |
|---|---|---|
| Form Adopted for Mandatory se<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Page 1 of 1<br>Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov |

American LegalNet, Inc.
www.USCourtForms.com

# EXHIBIT D

# Greenberg Traurig

**Transmittal Cover Sheet**

| From: | Cathy Sandifer on behalf of David J. Perez | Tel: 650.289.7862 | | E-Mail: sandiferc@gtlaw.com |
|---|---|---|---|---|

| To: | Fax No: | Company: | Phone No.: |
|---|---|---|---|
| Stephen R. Smerek Neal R. Marder | (213) 615-1750 | Winston & Strawn LLP | (213) 615-1700 |

**File No.:** 081329.010100

**Re:** *Kaiser Foundation Health Plan, et al. v. Medquist, Inc., et al.* Alameda Co. Superior Court Case No. RG08391487

**Date:** June 27, 2008

**No. Pages:** Including Cover Sheet **28**

If you do not receive all pages properly, please call the sender.

**Notes:** Enclosed are copies of the Applications of Ronald Kleinman, Mark L. Hogge and C. Allen Foster to appear *pro hac vice* on behalf of the Plaintiffs in the above action. The applications are set for hearing on 7/21/08 at 9:00 a.m., in Dept. 16 of the Alameda Co. Superior Court.

We appeared *ex parte* this morning to obtain an Order Shortening Time to set the hearings on these applications and the court granted our motion and set the hearing date for July 21. We will provide you with a copy of the Order when we obtain it on Monday but wanted to get copies of these applications to you today. Thank you.

Also sent via:  ☐ US Mail   ☐ Overnight   ☐ Messenger   ☐ Email   ☒ No Other

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

1900 University Avenue, 5th Floor, East Palo Alto, California 94303  Phone: 650.328.8500  Fax: 650.328.8508

1  EVE TRIFFO (SBN 61819)
   GREENBERG TRAURIG, LLP
2  2450 Colorado Avenue Suite 400E
   Santa Monica CA 90404
3  Telephone: (310) 586-7700
   Facsimile: (310) 586-7800
4
   WILLIAM J. GOINES (SBN 61290)
5  DAVID PEREZ (SBN 238136)
   CINDY HAMILTON (SBN 217951)
6  GREENBERG TRAURIG, LLP
   1900 University Avenue, 5th Floor
7  East Palo Alto, CA 94303
   Telephone: (650) 328-8500
8  Facsimile:  (650) 328-8508

9  Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc.;
   Kaiser Foundation Hospitals; The Permanente Medical Group,
10 Inc.; Southern California Permanente Medical Group; Kaiser
   Foundation Health Plan of the Mid-Atlantic States, Inc.; and
11 Kaiser Foundation Health Plan of Colorado

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                    FOR THE COUNTY OF ALAMEDA

15

16 KAISER FOUNDATION HEALTH PLAN,          Case No. RG08391487
   INC., KAISER FOUNDATION
17 HOSPITALS, THE PERMANENTE
   MEDICAL GROUP, INC., SOUTHERN           **NOTICE OF APPLICATION AND**
18 CALIFORNIA PERMANENTE MEDICAL           **APPLICATION FOR APPROVAL OF**
   GROUP, KAISER FOUNDATION                **RONALD W. KLEINMAN TO APPEAR**
19 HEALTH PLAN OF THE MID-ATLANTIC         ***PRO HAC VICE*; MEMORANDUM OF**
   STATES, INC., and KAISER                **POINTS AND AUTHORITIES**
20 FOUNDATION HEALTH PLAN OF
   COLORADO                                [Proposed Order Filed Concurrently]
21
                    Plaintiffs,            Date:  July 21, 2008
22                                         Time:  9:00 a.m.
                                           Dept.:  16
23 v.                                      Judge:  Hon. Lawrence John Appel
                                           Reservation No.:  R842402
24 MEDQUIST, INC. AND MEDQUIST
   TRANSCRIPTIONS, LTD.                    Date Action Filed: June 6, 2008
25
26                  Defendants.
27
28
                                    1

1 || TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2 ||      Please take notice that, pursuant to California Rules of Court, Rule 9.40, on July 21, 2008 at

3 || 9:00 a.m., in Department 16 of the above-entitled court located at 1221 Oak Street, Oakland,

4 || California, Plaintiffs Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; The

5 || Permanente Medical Group, Inc.; Southern California Permanente Medical Group; Kaiser Foundation

6 || Health Plan of the Mid-Atlantic States, Inc.; and Kaiser Foundation Health Plan of Colorado

7 || (hereafter collectively "Plaintiffs") hereby do and will move the court for an order admitting the

8 || appearance in this action of Ronald W. Kleinman *pro hac vice*. This application is based on this

9 || notice and application, the supporting memorandum of points and authorities and declaration of

10 || Ronald W. Kleinman, all pleadings and papers on file in this action, and any argument or further

11 || evidence presented at the hearing on this matter.

12

13 || Dated: June 27, 2008                          GREENBERG TRAURIG, LLP

14

15 ||                                               By: _Cindy Hamilton_____
                                                        Cindy Hamilton

16 ||                                               Attorneys for Plaintiffs Kaiser Foundation Health
                                                    Plan, Inc.; Kaiser Foundation Hospitals; The
17 ||                                               Permanente Medical Group, Inc.; Southern
                                                    California Permanente Medical Group; Kaiser
18 ||                                               Foundation Health Plan of the Mid-Atlantic States,
                                                    Inc.; and Kaiser Foundation Health Plan of
19 ||                                               Colorado

20

21

22

23

24

25

26

27

28

NOTICE AND APPLICATION FOR APPEARANCE OF RONALD W. KLEINMAN *PRO HAC VICE*; MEMO OF PTS & AUTH.

1               **MEMORANDUM OF POINTS AND AUTHORITIES**

2       California Rules of Court, Rule 9.40(a), provides as follows:

3       **[Eligibility.]** A person who is not a member of the State Bar of California but who is a member in good standing of and eligible to practice before the bar of any United

4       States court or the highest court in any state, territory, or insular possession of the United States, and who has been retained to appear in a particular cause pending in a

5       court of this state, may in the discretion of such court be permitted upon written application to appear as counsel *pro hac vice*, provided that an active member of the

6       State Bar of California is associated as attorney of record. No person is eligible to appear as counsel *pro hac vice* under this rule if the person is: (1) A resident of the

7       State of California; (2) Regularly employed in the State of California; or (3) Regularly engaged in substantial business, professional, or other activities in the State

8       of California.

9       As set forth in the accompanying Declaration of Ronald W. Kleinman, Mr. Kleinman meets

10   the qualification set forth in Rule 9.40(a). He is a member in good standing and is admitted to

11   practice before the courts of the District of Columbia, as well as the Supreme Court of the United

12   States; he is counsel for Plaintiffs in this action; and Eve Triffo, William Goines, and David Perez are

13   active members of the State Bar of California and are associated as attorneys of record.

14       Plaintiffs have served this application on, and paid a $50 fee to, the State Bar of California in

15   compliance with CRC 9.40(c)(1).

16       Accordingly, Plaintiffs hereby request the court grant the instant application to allow Ronald

17   W. Kleinman to appear *pro hac vice* on their behalf in this action.

18

19   Dated: June 27, 2008               GREENBERG TRAURIG, LLP

20

21                           By: _____
                             Cindy Hamilton

22                           Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; The

23                           Permanente Medical Group, Inc.; Southern California Permanente Medical Group; Kaiser

24                           Foundation Health Plan of the Mid-Atlantic States, Inc.; and Kaiser Foundation Health Plan of

25                           Colorado

26

27

28

3

NOTICE AND APPLICATION FOR APPEARANCE OF RONALD W. KLEINMAN *PRO HAC VICE*; MEMO OF PTS & AUTH.

# Greenberg
# Traurig

Cathy Sandifer
Tel. 650.289-7862
Fax 650.462-7862
sandiferc@gtlaw.com

June 27, 2008

State Bar of California
180 Howard Street
San Francisco, CA  94105-1639

Attn:  Office of Certification

Re:  Admission of Ronald W. Kleinman to Appear *Pro Hac Vice* in
*Kaiser Foundation Health Plan, Inc., et al. v. MedQuist, Inc., et al.*
Alameda Co. Superior Court Case No. RG08391487

Dear Sir/Madam:

Enclosed please find a check in the amount of $50.00 and a copy of an Application
of Ronald W. Kleinman to Appear *Pro Hac Vice* in the matter entitled *Kaiser Foundation
Health Plan, Inc., et al. v. MedQuist, Inc., et al.,* Alameda County Superior Court Case No.
RG08391487, being heard in the Alameda County Superior Court on July 21, 2008.

If you have any questions regarding the foregoing or the enclosed, please do not
hesitate to call me.

Very truly yours,

Cathy Sandifer

Enclosure

ALBANY

AMSTERDAM

ATLANTA

BOCA RATON

BOSTON

CHICAGO

DALLAS

DENVER

FORT LAUDERDALE

LOS ANGELES

MIAMI

NEW JERSEY

NEW YORK

ORANGE COUNTY, CA

ORLANDO

PHILADELPHIA

PHOENIX

SILICON VALLEY

TALLAHASSEE

TYSONS CORNER

WASHINGTON, D.C.

WEST PALM BEACH

WILMINGTON

ZURICH

SV 346,226,247v1 10-5-07 Greenberg Traurig, LLP | Attorneys at Law | Silicon Valley Office | 1900 University Avenue | 5th Floor | East Palo Alto, CA 94303
Tel 650.328.8500 | Fax 650.328.8508

www.gtlaw.com

1  |  Kaiser Foundation Health Plan, Inc., et al.v. MedQuist, Inc., et al.    Case No. RG08391487

2  |  **PROOF OF SERVICE**

3  |  I, Cathy Sandifer, declare that I am a citizen of the United States, over the age of eighteen years
4  |  and not a party to the within action. I am an employee of GREENBERG TRAURIG, LLP, and my
   |  business address is 1900 University Avenue, Fifth Floor, East Palo Alto, CA 94303. On June 27, 2008,
5  |  I served the following documents:

6  |  **NOTICE OF APPLICATION AND APPLICATION FOR APPROVAL OF RONALD W.**
   |  **KLEINMAN TO APPEAR *PRO HAC VICE*; MEMORANDUM OF POINTS AND**
7  |  **AUTHORITIES**

8  |  ☒  by transmitting via **FACSIMILE** the document(s) listed above to the fax numbers) set forth
   |  below, or as stated on the attached service list, on this date at approximately _____, from the
9  |  sending facsimile machine telephone number of 650-289-7893. The transmission was reported as
   |  complete and without error by the machine. Pursuant to California Rules of Court, Rule
10 |  2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of
11 |  which is attached to the original of this declaration. The transmission report was properly issued
   |  by the transmitting facsimile machine.

12 |

13 |  ☒  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid,
   |  in the **UNITED STATES MAIL** at East Palo Alto, California, addressed as set forth below.

14 |  ☐  by **OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight mail
15 |  envelope with postage thereon fully prepaid, addressed as set forth below.

16 |  ☐  **(BY MESSENGER PERSONAL SERVICE).** I caused delivery of such envelope by hand via
17 |  courier service to the offices of the addressee.

18 |  **Courtesy Copy** to Counsel for Defendants (who have not yet appeared in this action):

19 |  Stephen R. Smerek,Esq./Neal R. Marder, Esq.
   |  Winston & Strawn LLP
20 |  333 S Grand Ave
   |  Los Angeles, CA, 90071-1504

21 |  I am readily familiar with the business practice of my place of employment in respect to the
22 |  collection and processing of correspondence, pleadings and notices for mailing with United States
   |  Postal Service/Express Mail, Federal Express and other overnight mail services. The foregoing sealed
23 |  envelope was placed for collection and mailing this date consistent with the ordinary business practice
24 |  of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at
   |  East Palo Alto, California, in the ordinary course of such business.

25 |  I declare under penalty of perjury under the laws of the State of California that the foregoing is
   |  true and correct. Executed on June 27, 2008, at East Palo Alto, California.

26 |

27 |  _Cathy Sandifer_
   |  Cathy Sandifer

28 |

1

Proof of Service

SV 346,005,185v1 8-13-07

1  EVE TRIFFO (SBN 61819)
   GREENBERG TRAURIG, LLP
2  2450 Colorado Avenue Suite 400E
3  Santa Monica CA 90404
   Telephone: (310) 586-7700
4  Facsimile: (310) 586-7800

5  WILLIAM J. GOINES (SBN 61290)
   DAVID PEREZ  (SBN 238136)
6  GREENBERG TRAURIG, LLP
   1900 University Avenue, 5th Floor
7  East Palo Alto, CA 94303
   Telephone: (650) 328-8500
8  Facsimile:  (650) 328-8508

9  Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc.;
   Kaiser Foundation Hospitals; The Permanente Medical Group,
10 Inc.; Southern California Permanente Medical Group; Kaiser
   Foundation Health Plan of the Mid-Atlantic States, Inc.; and
11 Kaiser Foundation Health Plan of Colorado

12

13               SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                    FOR THE COUNTY OF ALAMEDA

15

16 KAISER FOUNDATION HEALTH PLAN,        Case No. RG08391487
   INC., KAISER FOUNDATION
17 HOSPITALS, THE PERMANENTE            **DECLARATION OF RONALD W.**
   MEDICAL GROUP, INC., SOUTHERN        **KLEINMAN IN SUPPORT OF**
18 CALIFORNIA PERMANENTE MEDICAL        **APPLICATION FOR APPROVAL OF**
   GROUP, KAISER FOUNDATION             **RONALD W. KLEINMAN TO APPEAR**
19 HEALTH PLAN OF THE MID-ATLANTIC      ***PRO HAC VICE***
   STATES, INC., and KAISER
20 FOUNDATION HEALTH PLAN OF
   COLORADO
21                                       [Proposed Order Filed Concurrently]

22              Plaintiffs,              Date: July 21, 2008
                                         Time: 9:00 a.m.
23 v.                                    Dept.: 16
                                         Judge: Hon. Lawrence John Appel
24 MEDQUIST, INC. AND MEDQUIST          Reservation No.: R842402
   TRANSCRIPTIONS, LTD.
25                                       Date Action Filed: June 6, 2008

26              Defendants.

27

28

                                        1

I, Ronald W. Kleinman, declare:

1. I make this declaration in support of my application to appear as counsel *pro hac vice* in the above-referenced matter on behalf of Plaintiffs Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; The Permanente Medical Group, Inc.; Southern California Permanente Medical Group; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; and Kaiser Foundation Health Plan of Colorado. I have knowledge of the matters stated herein and would competently testify thereto if called to do so.

2. My residence address is 9306 Jesup Lane, Bethesda, Maryland 20814. My business address is Greenberg Traurig, LLP, 2101 L Street, N.W. Suite 1000, Washington DC 20037. I am neither a resident of nor employed in the State of California, and am not regularly engaged in substantial business, professional or other activities in the State of California.

3. I was admitted in 1978 to the practice of law in the state courts of the District of Columbia. I was admitted in 1980 to the practice of law in the United States Supreme Court. I was admitted in 1978 to the practice of law in the United States District Court for the District of Columbia.

4. I am a current member in good standing in the District of Columbia.

5. I am not currently suspended or disbarred in any court.

6. In the past two years I have not applied for admission *pro hac vice* to any Court in the State of California.

7. The names, addresses, telephone numbers and active bar numbers of the California attorneys appearing as attorneys of record in this action are:

    a.   Eve Triffo (SBN 61819)
        Greenberg Traurig, LLP
        2450 Colorado Avenue Suite 400E
        Santa Monica CA 90404
        (310) 586-7700

and

///

///

///

DECLARATION OF RONALD W. KLEINMAN IN SUPPORT OF APPLICATION FOR APPEARANCE PRO HAC VICE

1        b.     William J. Goines (SBN 61290)
                    David Perez (SBN 238136)

2                    Greenberg Traurig, LLP
                    1900 University Avenue, 5th Floor

3                    East Palo Alto, CA 94303
                    (650) 328-8500.

4

5       I declare under penalty of perjury under the laws of the State of California that the foregoing

6 is true and correct. Executed this <u>13th</u> day of June, 2008.

7

8                               Ronald W. Kleinman

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RONALD W. KLEINMAN IN SUPPORT OF APPLICATION FOR APPEARANCE PRO HAC VICE

Kaiser Foundation Health Plan, Inc., et al.v. MedQuist, Inc., et al.                    Case No. RG08391487

## PROOF OF SERVICE

I, Cathy Sandifer, declare that I am a citizen of the United States, over the age of eighteen years and not a party to the within action. I am an employee of GREENBERG TRAURIG, LLP, and my business address is 1900 University Avenue, Fifth Floor, East Palo Alto, CA 94303. On June 27, 2008, I served the following documents:

**DECLARATION OF RONALD W. KLEINMAN IN SUPPORT OF APPLICATION FOR APPROVAL OF RONALD W. KLEINMAN TO APPEAR *PRO HAC VICE***

☑  by transmitting via **FACSIMILE** the document(s) listed above to the fax numbers) set forth below, or as stated on the attached service list, on this date at approximately _____, from the sending facsimile machine telephone number of 650-289-7893. The transmission was reported as complete and without error by the machine. Pursuant to California Rules of Court, Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration. The transmission report was properly issued by the transmitting facsimile machine.

☒  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the **UNITED STATES MAIL** at East Palo Alto, California, addressed as set forth below.

☐  by **OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight mail envelope with postage thereon fully prepaid, addressed as set forth below.

☐  **(BY MESSENGER PERSONAL SERVICE).** I caused delivery of such envelope by hand via courier service to the offices of the addressee.

**Courtesy Copy** to Counsel for Defendants (who have not yet appeared in this action):

Stephen R. Smerek,Esq./Neal R. Marder, Esq.
Winston & Strawn LLP
333 S Grand Ave
Los Angeles, CA, 90071-1504

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service/Express Mail, Federal Express and other overnight mail services. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at East Palo Alto, California, in the ordinary course of such business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 27, 2008, at East Palo Alto, California.

*Cathy Sandifer*
Cathy Sandifer

1
Proof of Service

SV 346,005,185v1 8-13-07

1   EVE TRIFFO (SBN 61819)
    GREENBERG TRAURIG, LLP
2   2450 Colorado Avenue Suite 400E
    Santa Monica CA 90404
3   Telephone: (310) 586-7700
    Facsimile: (310) 586-7800
4
    WILLIAM J. GOINES (SBN 61290)
5   DAVID PEREZ (SBN 238136)
    CINDY HAMILTON (SBN 217951)
6   GREENBERG TRAURIG, LLP
    1900 University Avenue, 5th Floor
7   East Palo Alto, CA 94303
    Telephone: (650) 328-8500
8   Facsimile:  (650) 328-8508

9   Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc.;
    Kaiser Foundation Hospitals; The Permanente Medical Group,
10  Inc.; Southern California Permanente Medical Group; Kaiser
    Foundation Health Plan of the Mid-Atlantic States, Inc.; and
11  Kaiser Foundation Health Plan of Colorado

12

13                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                          FOR THE COUNTY OF ALAMEDA

15

16  KAISER FOUNDATION HEALTH PLAN,          Case No. RG08391487
    INC., KAISER FOUNDATION
17  HOSPITALS, THE PERMANENTE               **NOTICE OF APPLICATION AND**
    MEDICAL GROUP, INC., SOUTHERN           **APPLICATION FOR APPROVAL OF**
18  CALIFORNIA PERMANENTE MEDICAL           **MARK L. HOGGE TO APPEAR** *PRO HAC*
    GROUP, KAISER FOUNDATION                *VICE*; **MEMORANDUM OF POINTS AND**
19  HEALTH PLAN OF THE MID-ATLANTIC         **AUTHORITIES**
    STATES, INC., and KAISER
20  FOUNDATION HEALTH PLAN OF               [Proposed Order Filed Concurrently]
    COLORADO
21                                          Date:  July 21, 2008
                                            Time: 9:00 a.m.
22              Plaintiffs,                  Dept.:  16
                                            Judge:  Hon. Lawrence John Appel
23  v.                                      Reservation No.:  R842402

24  MEDQUIST, INC. AND MEDQUIST             Date Action Filed:  June 6, 2008
    TRANSCRIPTIONS, LTD.
25
26              Defendants.

27

28
                                        1

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        Please take notice that, pursuant to California Rules of Court, Rule 9.40, on July 21, 2008 at

3   9:00 a.m., in Department 16 of the above-entitled court located at 1221 Oak Street, Oakland,

4   California, Plaintiffs Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; The

5   Permanente Medical Group, Inc.; Southern California Permanente Medical Group; Kaiser Foundation

6   Health Plan of the Mid-Atlantic States, Inc.; and Kaiser Foundation Health Plan of Colorado

7   (hereafter collectively "Plaintiffs") hereby do and will move the court for an order admitting the

8   appearance in this action of Mark L. Hogge *pro hac vice*. This application is based on this notice and

9   application, the supporting memorandum of points and authorities and declaration of Mark L. Hogge,

10  all pleadings and papers on file in this action, and any argument or further evidence presented at the

11  hearing on this matter.

12

13  Dated:  June 27, 2008                          GREENBERG TRAURIG, LLP

14

15                                          By: *Cindy Hamilton*
                                                Cindy Hamilton

16                                              Attorneys for Plaintiffs Kaiser Foundation Health
                                                Plan, Inc.; Kaiser Foundation Hospitals; The
17                                              Permanente Medical Group, Inc.; Southern
                                                California Permanente Medical Group; Kaiser
18                                              Foundation Health Plan of the Mid-Atlantic States,
                                                Inc.; and Kaiser Foundation Health Plan of
19                                              Colorado

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2  California Rules of Court, Rule 9.40(a), provides as follows:

3  **[Eligibility.]** A person who is not a member of the State Bar of California but who is
a member in good standing of and eligible to practice before the bar of any United
4  States court or the highest court in any state, territory, or insular possession of the
United States, and who has been retained to appear in a particular cause pending in a
5  court of this state, may in the discretion of such court be permitted upon written
application to appear as counsel *pro hac vice*, provided that an active member of the
6  State Bar of California is associated as attorney of record. No person is eligible to
appear as counsel *pro hac vice* under this rule if the person is: (1) A resident of the
7  State of California; (2) Regularly employed in the State of California; or (3)
Regularly engaged in substantial business, professional, or other activities in the State
8  of California.

9  As set forth in the accompanying Declaration of Mark L. Hogge, Mr. Hogge meets the

10  qualification set forth in Rule 9.40(a). He is a member in good standing and is admitted to practice

11  before the courts of the District of Columbia and Virginia, as well as the Supreme Court of the United

12  States, the United States District Court for the Eastern District of Virginia, the United States District

13  Court for the District of Columbia, the United States District Court for the District of Maryland, the

14  United States District Court for the Western District of Wisconsin, and the United States District

15  Court for the Eastern District of Michigan; he is counsel for Plaintiffs in this action; and Eve Triffo,

16  William J. Goines, and David Perez are active members of the State Bar of California and are

17  associated as attorneys of record. Plaintiffs have served this application on, and paid a $50 fee to, the

18  State Bar of California in compliance with CRC 9.40(c)(1).

19  Accordingly, Plaintiffs hereby request the court grant the instant application to allow Mark L.

20  Hogge to appear *pro hac vice* on their behalf in this action.

21  Dated: June 27, 2008                     GREENBERG TRAURIG, LLP

22

23  By: *Cindy Hamilton*
      Cindy Hamilton

24  Attorneys for Plaintiffs Kaiser Foundation Health
Plan, Inc.; Kaiser Foundation Hospitals; The
25  Permanente Medical Group, Inc.; Southern
California Permanente Medical Group; Kaiser
26  Foundation Health Plan of the Mid-Atlantic States,
Inc.; and Kaiser Foundation Health Plan of
27  Colorado

28

3

# Greenberg
# Traurig

Cathy Sandifer
Tel. 650.289-7862
Fax 650.462-7862
sandiferc@gtlaw.com

June 27, 2008

State Bar of California
180 Howard Street
San Francisco, CA  94105-1639

Attn:  Office of Certification

Re:  Admission of Mark L. Hogge to Appear *Pro Hac Vice* in
     *Kaiser Foundation Health Plan, Inc., et al. v. MedQuist, Inc., et al.*
     Alameda Co. Superior Court Case No. RG08391487

Dear Sir/Madam:

Enclosed please find a check in the amount of $50.00 and a copy of an Application of Mark L. Hogge to Appear *Pro Hac Vice* in the matter entitled *Kaiser Foundation Health Plan, Inc., et al. v. MedQuist, Inc., et al.,* Alameda County Superior Court Case No. RG08391487, being heard in the Alameda County Superior Court on July 21, 2008.

If you have any questions regarding the foregoing or the enclosed, please do not hesitate to call me.

Very truly yours,

Cathy Sandifer

Enclosure

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DENVER
FORT LAUDERDALE
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SILICON VALLEY
TALLAHASSEE
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
WILMINGTON
ZURICH

Kaiser Foundation Health Plan, Inc., et al.v. MedQuist, Inc., et al.    Case No. RG08391487

## PROOF OF SERVICE

I, Cathy Sandifer, declare that I am a citizen of the United States, over the age of eighteen years and not a party to the within action. I am an employee of GREENBERG TRAURIG, LLP, and my business address is 1900 University Avenue, Fifth Floor, East Palo Alto, CA 94303. On June 27, 2008, I served the following documents:

**NOTICE OF APPLICATION AND APPLICATION FOR APPROVAL OF MARK L. HOGGE TO APPEAR *PRO HAC VICE*; MEMORANDUM OF POINTS AND AUTHORITIES**

☒ by transmitting via **FACSIMILE** the document(s) listed above to the fax numbers) set forth below, or as stated on the attached service list, on this date at approximately _____, from the sending facsimile machine telephone number of 650-289-7893. The transmission was reported as complete and without error by the machine. Pursuant to California Rules of Court, Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration. The transmission report was properly issued by the transmitting facsimile machine.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the **UNITED STATES MAIL** at East Palo Alto, California, addressed as set forth below.

☐ by **OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight mail envelope with postage thereon fully prepaid, addressed as set forth below.

☐ **(BY MESSENGER PERSONAL SERVICE).** I caused delivery of such envelope by hand via courier service to the offices of the addressee.

**Courtesy Copy** to Counsel for Defendants (who have not yet appeared in this action):

Stephen R. Smerek,Esq./Neal R. Marder, Esq.
Winston & Strawn LLP
333 S Grand Ave
Los Angeles, CA, 90071-1504

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service/Express Mail, Federal Express and other overnight mail services. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at East Palo Alto, California, in the ordinary course of such business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 27, 2008, at East Palo Alto, California.

Cathy Sandifer

SV 346,005,185v1 8-13-07

1   EVE TRIFFO (SBN 61819)
    GREENBERG TRAURIG, LLP
2   2450 Colorado Avenue Suite 400E
    Santa Monica CA 90404
3   Telephone: (310) 586-7700
    Facsimile: (310) 586-7800

4

5   WILLIAM J. GOINES (SBN 61290)
    DAVID PEREZ (SBN 238136)
    GREENBERG TRAURIG, LLP
6   1900 University Avenue, 5th Floor
    East Palo Alto, CA 94303
7   Telephone: (650) 328-8500
    Facsimile:  (650) 328-8508

8

9   Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc.;
    Kaiser Foundation Hospitals; The Permanente Medical Group,
    Inc.; Southern California Permanente Medical Group; Kaiser
10  Foundation Health Plan of the Mid-Atlantic States, Inc.; and
    Kaiser Foundation Health Plan of Colorado

11

12             SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                  FOR THE COUNTY OF ALAMEDA

14

| | |
|---|---|
| 15   KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, THE PERMANENTE MEDICAL GROUP, INC., SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, KAISER FOUNDATION HEALTH PLAN OF THE MID-ATLANTIC STATES, INC., and KAISER FOUNDATION HEALTH PLAN OF COLORADO <br><br> Plaintiffs, <br><br> v. <br><br> MEDQUIST, INC. AND MEDQUIST TRANSCRIPTIONS, LTD. <br><br> Defendants. | Case No. RG08391487 <br><br> **DECLARATION OF MARK L. HOGGE IN SUPPORT OF APPLICATION FOR APPROVAL OF MARK L. HOGGE TO APPEAR *PRO HAC VICE*** <br><br> [Proposed Order Filed Concurrently] <br><br> Date:  July 21, 2008 <br> Time:  9:00 a.m. <br> Dept.: 16 <br> Judge: Hon. Lawrence John Appel <br> Reservation No.:  R842402 <br><br> Date Action Filed:  June 6, 2008 |

1

1    I, Mark L. Hogge, declare:

2       1.    I make this declaration in support of my application to appear as counsel *pro hac vice*

3  in the above-referenced matter on behalf of Plaintiffs Kaiser Foundation Health Plan, Inc.; Kaiser

4  Foundation Hospitals; The Permanente Medical Group, Inc.; Southern California Permanente

5  Medical Group; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; and Kaiser

6  Foundation Health Plan of Colorado. I have knowledge of the matters stated herein and would

7  competently testify thereto if called to do so.

8       2.    My residence address is 500 Old Saybrook Way, Great Falls, VA 22066. My business

9  address is Greenberg Traurig, LLP, 2101 L Street, N.W. Suite 1000, Washington DC 20037. I am

10  neither a resident of nor employed in the State of California, and am not regularly engaged in

11  substantial business, professional or other activities in the State of California.

12       3.    I was admitted in 1986 to the practice of law in the state courts of the District of

13  Columbia. I was admitted in 1984 to the practice of law in the state courts of Virginia. I was

14  admitted in 1989 to the practice of law in the Supreme Court of the United States. I was admitted in

15  1984 to the practice of law in the United States District Court for the Eastern District of Virginia. I

16  was admitted in 1986 to the practice of law in the United States District Court for the District of

17  Columbia. I was admitted in 1998 to the practice of law in the United States District Court for the

18  District of Maryland. I was admitted in 2000 to the practice of law in the United States District Court

19  for the Western District of Wisconsin. I was admitted in 2005 to the practice of law in the United

20  States District Court for the Eastern District of Michigan.

21       4.    I am a current member in good standing in all of the above courts.

22       5.    I am not currently suspended or disbarred in any court.

23       6.    In the past two years I have not applied for admission *pro hac vice* to any Court in the

24  State of California.

25       7.    The names, addresses, telephone numbers and active bar numbers of the California

26  attorneys appearing as attorneys of record in this action are:

27          a.    Eve Triffo (SBN 61819)
              Greenberg Traurig, LLP
28          2450 Colorado Avenue Suite 400E

1

Santa Monica CA 90404
(310) 586-7700

2

and

3

b.    William J. Goines (SBN 61290)
David Perez (SBN 238136)
Greenberg Traurig, LLP
1900 University Avenue, 5th Floor
East Palo Alto, CA 94303
(650) 328-8500.

4

5

6

7    I declare under penalty of perjury under the laws of the State of California that the foregoing

8    is true and correct. Executed this 16th day of June, 2008.

9

10    Mark L. Hogge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Kaiser Foundation Health Plan, Inc., et al.v. MedQuist, Inc., et al.    Case No. RG08391487

## PROOF OF SERVICE

I, Cathy Sandifer, declare that I am a citizen of the United States, over the age of eighteen years and not a party to the within action. I am an employee of GREENBERG TRAURIG, LLP, and my business address is 1900 University Avenue, Fifth Floor, East Palo Alto, CA 94303. On June 27, 2008, I served the following documents:

**DECLARATION OF MARK L. HOGGE IN SUPPORT OF APPLICATION FOR APPROVAL OF MARK L. HOGGE TO APPEAR *PRO HAC VICE***

[X] by transmitting via **FACSIMILE** the document(s) listed above to the fax numbers) set forth below, or as stated on the attached service list, on this date at approximately _____, from the sending facsimile machine telephone number of 650-289-7893. The transmission was reported as complete and without error by the machine. Pursuant to California Rules of Court, Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration. The transmission report was properly issued by the transmitting facsimile machine.

[X] by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the **UNITED STATES MAIL** at East Palo Alto, California, addressed as set forth below.

[ ] by **OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight mail envelope with postage thereon fully prepaid, addressed as set forth below.

[ ] **(BY MESSENGER PERSONAL SERVICE).** I caused delivery of such envelope by hand via courier service to the offices of the addressee.

**Courtesy Copy** to Counsel for Defendants (who have not yet appeared in this action):

Stephen R. Smerek,Esq./Neal R. Marder, Esq.
Winston & Strawn LLP
333 S Grand Ave
Los Angeles, CA, 90071-1504

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service/Express Mail, Federal Express and other overnight mail services. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at East Palo Alto, California, in the ordinary course of such business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 27, 2008, at East Palo Alto, California.

*[signature]*

Cathy Sandifer

1

SV 346,005,185v1 8-13-07

1  EVE TRIFFO (SBN 61819)
   GREENBERG TRAURIG, LLP
2  2450 Colorado Avenue Suite 400E
   Santa Monica CA 90404
3  Telephone: (310) 586-7700
   Facsimile: (310) 586-7800
4
   WILLIAM J. GOINES (SBN 61290)
5  DAVID PEREZ (SBN 238136)
   CINDY HAMILTON (SBN 217951)
6  GREENBERG TRAURIG, LLP
   1900 University Avenue, 5th Floor
7  East Palo Alto, CA 94303
   Telephone: (650) 328-8500
8  Facsimile: (650) 328-8508

9  Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc.;
   Kaiser Foundation Hospitals; The Permanente Medical Group,
10 Inc.; Southern California Permanente Medical Group; Kaiser
   Foundation Health Plan of the Mid-Atlantic States, Inc.; and
11 Kaiser Foundation Health Plan of Colorado

12

13                SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                       FOR THE COUNTY OF ALAMEDA

15

16 KAISER FOUNDATION HEALTH PLAN,        Case No. RG08391487
   INC., KAISER FOUNDATION
17 HOSPITALS, THE PERMANENTE
   MEDICAL GROUP, INC., SOUTHERN         **NOTICE OF APPLICATION AND**
18 CALIFORNIA PERMANENTE MEDICAL         **APPLICATION FOR APPROVAL OF C.**
   GROUP, KAISER FOUNDATION              **ALLEN FOSTER TO APPEAR** *PRO HAC*
19 HEALTH PLAN OF THE MID-ATLANTIC       *VICE*; **MEMORANDUM OF POINTS AND**
   STATES, INC., and KAISER              **AUTHORITIES**
20 FOUNDATION HEALTH PLAN OF
   COLORADO                              [Proposed Order Filed Concurrently]
21
                                         Date:  July 21, 2008
22            Plaintiffs,                 Time:  9:00 a.m.
                                         Dept.:  16
23 v.                                    Judge:  Hon. Lawrence John Appel
                                         Reservation No.:  R842402
24 MEDQUIST, INC. AND MEDQUIST
   TRANSCRIPTIONS, LTD.                  Date Action Filed:  June 6, 2008
25
26            Defendants.
27
28

                                         1

1

2

3      TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

4            Please take notice that, pursuant to California Rules of Court, Rule 9.40, on July 21, 2008 at

5      9:00 a.m., in Department 16 of the above-entitled court located at 1221 Oak Street, Oakland,

6      California, Plaintiffs Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; The

7      Permanente Medical Group, Inc.; Southern California Permanente Medical Group; Kaiser Foundation

8      Health Plan of the Mid-Atlantic States, Inc.; and Kaiser Foundation Health Plan of Colorado

9      (hereafter collectively "Plaintiffs") hereby do and will move the court for an order admitting the

10     appearance in this action of C. Allen Foster *pro hac vice*. This application is based on this notice and

11     application, the supporting memorandum of points and authorities and declaration of C. Allen Foster,

12     all pleadings and papers on file in this action, and any argument or further evidence presented at the

13     hearing on this matter.

14

15     Dated: June 27, 2008                         GREENBERG TRAURIG, LLP

16                                                   By: _Cindy Hamilton_____

17                                                       Cindy Hamilton

18                                                   Attorneys for Plaintiffs Kaiser Foundation Health
                                                     Plan, Inc.; Kaiser Foundation Hospitals; The
19                                                   Permanente Medical Group, Inc.; Southern
                                                     California Permanente Medical Group; Kaiser
20                                                   Foundation Health Plan of the Mid-Atlantic States,
                                                     Inc.; and Kaiser Foundation Health Plan of
21                                                   Colorado

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

California Rules of Court, Rule 9.40(a), provides as follows:

**[Eligibility.]**  A person who is not a member of the State Bar of California but who is a member in good standing of and eligible to practice before the bar of any United States court or the highest court in any state, territory, or insular possession of the United States, and who has been retained to appear in a particular cause pending in a court of this state, may in the discretion of such court be permitted upon written application to appear as counsel *pro hac vice*, provided that an active member of the State Bar of California is associated as attorney of record. No person is eligible to appear as counsel *pro hac vice* under this rule if the person is: (1) A resident of the State of California; (2) Regularly employed in the State of California; or (3) Regularly engaged in substantial business, professional, or other activities in the State of California.

As set forth in the accompanying Declaration of C. Allen Foster, Mr. Foster meets the qualification set forth in Rule 9.40(a). He is a member in good standing and is admitted to practice before the courts of the District of Columbia, as well as the Supreme Court of the United States; he is counsel for Plaintiffs in this action; and Eve Triffo, William Goines, and David Perez are active members of the State Bar of California and are associated as attorneys of record.

Plaintiffs have served this application on, and paid a $50 fee to, the State Bar of California in compliance with CRC 9.40(c)(1).

Accordingly, Plaintiffs hereby request the court grant the instant application to allow C. Allen Foster to appear *pro hac vice* on their behalf in this action.

Dated: June 27, 2008

GREENBERG TRAURIG, LLP

By: _Cindy Hamilton_
Cindy Hamilton

Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; The Permanente Medical Group, Inc.; Southern California Permanente Medical Group; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; and Kaiser Foundation Health Plan of Colorado

3

# Greenberg
# Traurig

Cathy Sandifer
Tel. 650.289-7862
Fax 650.462-7862
sandiferc@gtlaw.com

June 27, 2008

State Bar of California
180 Howard Street
San Francisco, CA  94105-1639

Attn:  Office of Certification

Re:  Admission of C. Allen Foster to Appear *Pro Hac Vice* in
*Kaiser Foundation Health Plan, Inc., et al. v. MedQuist, Inc., et al.*
Alameda Co. Superior Court Case No. RG08391487

Dear Sir/Madam:

Enclosed please find a check in the amount of $50.00 and a copy of an Application
of C. Allen Foster to Appear *Pro Hac Vice* in the matter entitled *Kaiser Foundation Health
Plan, Inc., et al. v. MedQuist, Inc., et al.,* Alameda County Superior Court Case No.
RG08391487, being heard in the Alameda County Superior Court on July 21, 2008.

If you have any questions regarding the foregoing or the enclosed, please do not
hesitate to call me.

Very truly yours,

*Cathy Sandifer*

Cathy Sandifer

Enclosure

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DENVER
FORT LAUDERDALE
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SILICON VALLEY
TALLAHASSEE
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
WILMINGTON
ZURICH

**PROOF OF SERVICE**

I, Cathy Sandifer, declare that I am a citizen of the United States, over the age of eighteen years and not a party to the within action. I am an employee of GREENBERG TRAURIG, LLP, and my business address is 1900 University Avenue, Fifth Floor, East Palo Alto, CA 94303. On June 27, 2008, I served the following documents:

**NOTICE OF APPLICATION AND APPLICATION FOR APPROVAL OF C. ALLEN FOSTER TO APPEAR *PRO HAC VICE*; MEMORANDUM OF POINTS AND AUTHORITIES**

☒ by transmitting via **FACSIMILE** the document(s) listed above to the fax numbers) set forth below, or as stated on the attached service list, on this date at approximately _____, from the sending facsimile machine telephone number of 650-289-7893. The transmission was reported as complete and without error by the machine. Pursuant to California Rules of Court, Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration. The transmission report was properly issued by the transmitting facsimile machine.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the **UNITED STATES MAIL** at East Palo Alto, California, addressed as set forth below.

☐ by **OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight mail envelope with postage thereon fully prepaid, addressed as set forth below.

☐ **(BY MESSENGER PERSONAL SERVICE).** I caused delivery of such envelope by hand via courier service to the offices of the addressee.

**Courtesy Copy** to Counsel for Defendants (who have not yet appeared in this action):

Stephen R. Smerek, Esq./Neal R. Marder, Esq.
Winston & Strawn LLP
333 S Grand Ave
Los Angeles, CA, 90071-1504

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service/Express Mail, Federal Express and other overnight mail services. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at East Palo Alto, California, in the ordinary course of such business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 27, 2008, at East Palo Alto, California.

Cathy Sandifer

1
Proof of Service

1  EVE TRIFFO (SBN 61819)
   GREENBERG TRAURIG, LLP
2  2450 Colorado Avenue, Suite 400E
   Santa Monica, CA 90404
3  Telephone: (310) 586-7700
   Facsimile: (310) 586-7800
4
5  WILLIAM J. GOINES (SBN 61290)
   DAVID PEREZ  (SBN 238136)
6  GREENBERG TRAURIG, LLP
   1900 University Avenue, 5th Floor
7  East Palo Alto, CA 94303
   Telephone: (650) 328-8500
8  Facsimile: (650) 328-8508

9  Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc.;
   Kaiser Foundation Hospitals; The Permanente Medical Group,
10 Inc.; Southern California Permanente Medical Group; Kaiser
   Foundation Health Plan of the Mid-Atlantic States, Inc.; and
11 Kaiser Foundation Health Plan of Colorado

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                    FOR THE COUNTY OF ALAMEDA

15

16 | KAISER FOUNDATION HEALTH PLAN, | Case No.: RG08391487
   | INC., KAISER FOUNDATION |
17 | HOSPITALS, THE PERMANENTE | **DECLARATION OF C. ALLEN FOSTER**
   | MEDICAL GROUP, INC., SOUTHERN | **IN SUPPORT OF APPLICATION FOR**
18 | CALIFORNIA PERMANENTE MEDICAL | **APPROVAL OF C. ALLEN FOSTER TO**
   | GROUP, KAISER FOUNDATION | **APPEAR *PRO HAC VICE***
19 | HEALTH PLAN OF THE MID-ATLANTIC |
   | STATES, INC., and KAISER | [Proposed Order Filed Concurrently]
20 | FOUNDATION HEALTH PLAN OF |
   | COLORADO | Date:  July 21, 2008
21 | | Time:  9:00 a.m.
   |                     Plaintiffs, | Dept.: 16
22 | | Judge: Hon. Lawrence John Appel
   | v. | Reservation No.: R842402
23 | |
   | | Date Action Filed:  June 6, 2008
24 | MEDQUIST, INC. AND MEDQUIST |
   | TRANSCRIPTIONS, LTD. |
25 | |
   |                     Defendants. |
26

27

28

                                    1

1    I, C. Allen Foster, declare:

2    1.    I make this declaration in support of my application to appear as counsel *pro hac vice*

3    in the above-referenced matter on behalf of Plaintiffs Kaiser Foundation Health Plan, Inc.; Kaiser

4    Foundation Hospitals; The Permanente Medical Group, Inc.; Southern California Permanente

5    Medical Group; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; and Kaiser

6    Foundation Health Plan of Colorado. I have knowledge of the matters stated herein and would

7    competently testify thereto if called to do so.

8    2.    My residence address is 4827 Foxhall Crescent, N.W., Washington, D.C. 20007. My

9    business address is Greenberg Traurig, LLP, 2101 L Street, N.W. Suite 1000, Washington DC 20037.

10   I am neither a resident of nor employed in the State of California, and am not regularly engaged in

11   substantial business, professional or other activities in the State of California.

12   3.    I was admitted in 1987 to the practice of law in the state courts of the District of

13   Columbia. I was admitted in 1967 to the practice of law in the state courts of North Carolina. I was

14   admitted in 1971 to the practice of law in the Supreme Court of the United States. I was admitted in

15   1992 to the practice of law in the United States District Court for the District of Columbia. I was

16   admitted in 1967 to the practice of law in the United States District Court for the Middle District of

17   North Carolina. I was admitted in 1968 to the practice of law in the United States District Court for

18   the Western District of North Carolina. I was admitted in 1968 to the practice of law in the United

19   States District Court for the Eastern District of North Carolina. I was admitted in 1992 to the practice

20   of law in the United States District Court for the Northern District of Texas. I was admitted in 1991

21   to the practice of law in the United States District Court for the Southern District of Texas.

22   4.    I am a current member in good standing in all of the above courts.

23   5.    I am not currently suspended or disbarred in any court.

24   6.    In the past two years I have not applied for admission *pro hac vice* to any Court in the

25   State of California.

26   7.    The names, addresses, telephone numbers and active bar numbers of the California

27   attorneys appearing as attorneys of record in this action are:

28

1        a.     Eve Triffo (SBN 61819)
Greenberg Traurig, LLP

2               2450 Colorado Avenue, Suite 400E
Santa Monica CA 90404

3               (310) 586-7700

4    and

5        b.     William J. Goines (SBN 61290)
David Perez (SBN 238136)

6               Greenberg Traurig, LLP
1900 University Avenue, 5th Floor

7               East Palo Alto, CA 94303
(650) 328-8500.

8

     I declare under penalty of perjury under the laws of the State of California that the foregoing

9

is true and correct. Executed this 24th day of June, 2008.

10

11

                                 C. Allen Foster

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF C. ALLEN FOSTER IN SUPPORT OF APPLICATION FOR APPEARANCE PRO HAC VICE

Kaiser Foundation Health Plan, Inc., et al.v. MedQuist, Inc., et al.    Case No. RG08391487

## PROOF OF SERVICE

I, Cathy Sandifer, declare that I am a citizen of the United States, over the age of eighteen years and not a party to the within action. I am an employee of GREENBERG TRAURIG, LLP, and my business address is 1900 University Avenue, Fifth Floor, East Palo Alto, CA 94303. On June 27, 2008, I served the following documents:

**DECLARATION OF C. ALLEN FOSTER IN SUPPORT OF APPLICATION FOR APPROVAL OF C. ALLEN FOSTER TO APPEAR *PRO HAC VICE***

☒ by transmitting via **FACSIMILE** the document(s) listed above to the fax numbers) set forth below, or as stated on the attached service list, on this date at approximately _____, from the sending facsimile machine telephone number of 650-289-7893. The transmission was reported as complete and without error by the machine. Pursuant to California Rules of Court, Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration. The transmission report was properly issued by the transmitting facsimile machine.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the **UNITED STATES MAIL** at East Palo Alto, California, addressed as set forth below.

☐ by **OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight mail envelope with postage thereon fully prepaid, addressed as set forth below.

☐ **(BY MESSENGER PERSONAL SERVICE).** I caused delivery of such envelope by hand via courier service to the offices of the addressee.

**Courtesy Copy** to Counsel for Defendants (who have not yet appeared in this action):

Stephen R. Smerek,Esq./Neal R. Marder, Esq.
Winston & Strawn LLP
333 S Grand Ave
Los Angeles, CA, 90071-1504

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service/Express Mail, Federal Express and other overnight mail services. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at East Palo Alto, California, in the ordinary course of such business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 27, 2008, at East Palo Alto, California.

Cathy Sandifer

SV 346,005,185v1 8-13-07

1

PROOF OF SERVICE

2

STATE OF CALIFORNIA    )

3                                              )     ss
COUNTY OF LOS          )
ANGELES

4

5       I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Winston & Strawn, 333 South Grand Avenue, 38th Floor, Los Angeles, CA 90071-1543. On **July 3, 2008**, I caused to be served the within document(s):

6

7

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b) (DIVERSITY)**

8

9       ☐   I sent such document(s) by electronic mail on **July 3, 2008**, to the addresses set forth below.

10      ☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, addressed as set forth below.

11      ☐   On **July 3, 2008**, I sent such document(s) from facsimile machine 213-615-1750. I certify that said transmission was completed and that all pages were received and that a report was generated by facsimile machine 213-615-1750 which confirms said transmission and receipt.

12

13      ☐   by causing the document(s) listed above to be delivered via overnight delivery (United Parcel Service (UPS) to the person(s) at the address(es) set forth below or via overnight delivery (Federal Express) to the person(s) at the address(es) set forth below.

14

15      ☐   by causing to be personally delivered the document(s) listed above to the person(s) at the address(es) set forth below.

16

17

SEE ATTACHED SERVICE LIST

18      I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

19

20

21

22      I declare that I am employed in the office of a member of the bar of this court whose direction the service was made.

23      Executed on **July 3, 2008**, at Los Angeles, California.

24

25

26                                        Deborah A. Jones

27

28

2

LA:217169.1A

1

<u>SERVICE LIST</u>

2  Mark L. Hogge, Esq. (to be admitted Pro Hac Vice)
   Eve Triffo, Esq.
3  Ronald W. Kleinman (to be admitted Pro Hac Vice)
   C. Allen Foster (to be admitted Pro Hac Vice)
4  **GREENBERG TRAURIG, LLP**
   2101 L Street, N.W., Suite 1000
5  Washington, DC  20036
   Phone:  (202) 331-3100
6  Fax:  (202) 331-3101

7

   David Perez, Esq.
8  **GREENBERG TRAURIG, LLP**
   1900 University Avenue, 5th Floor
9  East Palo Alto, CA  94303
   Phone:  (650) 328-8500
10 Fax:  (650) 328-8508

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6